BRETT A. SHUMATE
Assistant Attorney General, Civil Division
YAAKOV M. ROTH
Principal Deputy Assistant Attorney General, Civil Division
ERIC J. HAMILTON
Deputy Assistant Attorney General, Civil Division
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
BILAL A. ESSAYLI
First Assistant U.S. Attorney, Central District of California
ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Director
ELISABETH J. NEYLAN
CRISTEN C. HANDLEY
Trial Attorneys
Civil Division, Federal Programs Branch
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br> v. <br><br> STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his Official Capacity; ROBERT BONTA, Attorney General of California, in his Official Capacity, <br><br> Defendants. | No. 2:25-cv-10999 <br><br> **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** <br><br> [Proposed] Hearing Information: Monday, December 22, 2025 at 10:00 a.m. <br><br> Honorable Christina A. Snyder <br> United States District Judge |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND .................................................................................................2

I.    Governing Principles of Federal Law Enforcement ...........................2

II.   The Challenged State Laws .................................................................4

      A.    The No Secret Police Act ..........................................................4

      B.    The No Vigilantes Act ..............................................................6

III.  Increased Violence and Doxxing of Federal Officers ........................7

LEGAL STANDARDS .......................................................................................8

ARGUMENT .......................................................................................................9

I.    The United States Has Pre-Enforcement Standing ............................9

II.   The United States is Likely to Succeed on the Merits of its Claims ...................11

      A.    The Challenged Provisions Unlawfully Regulate the United States ..........12

      B.    The No Secret Police Act Also Unlawfully Discriminates Against the United States ................................................15

      C.    The Tenth Amendment Does Not Justify the Challenged Laws ..............17

III.  The United States Faces Irreparable Harm Absent Preliminary Relief ..............17

IV.  The Balance of Equities and the Public Interest Weigh in the United States' Favor ................................................19

CONCLUSION .................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009)............................................................. 19

*United States v. City of Arcata,*
629 F.3d 986 (9th Cir. 2010)........................................... 12, 13, 16, 17

*Arizona v. California,*
283 U.S. 423 (1931) .......................................................................... 12

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................................3

*Arizona v. Yellen,*
34 F.4th 841 (9th Cir. 2022) ...............................................................9

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ............................................................................9

*Boeing Co. v. Movassaghi,*
768 F.3d 832 (9th Cir. 2014)............................................................. 12

*Cal. Pharmacists Ass'n v. Maxwell–Jolly,*
563 F.3d 847 (9th Cir. 2009)............................................................. 20

*CoreCivic, Inc. v. Governor of N.J.,*
145 F.4th 315 (3d Cir. 2025)....................................................... 12, 13

*CTIA – The Wireless Ass'n v. City of Berkeley, Cal.,*
928 F.3d 832 (9th Cir. 2019)...............................................................8

*Dawson v. Steager,*
586 U.S. 171 (2019) .................................................................... 15, 16

*Douglas v. Indep. Living Ctr. of S. Cal.,*
565 U.S. 606 (2012) .......................................................................... 20

*Geo Grp., Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) ................................................................ 12, 13

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988) ................................................................................. 11

*Hancock v. Train*,
   426 U.S. 167 (1976) ................................................................................. 12

*In re Neagle*,
   135 U.S. 1 (1890) ..................................................................................... 14

*Jensen v. Lane Cnty.*,
   222 F.3d 570 (9th Cir. 2000) .................................................................. 10

*Johnson v. Maryland*,
   254 U.S. 51 (1920) ................................................................................... 13

*Leslie Miller, Inc. v. State of Arkansas*,
   352 U.S. 187 (1956) ................................................................................. 13

*Mayo v. United States*,
   319 U.S. 441 (1943) ................................................................................. 11

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ........................................................... 11, 15

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018) ................................................................................. 17

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,
   491 U.S. 350 (1989) ................................................................................. 18

*New York v. Tanella*,
   374 F.3d 141 (2d Cir. 2004) .................................................................... 18

*New York v. United States*,
   505 U.S. 144 (1992) ................................................................................. 17

*North Dakota v. United States,*
    495 U.S. 423 (1990) .......................................................................... 11, 15

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.,*
    361 U.S. 376 (1960) .................................................................................... 16

*Pub. Utils. Comm'n of State of Cal. v. United States,*
    355 U.S. 534 (1958) .................................................................................... 14

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) ................................................................... 20

*Rowe v. N.H. Motor Transp. Ass'n,*
    552 U.S. 364 (2008) .................................................................................... 19

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ...................................................................................... 2

*Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ................................................................ 8, 18

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ...................................................................................... 9

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ...................................................................................... 9

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................. 9, 10

*Tennessee v. Davis,*
    100 U.S. 257 (1879) ................................................................................. 2, 14

*Thomas v. Anchorage Equal Rts. Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ..................................................................... 9

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ................................................................... 10

iv

*United States v. Alabama*,

   691 F.3d 1269 (11th Cir. 2012) .................................................................. 19

*United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011),

   *aff'd in part, rev'd in part and remanded*, 567 U.S. 287 (2012) ............................ 18

*United States v. California*,

   921 F.3d 865 (9th Cir. 2019) .................................................... 12, 14, 16

*United States v. California*,

   2018 WL 5780003 (E.D. Cal. Nov. 1, 2018) ............................................ 16

*United States v. Fresno Cnty.*,

   429 U.S. 452 (1977) .................................................................... 15

*United States v. King Cnty.*,

   122 F.4th 740 (9th Cir. 2024) .............................................. 13, 16

*United States v. Washington*,

   596 U.S. 832 (2022) .............................................................. 15, 16

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,

   529 U.S. 765 (2000) ................................................................ 9, 10

*Washington v. United States*,

   460 U.S. 536 (1983) .................................................................... 15

*Winter v. Nat. Res. Def. Council*,

   555 U.S. 7 (2008) ........................................................................ 8

**STATUTES**

5 U.S.C. § 301 .............................................................................. 3

5 U.S.C. § 5901 ............................................................................ 3

8 U.S.C. § 1103(a)(2) ...................................................................... 3

8 U.S.C. § 1182 ............................................................................ 3

8 U.S.C. §§ 1225–29a ...................................................................... 3

8 U.S.C. § 1231 ............................................................................ 3

21 U.S.C. § 801.................................................................................................3

28 U.S.C. § 509.................................................................................................3

29 U.S.C. § 668.................................................................................................3

Cal. Penal Code § 19.................................................................................5, 6, 7

Cal. Penal Code § 830....................................................................................4, 5

**REGULATIONS**

28 C.F.R. § 0.100–0.101...................................................................................3

**ADMINISTRATIVE MATERIALS**

No Secret Police Act,

    Senate Bill No. 627, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025).....................*passim*

No Vigilantes Act,

    Senate Bill No. 805, 2025 Gen. Assemb., Reg. Sess. (Ca. 2025).....................*passim*

**OTHER AUTHORITIES**

Ayesha Rascoe, *Gov. Gavin Newsom signs bill banning law enforcement*

    *and ICE from wearing masks*, NPR (Sep. 21, 20215 8:47 ET),

    https://perma.cc/7F4U-XVDQ ...........................................................10

DEA Mission Statement, DEA,

    https://perma.cc/99W4-98GL.............................................................3

FBI, About, Mission and Priorities,

    https://www.fbi.gov/about/mission ....................................................3

Heather Knight & Kellen Browning, Pelosi Says Police May Arrest Federal Agents

    Who Violate California Law, N.Y. Times, Oct. 22, 2025,

    https://perma.cc/3VF8-6DHH ...........................................................11

Homeland Security (@DHSgov), X (Nov. 8, 2025, 14:27 ET),

    https://perma.cc/J35L-MJE3 .............................................................8

Lindsey Holden, *California lawmakers pass bill to ban ICE agents from wearing masks*, Politico (Sep. 11, 2025, 21:15 ET), https://perma.cc/EAL3-ETZR ............................................................ 1

Press Release, DHS, 8000% Increase in Death Threats Against DHS, ICE Law Enforcement as They Risk Their Lives to Remove the Worst of the Worst (Oct. 30, 2025), https://perma.cc/VXK9-MSBQ .......................................................... 7

Press Release, DHS, Despite 1000% Increase in Assaults on ICE Officers, Governor Newsom Signs Unconstitutional Law to Ban Law Enforcement Officer Protections (Sep. 22, 2025), https://perma.cc/K3P9-K4H9 ........................................................... 7

Press Release, DHS, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (Sep. 24, 2025), https://perma.cc/BS2F-QJUE ........................................................... 7

Scott Wiener, California State Senator, Press Release, Governor Newsom Signs Senator Wiener's Ban On Extreme Masking By ICE & Other Law Enforcement (Sep. 20, 2025), https://perma.cc/GLG4-JMVQ ....................................................... 11

# INTRODUCTION

The Constitution establishes a system of dual sovereignty. Under that system, while States may govern legitimate areas of local concern, they may not do so in a manner that regulates or discriminates against the Federal Government. Yet the State of California, through its No Secret Police Act and No Vigilantes Act, seeks to do both. The No Secret Police Act prohibits federal law enforcement agents—but not California State agents—from wearing facial coverings in the performance of their official duties. And the No Vigilantes Act requires federal law enforcement agents who are not uniformed to publicly display identification that includes their agency and their name or badge number, or both, when enforcing federal law. The Acts also require federal law enforcement agencies to adopt written policies on the use of facial coverings and identification. Absent judicial intervention, these laws will take effect on January 1, 2026, and subject federal law enforcement agents to the threat of state criminal prosecution.

The State of California has no authority to regulate or discriminate against federal officers in this way. Just as the State could not forbid federal agents from carrying guns or force them to wear purple vests, it cannot forbid them from wearing masks or force them to wear special identification. Governor Newsom himself questioned the constitutionality of a state-law mask ban and conceded that "[i]t appears we don't have the legal authority for federal agents[.]"[1] Thumbing his nose at the Constitution, he signed the ban anyway.

The United States therefore moves this Court for a preliminary injunction prohibiting the State of California and its officials from enforcing the No Secret Police Act and No Vigilantes Act against the Federal Government. On the merits, both the No Secret Police Act and the No Vigilantes Act violate the Supremacy Clause by seeking to regulate the uniforms of federal officers and the policies of federal agencies. And the No Secret Police Act also discriminates against the Federal Government by imposing its requirements on federal law enforcement officers but not California State officers.

---

[1] Lindsey Holden, *California lawmakers pass bill to ban ICE agents from wearing masks*, Politico (Sep. 11, 2025, 21:15 ET), https://perma.cc/EAL3-ETZR.

These constitutional violations alone establish irreparable injury, but the harm here is even greater. If forced to comply with these laws, federal agents will face increased incidents of doxxing and harassment, and law enforcement operations will be compromised. Meanwhile, if agents refuse to comply, they risk criminal prosecution and a dangerous conflict between state and federal law-enforcement agents. Finally, the balance of equities and the public interest favor an injunction: Whereas California has no legitimate interest in its unconstitutional laws, there is significant public interest in protecting federal officers' safety, removing unlawful impediments to federal law enforcement operations, and avoiding conflict between state and federal agents. The United States is therefore entitled to a preliminary injunction and requests a ruling on this motion before these laws take effect on January 1, 2026.

## BACKGROUND

### I.    Governing Principles of Federal Law Enforcement

The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Because "no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020). In executing the laws, the Federal Government "can act only through [those] officers and agents," who must in turn "act within the States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement activities necessarily take place within the several States, including in California.

For example, the Department of Homeland Security ("DHS"), and two of its components—Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP")—are responsible for enforcing the nation's immigration laws. Those laws are primarily contained in the Immigration and Nationality Act ("INA"), and,

pursuant to Congress's power to "establish a uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *see Arizona v. United States*, 567 U.S. 387, 395 (2012). The INA gives the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231.

As further examples, the Drug Enforcement Administration ("DEA") enforces the nation's controlled substances laws. *See generally* 21 U.S.C. § 801, *et seq*. In carrying out that mission, the DEA investigates and aids in the prosecution of violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100–0.101.[2] And the Federal Bureau of Investigation ("FBI") is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. *See id.* § 0.85.[3] It conducts extensive operations throughout the country and in partnership with federal, state, and local officials.

To achieve the goals outlined above, the heads of each agency have the power to govern the agency's affairs and direct their agents' activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the DHS Secretary to "control, direct[], and supervis[e]" all DHS employees).[4]

---

[2] *See also* DEA Mission Statement, DEA, https://perma.cc/99W4-98GL.
[3] *See also* FBI, About, Mission and Priorities, https://www.fbi.gov/about/mission (last visited Nov. 21, 2025).
[4] *See also* 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of certain safety equipment).

## II. The Challenged State Laws

On a single day, Governor Newsom signed into law two bills that purport to regulate "federal law enforcement agenc[ies]" operating in California. *See* No Secret Police Act (Senate Bill No. 627) §§ 2(d)(2)(C), 3(e); No Vigilantes Act (Senate Bill No. 805) §§ 2(c)(2)(C), 10(d)(2). The Acts prohibit officers of those agencies from wearing facial coverings in the performance of their duties, *see* No Secret Police Act § 3, require officers who are not in uniform to publicly display identification, *see* No Vigilantes Act § 10, and direct the agencies to adopt written policies on the use of facial coverings and identification, *see* No Secret Police Act § 2; No Vigilantes Act § 2.

### A. The No Secret Police Act

The No Secret Police Act, which takes effect on January 1, 2026, bans law enforcement officers from "wear[ing] a facial covering that conceals or obscures their facial identity in the performance of their duties" in California. No Secret Police Act § 3. The Act also requires law enforcement agencies operating in California to maintain and publicly post a written policy on the use of facial coverings by July 1, 2026. *Id.* § 2.

The law defines "facial covering" to mean "any opaque mask, garment, helmet, headgear, or other item that conceals or obscures the facial identity of an individual" but does not include translucent face shields, medical or gas masks, devices for underwater use, motorcycle helmets, or certain protective eyewear. *Id.* § 3.

The policy requirement applies to any "law enforcement agency," defined as any entity of a city, county, or other local agency that employs a peace officer[5]; any law enforcement agency of another state; and any federal law enforcement agency. *Id.* § 2(d)(2). That definition does *not* include any California State agency.

The policy must include a purpose statement affirming the agency's commitment to (a) transparency, accountability, and public trust; (b) restricting the use of facial coverings to specific, limited circumstances; and (c) the principle that generalized and

---

[5] Under California law, peace officers are public servants who enforce the law and have arrest authority. *See* Cal. Penal Code § 830, *et seq.*

4

undifferentiated fear about officer safety shall not be sufficient to justify the use of facial coverings. *Id.* The policy must also include "[a] requirement that all sworn personnel not use a facial covering when performing their duties" subject to "narrowly tailored exemptions" for active undercover operations; tactical operations where protective gear is required for physical safety; applicable law governing occupational health and safety; protection of identity during prosecution; and applicable law governing reasonable accommodations. *Id.* § 2(b)(2)–(3). The Act does not define "active undercover operations," "tactical operations," or any of these other excepted terms. *See id.* § 2(d).

The mask ban applies to any "law enforcement officer," meaning "a peace officer . . . employed by a city, county, or other local agency" and "any officer or agent of a federal law enforcement agency or any law enforcement agency of another state," including any person acting on behalf of a federal or out-of-state law enforcement agency. *Id.* § 3. Again, that definition excludes California State officers. *See id.*

The mask ban's "narrowly tailored exemptions" incorporate the exemptions identified above and add another exemption for active Special Weapons and Tactics ("SWAT") team duties, which the Act does not define. No Secret Police Act § 3(c).

Willful and knowing violations of the mask ban are "punishable as an infraction or a misdemeanor." *Id.* § 3. Under California law, misdemeanors are punishable by up to six months' imprisonment in county jail, a $1,000 fine, or both. Cal. Penal Code § 19. Those criminal penalties do not apply to law enforcement officers whose agency issues a compliant written policy. No Secret Police Act § 3. Even so, any law enforcement officer who commits certain acts while wearing a facial covering in violation of the Act "shall not be entitled to assert any privilege or immunity for their tortious conduct against a claim of civil liability, and shall be liable to that individual for the greater of actual damages or statutory damages of not less than ten thousand dollars ($10,000), whichever is greater." *Id.*

### B.    The No Vigilantes Act

The No Vigilantes Act likewise takes effect in relevant part on January 1, 2026. No Vigilantes Act §§ 2(a), 10(f). It requires non-uniformed law enforcement officers operating in California to conspicuously display identification—which must include the officer's agency and either a name or badge number, or both—when performing their enforcement duties. *Id.* § 10. The Act also requires law enforcement agencies operating in the State to maintain and publicly post a written policy on identification of "sworn personnel" by January 1, 2026. *Id.* § 2(a).

The policy requirement applies to any California State or local law enforcement agency that employs a peace officer; any law enforcement agency of another state; and any federal law enforcement agency. *Id.* § 2(c)(2). The policy must include a purpose statement affirming the agency's commitment to transparency, accountability, and public trust, *see id.* § 2(a)(1), and "[a] list of narrowly tailored exemptions" that includes undercover officers; officers engaged in plainclothes operations working with specified state agencies or their federal equivalents; officers wearing personal protective equipment ("PPE") that prevents display; and exigent circumstances, *id.* § 2(a)(3)(A)–(D). As with the No Secret Police Act, these terms are not defined. *See id.* § 2(c). An exemption is also permitted when there is a specific, articulable, and particularized reason to believe identification would pose a significant danger to the physical safety of the officer. *Id.* § 2(a)(3)(E).

The identification requirement applies to peace officers and "any federal law enforcement officer" engaged in "[e]nforcement duties," meaning "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes." *Id.* § 10(d)(2). The identification requirement contains exceptions incorporating most of the exceptions to the policy requirement and adding exceptions for (undefined) active SWAT or tactical team activities and for operations involving certain public officials. No Vigilantes Act § 10(b)(1)–(6).

Willful and knowing violations of the identification requirement are punishable as a misdemeanor under California law, unless the employing agency has issued a written policy in accordance with the Act. *Id.* § 10(d)–(e).

## III. Increased Violence and Doxxing of Federal Officers

Federal officers are navigating an intensely hostile environment that jeopardizes their safety and that of their families. ICE officers in particular have faced an 8000% increase in death threats[6] and a 1000% increase in assaults against them.[7] Incidents range from harassment, online doxxing, and stalking, to "vehicles being used as weapons towards" officers[8] and even bounties being "placed on their heads for their murders."[9] *See* Declaration of Sergio Albarran ¶ 24 ("Albarran Decl."); Declaration of Michael R. Vargas ¶ 12 ("Vargas Decl.").

During enforcement actions, ICE personnel regularly encounter "individuals shouting phrases such as 'doxx these people,' 'find out who they are and where they live,' and 'we will find out who you are and who your family members are.'" Albarran Decl. ¶ 24; *see also* Vargas Decl. ¶¶ 9–16 (explaining similar harassment of CBP agents). Public websites seek and publish personal information about ICE and other federal officers to harass and threaten them and their families. *See* Albarran Decl. ¶¶ 23, 28; Vargas Decl. ¶ 11. And on several occasions, individuals have followed ICE officers and threatened them and their families at their homes. *See* Albarran Decl. ¶¶ 25(c), 26. Activists have even fired shots at ICE agents in Dallas[10] and CBP agents in Chicago.[11] DEA and FBI

---

[6] Press Release, DHS, 8000% Increase in Death Threats Against DHS, ICE Law Enforcement as They Risk Their Lives to Remove the Worst of the Worst (Oct. 30, 2025), https://perma.cc/VXK9-MSBQ [hereinafter Press Release, 8000% Increase in Death Threats].

[7] Press Release, DHS, Despite 1000% Increase in Assaults on ICE Officers, Governor Newsom Signs Unconstitutional Law to Ban Law Enforcement Officer Protections (Sep. 22, 2025), https://perma.cc/K3P9-K4H9 [hereinafter Press Release, 1,000% Increase in Assaults].

[8] *See* Press Release, 1,000% Increase in Assaults, *supra* note 7.

[9] *See* Press Release, 8000% Increase in Death Threats, *supra* note 6.

[10] *See* Press Release, DHS, DHS Issues Statement on Targeted Attack on Dallas ICE Facility (Sep. 24, 2025), https://perma.cc/BS2F-QJUE.

[11] Homeland Security (@DHSgov), X (Nov. 8, 2025, 14:27 ET), https://perma.cc/J35L-MJE3.

officers also face threats of doxxing and harassment. *See* Declaration of Matthew W. Allen ¶¶ 15–16 ("Allen Decl.") (explaining that individuals may take photos and videos of DEA agents during operations to harass and intimidate them); Declaration of Michael H. Glasheen ¶ 11 ("Glasheen Decl.") ("FBI Special Agents around the country have been targeted for harm, including harassment, assault, and murder.").

Given the personal threats and violence that officers face, federal law enforcement agencies allow their officers to choose whether to wear masks to protect their identities. *See* Vargas Decl. ¶¶ 8, 18; Albarran Decl. ¶¶ 30–31; Glasheen Decl. ¶ 14. This allows officers to focus on enforcing federal law rather than worrying about whether their personal information will be leaked and their families targeted. Aside from safety concerns, the success of federal law enforcement actions often depends on officers' anonymity. *See* Albarran Decl. ¶¶ 32–36; Vargas Decl. ¶ 21; Glasheen Decl. ¶ 13; Allen Decl. ¶¶ 14, 17. Denying federal agencies and officers the choice as to whether to wear masks or identification, and subjecting them to criminal liability for noncompliance, will therefore significantly impede federal operations. *See* Albarran Decl. ¶¶ 10, 19, 32–38; Vargas Decl. ¶¶ 7, 19–24; Glasheen Decl. ¶¶ 14–15; Allen Decl. ¶¶ 11, 17–19.

## LEGAL STANDARDS

To obtain a preliminary injunction, the moving party must establish that it is "likely to succeed on the merits," that it is "likely to suffer irreparable harm in the absence of preliminary relief," that "the balance of equities tips in [its] favor," and that "an injunction is in the public interest." *CTIA – The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 841 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). In general, where the United States has demonstrated a likelihood of success on the merits of a Supremacy Clause claim, the other factors also favor a preliminary injunction. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

**ARGUMENT**

## I.    The United States Has Pre-Enforcement Standing

The United States has standing to bring this suit to enjoin California's laws before they take effect on January 1, 2026. Article III requires a plaintiff to demonstrate a concrete injury that is fairly traceable to the conduct of the defendant and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy this requirement based on the threatened enforcement of a law, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Rather, that requirement is satisfied where the plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (considering whether plaintiffs have articulated a "concrete plan" to violate the law, whether the prosecuting authorities have communicated a specific threat to initiate proceedings, and the history of past enforcement).

The United States easily satisfies these requirements. First, the United States asserts "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [state] statute[.]" *Driehaus*, 573 U.S. at 159 (citation omitted). The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to California (or any State) by complying with California's purported requirements for federal law enforcement officers. Indeed, the very fact that a state is attempting to regulate the conduct of the Federal Government inflicts a "sovereign injury" on the United States. *Cf. Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,

529 U.S. 765, 771 (2000). So too does discriminating against the Federal Government.

Beyond that sovereign injury, these laws will also likely deter officers from taking safety measures necessary to protect their well-being, identities, and families, which can chill federal law enforcement operations and reduce the number of officers willing to engage in certain operations. *See, e.g.*, Albarran Decl. ¶ 37; Vargas Decl. ¶¶ 20, 24. These laws thus threaten the strong federal interest in "serv[ing] the public good by zealous enforcement of the law and the avoidance of deterring talented candidates from entering government employment for fear of liability." *Jensen v. Lane Cnty.*, 222 F.3d 570, 576 (9th Cir. 2000).

To be clear, the United States will not direct its law enforcement agencies to adopt the policies that California demands or require its officers to comply with these provisions of California law. *See* Albarran Decl. ¶ 9; Vargas Decl. ¶¶ 7, 23; Allen Decl. ¶ 13; Glasheen Decl. ¶ 15. But in consequence, federal officers are threatened with state criminal prosecution. That poses a serious and concrete injury that the Federal Government is empowered to address through this pre-enforcement challenge.

Second, the threat of future enforcement is substantial. *See Driehaus*, 573 U.S. at 164. Although the challenged laws have no history of past enforcement because they are newly enacted, that is inconsequential. *See Tingley v. Ferguson*, 47 F.4th 1055, 1069 (9th Cir. 2022) (history of past enforcement carries "'little weight' when the challenged law is 'relatively new' and the record contains little information as to enforcement"); *see also Driehaus*, 573 U.S. at 158 (being "subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law"). As is evident from California officials' public statements, California intends to enforce these laws against the Federal Government. Governor Newsom himself declared: "I'll be signing the bill, first in the nation, saying enough. To ICE: unmask. What are you afraid of?"[12] California Senator Scott Wiener, the sponsor of the No Secret Police Act, "applaud[ed]

---

[12] Ayesha Rascoe, *Gov. Gavin Newsom signs bill banning law enforcement and ICE from wearing masks*, NPR (Sep. 21, 20215 8:47 ET), https://perma.cc/7F4U-XVDQ.

Governor Newsom for . . . combatting President Trump's assault on California,"[13] boasting that "California is meeting the Trump Administration's secret police tactics with strength and defiance."[14] And San Francisco District Attorney Brooke Jenkins has publicly supported arresting and prosecuting federal officers for alleged violations of California law.[15] Doing so would subject federal officers to potential jail time and substantial fines. Indeed, targeting federal officers is the whole point.

In short, these California laws impose concrete harms on the Federal Government and its interests, by threatening federal agents with prosecution and, in turn, chilling their protected conduct and endangering their safety and the integrity of federal operations. *See, e.g.*, Albarran Decl. ¶¶ 19–38; Vargas Decl. ¶¶ 7–24; Glasheen Decl. ¶¶ 9–15; Allen Decl. ¶¶ 11–19. The United States thus has standing to challenge these laws, and need not wait for the chaos that would occur if the State of California attempted to arrest a federal officer.

## II.    The United States is Likely to Succeed on the Merits of its Claims

The United States is likely to succeed in showing that the No Secret Police Act and No Vigilantes Act violate the Supremacy Clause. Under that Clause, States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). The intergovernmental immunity doctrine is an outgrowth of this principle. A state law violates intergovernmental immunity if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals," *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.), "unless Congress provides 'clear and unambiguous' authorization for such regulation," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 175 (1988) (citation omitted). The Acts challenged here do

---

[13] Scott Wiener, California State Senator, Press Release, Governor Newsom Signs Senator Wiener's Ban On Extreme Masking By ICE & Other Law Enforcement (Sep. 20, 2025), https://perma.cc/GLG4-JMVQ.

[14] *Id.*

[15] Heather Knight & Kellen Browning, Pelosi Says Police May Arrest Federal Agents Who Violate California Law, N.Y. Times, Oct. 22, 2025, https://perma.cc/3VF8-6DHH.

both, and Congress has provided no authorization—let alone clear and unambiguous authorization—for California's actions.

## A.    The Challenged Provisions Unlawfully Regulate the United States

The No Secret Police Act and No Vigilantes Act regulate the United States in violation of intergovernmental immunity principles. A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal government." *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)). As the Supreme Court put it nearly a century ago: "The United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931).

This well-settled principle has been consistently applied to invalidate California laws that "directly or indirectly affect[] the operation of a federal program or contract." *See United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019). In *United States v. City of Arcata*, for example, the Ninth Circuit invalidated local ordinances that purported to bar the Federal Government from recruiting minors into the military. 629 F.3d 986, 988 (9th Cir. 2010). The Ninth Circuit held that the ordinances were invalid because "[b]y constraining the conduct of federal agents and employees, the ordinances s[ought] to regulate the government directly." *Id.* at 991. Similarly, in *Boeing Co. v. Movassaghi*, California attempted to impose more stringent environmental standards on a federal contractor than those imposed by the U.S. Department of Energy. 768 F.3d 832, 834–37 (9th Cir. 2014). The Ninth Circuit rejected the State's effort, holding that California violated intergovernmental immunity by "overrid[ing] federal decisions as to necessary decontamination measures" and "regulat[ing] . . . the effective terms of federal contract itself." *Id.* at 840. And most recently, in *Geo Grp., Inc. v. Newsom*, the en banc Ninth Circuit invalidated a California statute that phased out all private detention facilities in the State. 50 F.4th 745, 751 (9th Cir. 2022) (en banc). Because the statute would have prevented ICE's contractors from continuing to run detention facilities for federal

purposes, requiring ICE either to transform its approach to detention in California or abandon its California facilities, the statute directly regulated the Federal Government and was therefore unconstitutional. *Id.* [16]

The No Secret Police Act and No Vigilantes Act are even more patently illegal than the laws invalidated in those cases, because while most of those laws operated against government contractors, the Acts challenged here operate against federal agencies and employees *directly*. [17] By its express terms, the No Secret Police Act prohibits "any officer or agent of a federal law enforcement agency," *see* No Secret Police Act § 3(e), from "wear[ing] a facial covering that conceals or obscures their facial identity in the performance of their duties," *id.* § 3(a). The No Vigilantes Act similarly requires "any federal law enforcement officer," *see* No Vigilantes Act § 10(d)(2), who is not uniformed to "visibly display identification," *id.* § 10(a). And both Acts require "federal law enforcement agenc[ies]" to "maintain and publicly post" a specific "written policy." No Secret Police Act § 2; No Vigilantes Act § 2.

The Acts thus expressly "constrain[] the conduct of federal agents," thereby "regulat[ing] the government directly." *Arcata*, 629 F.3d at 991; *see also Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (States cannot "control the conduct of [individuals] . . . acting under and in pursuance of the laws of the United States"). These wolves come as wolves.

If the challenged provisions were enforced against the Federal Government, they would also directly regulate the Federal Government by substantially hampering federal operations. *See CoreCivic, Inc.*, 145 F.4th at 327 (finding that a state law "directly

---

[16] *See also United States v. King Cnty.*, 122 F.4th 740, 747 (9th Cir. 2024) (holding that a state ban on deportation flights impermissibly overrode the Federal Government's decision to use private contractors to run its flights); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189 (1956) (holding that a state law requiring building contractors to obtain a state license could not be enforced against a contractor hired on a federal construction project).

[17] *See Geo Grp., Inc.*, 50 F.4th at 755 ("The scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality.").

regulates the federal government by substantially interfering with a core federal function"); *California*, 921 F.3d at 880 (explaining that intergovernmental immunity is implicated when a state "burden[s] [the Federal Government] in some way"); *Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543 (1958) (holding that a state law that barred federal officials from hiring shipping contractors without state approval violated intergovernmental immunity where the law would have delayed shipments, thereby hampering military missions).

First, the Acts risk chilling federal activities by subjecting federal officers to criminal liability for noncompliance. But it is well settled that States cannot subject federal officers to state criminal liability for actions undertaken in accordance with federal law. *See Davis*, 100 U.S. at 262–63 ("If, when . . . acting . . . within the scope of their authority, [federal] officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State . . . the operations of the general government may at any time be arrested at the will of one of its members."); *In re Neagle*, 135 U.S. 1, 75 (1890) ("[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under . . . [state] law[.]").

Second, if federal officers were forced to comply with the challenged laws, they would be publicly exposed in the discharge of their duties. The exposure would facilitate escalating instances of harassment against those officers by agitators seeking to disrupt their operations. *See, e.g.*, Albarran Decl. ¶ 28 (stating that protesters regularly interfere with agents conducting field operations). The challenged laws would jeopardize federal law enforcement operations—particularly plainclothes operations, the whole point of which is to protect agents' identities for safety reasons and to mitigate the risk of evasion by investigative subjects. *See id.* ¶¶ 33–35; Vargas Decl. ¶ 21; Allen Decl. ¶ 17; *see also* Glasheen Decl. ¶ 13 (explaining that certain surveillance operations require FBI agents to

remain unidentified). Further, the challenged provisions would enable suspects to identify officers who may be involved in future enforcement actions, including undercover operations. *See, e.g.*, Albarran Decl. ¶ 36; Allen Decl. ¶ 17. Because suspects who recognize officers may try to evade apprehension and obstruct enforcement efforts, masking is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. *See, e.g.*, Albarran Decl. ¶ 36.

For these reasons, the challenged provisions threaten to "destroy the federal function" of law enforcement in the State of California. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11, 464 (1977). Because the Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362, California cannot unilaterally apply its policy preferences to the Federal Government. A "concurrent power in the [S]tates" to regulate federal operations "would bring back all the evils and embarrassments, which the uniform rule of the [C]onstitution was designed to remedy." 2 J. Story, Commentaries on the Constitution § 1099 (3d ed. 1858).

## B. The No Secret Police Act Also Unlawfully Discriminates Against the United States

The No Secret Police Act independently violates intergovernmental immunity principles by discriminating against the Federal Government. A state law is discriminatory if it "singl[es] out the Federal Government for unfavorable treatment," *United States v. Washington*, 596 U.S. 832, 839 (2022), or imposes a discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 175 (2019). The antidiscrimination rule prevents a state from "treat[ing] someone else better than it treats" the Federal Government. *See Washington v. United States*, 460 U.S. 536, 544–45 (1983); *North Dakota*, 495 U.S. at 434–36 (plurality op.).

The No Secret Police Act violates these principles because it applies to federal law

enforcement agencies and officers, but not California State agencies or officers. *See* No Secret Police Act §§ 2(d), 3(e) (defining law enforcement agency and officer to exclude California State law enforcement agencies and officers). Specifically, the Act prohibits federal law enforcement officers from wearing facial coverings, exposes those officers to criminal liability for violating that prohibition, and requires federal law enforcement agencies to adopt specified policies—but imposes none of those mandates on California State officers or agencies. Moreover, these discriminatory provisions are not "innocuous enactment[s]," *see California*, 921 F.3d at 881, as they negatively impact federal activities by putting federal agents at risk and jeopardizing federal law enforcement operations. *See* Argument § II.A., *supra*.

In treating its own state entities better than the Federal Government, California has unlawfully discriminated against the United States. Preventing this sort of "discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841. *See Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 381–82 (1960) (holding that a State discriminated against the Federal Government by taxing lessees of federal property while exempting lessees of state property); *Arcata*, 629 F.3d at 991 (finding discrimination where ordinances prevented only federal employees from encouraging minors to join the military).

Nor could California justify its discrimination by alleging purported differences between state and federal law enforcement entities. Such entities are similarly situated for purposes of intergovernmental immunity because they "perform[] comparable duties." *See Dawson*, 586 U.S. at 177; *see also Washington*, 596 U.S. at 839 (deeming law discriminatory because "[o]n its face" it "explicitly treats federal workers differently than state or private workers"); *King County*, 122 F.4th at 757–58 (rejecting county's argument that "significant differences" between ICE, whose flights carried out deportations, and others who chartered flights justified the discriminatory treatment of ICE); *United States v. California*, 2018 WL 5780003, at *6 (E.D. Cal. Nov. 1, 2018) (holding that California

could not treat federal public lands differently than private lands based on a characteristic that was "so directly linked to their federal status that it cannot serve as the basis for non-discriminatory differentiation"). Both engage in public law enforcement including investigations, stops, searches, and arrests. In fact, federal law enforcement often coordinates with state law enforcement in investigations and enforcement actions. *See, e.g.*, Glasheen Decl. ¶ 8. There is no relevant distinction between these entities.

Accordingly, the United States is also likely to succeed on the merits of its discrimination challenge to the No Secret Police Act.

### C.   The Tenth Amendment Does Not Justify the Challenged Laws

California cannot rely on the Tenth Amendment to salvage the challenged laws. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Here, that amendment is inapposite because neither regulating nor discriminating against the Federal Government is "a power reserved to the states." *Arcata*, 629 F.3d at 992. And invalidating the challenged laws would not amount to commandeering of California—quite the opposite, it would prevent California from controlling the Federal Government's lawful exercise of its own sovereign authority. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018); *New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . ."). In seeking this injunction, the United States is not forcing California to do anything; it simply demands that California stop unlawfully regulating the Federal Government and its agents. That cannot be a Tenth Amendment problem.

## III.   The United States Faces Irreparable Harm Absent Preliminary Relief

The United States will suffer irreparable harm if the No Secret Police Act and No Vigilantes Act were enforced against the Federal Government. Irreparable harm necessarily results from the enforcement of a preempted state law. *See New Orleans Pub.*

*Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366–67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted)); *Valle del Sol*, 732 F.3d at 1029 (finding irreparable harm based on a Supremacy Clause violation); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (same), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012). On that basis alone, the United States satisfies this element of the preliminary injunction standard.

In addition, the laws will substantially hamper federal operations in California, *see* Argument § II.A, *supra*, including by subjecting federal agents to criminal and civil liability for noncompliance. *See* No Secret Police Act §§ 3(d), 3(g); No Vigilantes Act § 10(c). That threat of liability will chill federal law enforcement activities. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (stating that the federal immunity defense provides "immunity from suit rather than a mere shield against liability," to "protect[] federal operations from the chilling effect of state prosecution"); *see also, e.g.*, Albarran Decl. ¶ 37; Vargas Decl. ¶ 24.

Moreover, the challenged laws would thwart federal law enforcement activities by endangering federal officers and their families. By design, the laws publicly expose law enforcement officers' personal identities at a time of already escalating instances of violence against federal officers. *See, e.g.*, Albarran Decl. ¶¶ 22–31. ICE officers are facing an 8000% increase in death threats and a 1000% increase in assaults, which are facilitated by doxxing websites that broadcast the identities and home addresses of officers and their families, encouraging retaliation against them. *See* Background § III, *supra*; *see also* Albarran Decl. ¶¶ 24, 25(c) (describing threats against ICE officers, including to "find out who they are and where they live," and an incident in which agitators assaulted an officer and his wife at their home); *id.* ¶ 25(b) (relating that Tren de Aragua criminal gang members were sharing photographs of an unmasked ICE officer). CBP, DEA, and FBI

officers likewise face threats of doxxing and harassment. *See* Vargas Decl. ¶ 12 (stating that criminal organizations have placed targeted bounties on CBP personnel); *see also* Allen Decl. ¶¶ 15, 16; Glasheen Decl. ¶ 11. The laws would thus exacerbate the burdens that federal agents and their families already endure. The effect would be to understandably chill agents from engaging in important federal enforcement operations and deter candidates from applying to federal law enforcement jobs. *See* Vargas Decl. ¶ 24; Albarran Decl. ¶ 37.

Finally, if the No Secret Police Act and No Vigilantes Act were allowed to stand, other States could be emboldened to impose similar unconstitutional restraints on the Federal Government. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a State to act unconstitutionally "would allow other States to do the same"). This could in turn create a "patchwork" system of laws, *id.*, under which federal agents would be subject to different regulations in each state, severely undermining the Federal Government's ability to uniformly enforce federal law.

The United States thus faces irreparable harm from the challenged laws.

## IV.    The Balance of Equities and the Public Interest Weigh in the United States' Favor

The balance of equities and the public interest likewise favor the United States. "Frustration of federal statutes and prerogatives are not in the public interest." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). Because the challenged laws would have that effect, they are not in the public interest. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009) (considering the public interest represented by "the Constitution's declaration that federal law is to be supreme").

Moreover, it is not in the public interest to subject federal agents to increased harassment, doxxing, and violence. Unfortunately, when federal agents' identities are revealed, the resulting harm is not always limited to their official duties; it can impact their families as well. As noted, this understandably chills federal agents from participating in

crucial law enforcement operations. And even when officers do participate, the statutes and resulting dangers chill zealous enforcement of the law. The people of the United States selected this Administration to enforce federal law and California's explicit attempts to thwart the will of the Nation as represented by its elected officials, *see* Argument § I, *supra*, tips the equities squarely in favor of the United States.

The public interest is also impaired by placing state and federal officials on a dangerous collision course. The Federal Government maintains that its agents are not lawfully regulated by the State of California, but the State insists that it can arrest and prosecute those federal agents, including during the discharge of their duties. The risk of tension and conflict between these law-enforcement agencies strongly counsels in favor of an injunction that clearly lays out the respective spheres of authority.

While California may disagree with the United States' priorities, it has no legitimate interest in interfering with the enforcement of federal law or putting federal agents at risk. Nor can it have a legitimate interest in enforcing invalid legislation. *See Cal. Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009) (explaining that "it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law" when "there are no adequate remedies available" because "[i]n such circumstances, the interest of preserving the Supremacy Clause is paramount"), *vacated and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal.*, 565 U.S. 606 (2012); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (stating that a party "cannot suffer harm from an injunction that merely ends an unlawful practice"). Thus the balance of equities also supports a preliminary injunction.

## CONCLUSION

Accordingly, the Court should enter a preliminary injunction prohibiting the State of California and its officials from enforcing the challenged provisions of the No Secret Police Act and No Vigilantes Act against the Federal Government, and awarding any other relief the Court deems appropriate.

Dated: November 25, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
Civil Division

BILAL A. ESSAYLI
First Assistant U.S. Attorney, Central District of California

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

ELISABETH J. NEYLAN
CRISTEN C. HANDLEY
Trial Attorneys
Civil Division, Federal Programs Branch
*Attorneys for the United States*

*/s/  Elisabeth J. Neylan*
ELISABETH J. NEYLAN (N.Y. Bar Reg. No. 6125736)

21

CRISTEN C. HANDLEY (MO Bar No. 69114)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 616-3519
Fax: (202) 616-8460
E-mail: Elisabeth.J.Neylan@usdoj.gov

*Attorneys for the United States*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the United States, certifies that this brief contains 6,956 words, which complies with the word limit of L.R. 11-6.1.

Dated: November 25, 2025                    Respectfully submitted,

                                            */s/  Elisabeth J. Neylan*
                                            Elisabeth J. Neylan (N.Y. Bar Reg. No. 6125736)
                                            Trial Attorney
                                            United States Department of Justice