# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his Official Capacity; ROBERT BONTA, Attorney General of California, in his Official Capacity,<br><br>Defendants. | No. 2:25-cv-10999 |

## DECLARATION OF SERGIO ALBARRAN

I, Sergio Albarran, declare as follows:

1. I am employed by the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") as a Field Office Director ("FOD") within the ERO San Francisco Field Office ("ERO-SFR"). I have held this position since June 1, 2025. I have also served as the Acting FOD in the San Diego Field Office on several occasions, most recently, from September 2023 through January 2024. I have directly supervised and managed national security, criminal, and immigration investigations in the ERO Los Angeles, ERO San Diego, and ERO San Francisco Field Offices, which together cover the entire State of California.

2. I began my tenure with the United States Government on November 9, 2008, with the ICE Los Angeles Field Office, in Los Angeles, California, where I worked as an Immigration Enforcement Agent, an Acting Supervisory Immigration Enforcement Agent,

1

and an Acting Supervisory Detention and Deportation Officer, among other titles. My tenure at the Los Angeles Field Office consisted of conducting criminal and administrative investigations and my area of responsibility covered the Los Angeles, Orange, Ventura, San Bernadino, Riverside, Santa Barbara, and San Luis Obispo Counties. On December 14, 2014, I became a Deportation Officer in the Los Angeles Field Office and, on or about March 18, 2018, I was selected as a Supervisory Detention and Deportation Officer at the San Diego Field Office. On September 13, 2020, I was selected as the Assistant FOD at the San Diego Field Office. In that position, I oversaw all enforcement tactical teams, which includes the Fugitive Operations Teams ("FOT"), Task Force, Special Operations Groups, Special Response Team ("SRT"), and Intelligence Unit ("IU") for the San Diego and Imperial Counties. On June 19, 2022, I was selected as the Deputy FOD for the San Diego Field Office.

3. During my tenure with DHS, I have been selected to serve several detail assignments. Specifically, on or about September 10, 2023 through January 31, 2024, I served a detail assignment as the Acting FOD for the San Diego Field Office. In that position, I was the senior official responsible for the Fugitive Operation Program ("FOP"), SRT, Training Unit Program ("TUP"), Criminal Alien Program ("CAP"), Task Force, IU, Mission Support Unit ("MSU"), the El Centro Sub-Office, Alternatives to Detention ("ATD") Program, Non-Detained Unit, Otay Mesa Detention Center, Imperial Regional Detention Facility, San Luis Regional Detention Center, Southwest Border Emergency Operations Center Region IX, San Diego Incident Command Post ("ICP"), and the congressional and community outreach for San Diego and Imperial Counties.

4. In or about February 2024 through August 2024, I was detailed to the Office of the DHS Secretary as the Deputy Executive Director over the DHS Joint Requirements Counsel in Washington D.C. In that position, I was responsible for advancing the objectives set by the Secretary of Homeland Security toward building a more unified and operationally effective and efficient organization. This included overseeing all

components within DHS and leading all efforts for investment, as well as changes to training, organization, laws, and operational processes and procedures.

5. In or about January 2025 through February 2025, I was detailed as the Acting Deputy Assistant Director for the ICE Targeting Operations Division in Washington D.C. I was responsible for the Law Enforcement Support Center, the Pacific Enforcement Response Center ("PERC"), and the National Criminal Analysis and Targeting Center, which provide identification and investigative support to all ICE field offices and other federal, state, and local law enforcement agencies.

6. In or about March 2025 through May 2025, I was detailed as the Acting Center Director for the PERC in Santa Ana, California. The PERC protects and defends the United States by sharing timely and relevant ICE information with law enforcement partners nationwide and issuing immigration detainers on criminal aliens in real-time.

7. On June 1, 2025, I was promoted to my current position of FOD for ERO-SFR. In that capacity, I oversee all of ERO-SFR's operational units, multi-agency tactical units, and multi-agency task force which includes the Federal Bureau of Investigation, Drug Enforcement Administration, United States Marshals Service, and detention facilities. I oversee all criminal and administrative investigations and law enforcement operations in Northern California, which cover a total of 49 counties. My area of responsibility also covers Hawaii, Guam, and Saipan. I am the senior official responsible for the Special Operations Division, FOP, SRT, TUP, CAP, Task Force, IU, MSU, ATD, Non-Detained Unit, and detention centers.

8. The purpose of this declaration is to inform the Court about conditions on the ground in the State of California with respect to federal immigration enforcement operations. In particular, the declaration seeks to relay those conditions as they pertain to California's recently enacted "No Secret Police Act" (Senate Bill 627) and "No Vigilantes Act" (Senate Bill 805), both of which take effect on January 1, 2026.

9. Because the No Secret Police Act and No Vigilantes Act are flagrantly unconstitutional, DHS officers/agents will not comply with either law.

10. If federal officers/agents were forced to comply with the No Secret Police Act and No Vigilantes Act, serious harm to officers and operational effectiveness would result, as explained further below.

## BACKGROUND

11. Responsibility for enforcing the federal immigration laws lies primarily with DHS and two of its components: ICE and U.S. Customs and Border Protection ("CBP").

12. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former U.S. Immigration and Naturalization Service and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which is the focus of this declaration and which consists of 25 field offices led by FODs; (2) Homeland Security Investigations, which consists of 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 26 field offices led by Chief Counsel.

13. ICE ERO personnel include ICE deportation officers who are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs-officer authority under 19 U.S.C. § 1589a. It is the mission of ICE ERO to identify, arrest, criminally prosecute, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter and/or remain in the United States illegally—including those who cross the border illegally, a federal misdemeanor, and those who

illegally reenter the United States after having been removed, a federal felony, as well as those aliens ordered removed from the United States who have failed to depart—or otherwise undermine the integrity of federal immigration laws and border control efforts. ICE ERO oversees programs and conducts operations to identify and apprehend removable aliens, criminally prosecute aliens when applicable, to detain these individuals when necessary, and to remove illegal aliens from the United States. ICE ERO prioritizes the apprehension, arrest, criminal prosecution, and removal of aliens who are known or suspected terrorist, members or associates of transnational criminal organizations, threat to national security, or threaten the safety of our nation's communities and the integrity of U.S. laws.

14. ICE ERO is responsible for interior enforcement of U.S. immigration laws in the State of California through three primary Areas of Responsibility ("AORs"): ERO-San Francisco, ERO-Los Angeles, and ERO-San Diego. The State of California has 58 counties which are divided among these three AORs—San Diego and Imperial Counties are under the San Diego AOR; the Los Angeles, Orange, Ventura, San Bernardino, Riverside, Santa Barbara, and San Luis Obispo Counties are under the Los Angeles AOR; and the remaining 49 counties are under the San Francisco AOR.

15. ERO administers several programs in furtherance of its mission to enforce the U.S. immigration laws. In particular, the FOP consists of FOTs and Task Force Units that target, arrest, and criminally prosecute at-large aliens who are not in the custody of a law enforcement agency and present a danger to national security or are a risk to public safety, as well as those who entered the United States illegally, are subject to orders of removal, or otherwise undermine the integrity of federal immigration laws and border control efforts. This includes the identification, apprehension, criminal prosecution, detention, and removal of aliens from the United States, the service of legal documents on removable aliens, and immigration case management during removal proceedings.

Additionally, the CAP focuses on the Federal Government's identification, arrest, and removal of aliens who are incarcerated at federal, state, county, or local detention facilities.

## CALIFORNIA'S NO SECRET POLICE ACT
## AND NO VIGILANTES ACT

16. On September 20, 2025, California enacted the "No Secret Police Act" (Senate Bill 627) and the "No Vigilantes Act" (Senate Bill 805), which take effect on January 1, 2026.

17. The No Secret Police Act makes it a misdemeanor crime for federal law enforcement officers to wear certain kinds of facial masks in the performance of their duties in California, subject to limited exceptions. It also requires federal law enforcement agencies to adopt and publicly post a written policy regarding the use of facial masks by July 1, 2026.

18. The No Vigilantes Act requires, under threat of criminal punishment, non-uniformed federal law enforcement officers to visibly display identification that includes their agency and either a name or badge number, or both, when performing their enforcement duties in California, subject to limited exceptions. The Act further requires federal law enforcement agencies to adopt and publicly post a written policy regarding the visible identification of sworn personnel by January 1, 2026.

19. Based on my experience and the nature of my official duties as the FOD for ERO-SFR, I am familiar with the officer safety and operational effectiveness considerations that influence when ICE officers should conceal their identities and/or agency associations while performing law enforcement activities. In my opinion, these laws, if enforced against DHS, would create significant obstacles to ERO's ability to safely and effectively enforce federal laws in the State of California. These laws also purport to impose requirements and obligations on ICE officers that are not required by DHS policy or federal law.

20. Because DHS does not intend to comply with the requirements imposed on the Federal Government either by the No Vigilantes Act or the No Secret Police Act, ICE officers working in California face the threat of criminal liability under those Acts.

## PROTECTING OFFICERS' PERSONAL IDENTITES IS CRITICAL FOR OFFICER SAFETY AND OPERATIONAL EFFECTIVENESS

21. Protecting federal immigration officers' personal identities during enforcement operations is a critical tool serving vital safety and operational purposes.

### *Officer Safety*

22. Protecting the personal identities of federal officers and their families is necessary in part due to the increasingly common threats of targeted harassment of and retaliation against federal immigration agents for simply doing their jobs.

23. Individuals, including immigration activists and other members of the public, routinely photograph, film, and publish online ICE ERO enforcement actions to include the personal identities of ICE officers and other federal task force personnel. The photographs and films are posted online for the sole purpose of intimidating and harassing government employees and are directly used by members of local organized crime and transnational criminal organizations in serious and potentially deadly ways.

24. During enforcement actions, ICE personnel regularly observe and overhear individuals shouting phrases such as "doxx these people," "find out who they are and where they live," and "we will find out who you are and who your family members are." DHS has obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and CBP personnel in a tiered bounty system. Cartels have disseminated a structured bounty program to incentivize violence against federal personnel, with payouts escalating based on rank and action taken: (1) $2,000 for gathering intelligence or doxxing agents (including photos and family details); (2) $5,000–$10,000 for kidnapping or non-lethal

assaults on standard ICE/CBP officers/agents; and (3) up to $50,000 for the assassination of high-ranking officials.

25. These threats have created an intensely hostile environment that jeopardizes the safety of officers and their families. Some additional examples of these kinds of incidents are as follows:

    a. On or about February 21, 2025, a flyer was posted in numerous locations throughout Orange County. The flyer identified several ICE officers' photograph, job title, full name, city, phone number, and age.

    b. On July 15, 2025, a phone analysis of a known Tren de Aragua criminal gang member disclosed a photograph of an unmasked San Diego ICE official while that official was conducting an enforcement activity. The photograph displayed the officer's face and was shared with another TDA gang member in the phone's contact list.

    c. On August 28, 2025, an ERO Los Angeles officer was followed home from work and, upon arriving at his home, approached by three individuals wearing ski masks. With the officer's wife and children present, one of the masked individuals pushed the officer at his waist, grabbed the officer's wife by her arm and screamed, "I will throw this coffee at you, bitch." During this incident, all three masked individuals were yelling profanities at the officer and his wife while their children were in the vehicle. Local police arrived on the scene and arrested one of the individuals. Four additional agitators arrived in support of the original three, and the local police officers recommended that the ERO officer and his family depart the residence. As a result of this incident, this officer and his family has since required ICE security surveillance at his home address.

26. Protesters have attempted to follow ICE personnel in their vehicles outside facilities where enforcement actions take place. Despite law enforcement personnel conducting countersurveillance maneuvers, several officers on temporary duty have been

followed back to their hotels. After discovering the location of the officers' hotels, protesters have doxxed the officers by posting their hotel locations on social media, resulting in the hotels becoming overwhelmed by protesters demanding the hotels evict the officers.

27. Protesters have presented other safety threats including by blocking traffic in and around officers' hotels, unleashing a barrage of honking at all hours of the day and night, and in one instance, slashing the tires of an unmarked government vehicle parked at the hotel parking lot.

28. Doxxing of ICE officers/agents has also been encouraged across the web. Some examples of websites perpetrating the doxxing of ICE staff and contractors are ICESpy.org, ICEList.is, and ICEList.info. During protests at each of our respective offices, there have been numerous attempts by activists, protesters, and agitators to identify and doxx our staff as they enter and exit federal properties. In addition, it is a regular occurrence for members of the public to interfere with and attempt to document/identify our agents conducting field operations.

29. Some individuals are taking pictures of ICE officers' faces and running those pictures through facial recognition applications that will search all of social media. Once a match is made, they will continue to search for family members, including children. Once all the family members are identified, they'll attempt to locate their home. All the findings are posted on anti-ICE websites.

30. Masking or otherwise protecting the personal identities of immigration officers can be essential to mitigating the above kinds of threats. That is, masking reduces the risk of officers' personal identities being shared publicly, which helps ensure that officers' privacy and safety, and that of their family members, remains intact. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal history, gang affiliations, transnational criminal organizations, and known or suspected terrorists.

31. Masking is also an important tool to protect officers from unpredictable health and safety hazards that arise during enforcement activities. Activists in California have subjected ERO officers to being spit on and having unidentified objects thrown at them while conducting enforcement activities. Masking can minimize exposure to these, and other types, of health hazards. ICE officers should therefore have the ability to prepare themselves for these hazards at any time during any law enforcement operation, irrespective of whether the operation is an active undercover operation, a tactical operation, or whether an operation is occurring in exigent circumstances. Moreover, ICE personnel should have the options of using any facial covering they feel is appropriate to meet operational needs and to protect from health hazards.

### *Operational Effectiveness*

32. In addition to mitigating safety risks, protecting the personal identities of federal immigration officials is necessary for operational purposes to effectively accomplish DHS's immigration enforcement mission.

33. For instance, ICE routinely conducts investigations and surveillance in plainclothes to locate and apprehend illegal aliens, particularly in public courts or community areas where targets may attempt to evade detection.

34. California's attempt to require ICE officers/agents to wear visible identification would compromise operational security by alerting targets to the presence of law enforcement and increasing the likelihood of flight.

35. The visible identification requirement would therefore undermine ICE's ability to apprehend even those individuals who pose significant risks to national security and public safety, which further jeopardizes the safety of officers, the public, and targets themselves.

36. Masking also prevents suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, masking is

critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent.

37. Given the personal threats and violence that ICE officers/agents face, denying them the opportunity to protect their identities and provide an extra layer of security with the choice to wear facial masks would chill federal law enforcement operations.

38. The inability to conceal officers' identities during enforcement actions thus compromises DHS's mission and increases the likelihood of targeted violence against officers.

## CONCLUSION

39. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, belief, and reasonable inquiry.

Dated on this 24th day of November 2025.

SERGIO ALBARRAN
Digitally signed by SERGIO ALBARRAN
Date: 2025.11.24 10:10:49 -08'00'