Rob Bonta
Attorney General of California
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anna Ferrari, SBN 261579
Lee I. Sherman, SBN 272271
Supervising Deputy Attorneys General
Kristi A. Hughes, SBN 235943
Zelda Vassar, SBN 313789
Asha Albuquerque, SBN 332901
Alyssa Zhang, SBN 360105
Cameron A. Bell, SBN 305872
Deputy Attorneys General
  300 South Spring Street
  Los Angeles, CA 90013
  Telephone: (213) 269-6000
  E-mail: Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: January 12, 2026<br>Time: 10:00 a.m.<br>Courtroom: 8D<br>Judge: The Honorable Christina A. Snyder<br>Trial Date: Not set<br>Action Filed: November 17, 2025 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

   I.    Masked and Plainclothes Federal Agents Conduct Militarized
      Immigration-Enforcement Raids in California .................................2

   II.   Federal LEOs' Recent Masking and Identification Practices
      Stray from Recognized Best Policing Practices Favoring
      Accountability, Transparency, and Public Safety.................................3

   III.  Legislature Responds to Summer 2025's Chaos with SBs 627
      and 805 ..............................................................................................5

      A.    The No Secret Police Act (SB 627).............................................5

      B.    The No Vigilantes Act (SB 805) .................................................6

LEGAL STANDARD ............................................................................................7

   I.    Preliminary-Injunction Standard........................................................7

   II.   Facial-Challenge Standard ...................................................................8

   III.  Principles of Intergovernmental and Supremacy-Clause Immunity.......8

ARGUMENT ...................................................................................................... 11

   I.    Plaintiff Cannot Establish a Likelihood of Success on the Merits ..... 11

      A.    Plaintiff Lacks Pre-Enforcement Standing............................. 11

      B.    SB 627 Does Not Violate Intergovernmental Immunity.......... 13

          1.    SB 627 Does Not Impermissibly Regulate the
             Federal Government...................................................... 13

          2.    SB 627 Does Not Unlawfully Discriminate
             Because Federal and State LEOs Are Not Similarly
             Situated ........................................................................ 15

      C.    SB 805 Does Not Violate Intergovernmental Immunity.......... 16

      D.    Plaintiff Has Not Satisfied the Standard for Bringing a
          Facial Challenge to Either Law's Conduct Provision ............. 17

   II.   Plaintiff Has Not Demonstrated Irreparable Harm ............................ 18

   III.  The Public Interest and Balance of Equities Weigh Heavily
      Against a Preliminary Injunction ...................................................... 20

CONCLUSION.................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Alden v. Maine*
    527 U.S. 706 (1999) ............................................................ 1

*Amoco Prod. Co. v. Village of Gambell, Alaska*
    480 U.S. 531 (1987) .......................................................... 20

*Boeing Co. v. Movassaghi*
    768 F.3d 832 (9th Cir. 2014) ............................................ 14

*Cal. Trucking Ass'n v. Bonta*
    996 F.3d 644 (9th Cir. 2021) ............................................ 13

*Clifton v. Cox*
    549 F.2d 722 (9th Cir. 1977) ...................................... 10, 14

*Coal. for Econ. Equity v. Wilson*
    122 F.3d 718 (9th Cir. 1997) ........................................ 7, 21

*Comm'n on Peace Officer Standards & Training v. Superior Court*
    42 Cal.4th 278 (2007) ........................................................ 5

*Davis v. Mich. Dep't of the Treasury*
    489 U.S. 803 (1989) ............................................................ 8

*Dawson v. Steager*
    586 U.S. 171 (2019) ...................................................... 9, 15

*Geo Grp., Inc. v. Inslee*
    151 F.4th 1107 (9th Cir. 2025)............................... 9, 13, 16

*Geo Grp., Inc. v. Newsom*
    50 F.4th 745 (9th Cir. 2022) .................................. 9, 14, 16

*In re Neagle*
    135 U.S. 1 (1890) ............................................................ 10

*Johnson v. Maryland*
    254 U.S. 51 (1920) .................................................... 10, 16

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Kidd v. Noem*
No. 2:20-cv-03512 (C.D. Cal. 2025)......................................................19

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) ..............................................................11, 12

*Maryland v. King*
567 U.S. 1301 (2012) ...................................................................21

*Moody v. NetChoice, LLC*
603 U.S. 707 (2024) .................................................................8, 17

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*
434 U.S. 1345 (1977) ...................................................................21

*Nken v. Holder*
556 U.S. 418 (2009) .....................................................................20

*North Dakota v. United States*
495 U.S. 423 (1990) ..................................................................8, 9

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016) .....................................................................11

*State v. Ivory*
906 F.2d 999 (4th Cir. 1990) ...........................................................10

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014) .....................................................................11

*Texas v. Kleinert*
855 F.3d 305 (5th Cir. 2017) .......................................................10, 18

*Texas v. U.S. Dep't of Homeland Sec.*
123 F.4th 186 (5th Cir. 2024)..........................................9, 13, 14, 17

*Thomas v. Anchorage Equal Rights Comm'n*
220 F.3d 1134 (9th Cir. 2000).........................................................12

*United States ex rel. Drury v. Lewis*
200 U.S. 1 (1906) .......................................................................10

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. California*
    921 F.3d 865 (9th Cir. 2019) ................................................................. 18

*United States v. City of Arcata*
    629 F.3d 986 (9th Cir. 2010) ................................................................. 13

*United States v. King Cnty.*
    122 F.4th 740 (9th Cir. 2024) ................................................................ 14

*United States v. Morrison*
    529 U.S. 598 (2000) .............................................................................. 9

*United States v. Washington*
    596 U.S. 832 (2022) .............................................................................. 8

*Wash. State Grange v. Wash. State Republican Party*
    552 U.S. 442 (2008) ......................................................................... 8, 18

*Washington v. United States*
    460 U.S. 536 (1983) .............................................................................. 9

*Weinberger v. Romero-Barcelo*
    456 U.S. 305 (1982) ............................................................................ 21

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ......................................................... 7, 18, 20, 21

**FEDERAL STATUTES**

United States Code, Title 10
    § 723(a) .................................................................................................. 4
    § 723(b) .................................................................................................. 4

**STATE STATUTES**

California Government Code
    § 7288 .................................................................................................. 12
    § 7288(a) ................................................................................................ 7
    § 7288(c) ............................................................................................ 6, 7
    § 7289 .................................................................................................. 12
    § 7289(a) ................................................................................................ 5

# TABLE OF AUTHORITIES
### (continued)

Page

§ 7289(b)......................................................................................5, 15
§ 7289(d)...........................................................................................5
§ 26690 ..............................................................................................5

California Penal Code
  § 185.5(a)..........................................................................................6
  § 185.5(b).....................................................................................6, 20
  § 185.5(c)...............................................................................6, 15, 20
  § 185.5(d)..........................................................................................6
  § 185.5(e).........................................................................................15
  § 185.5(f)......................................................................................6, 12
  § 538d(a)............................................................................................5
  § 830 ................................................................................................15
  § 830.3(a).........................................................................................15
  § 830.3(b).........................................................................................15
  § 830.3(c).........................................................................................15
  § 830.10 .........................................................................................5, 7
  § 13654(a)...........................................................................................7
  § 13654(b)..............................................................................7, 17, 20
  § 13654(c)...........................................................................................7
  § 13654(d).........................................................................................17
  § 13654(e).....................................................................................7, 12

REGULATIONS

Code of Federal Regulations, Title 8
  § 287.8(c)...........................................................................................4

**INTRODUCTION**

Our Constitution's Framers "split[] the atom of sovereignty" by dividing power between two governments, "each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *Alden v. Maine*, 527 U.S. 706, 751 (1999) (cleaned up). But in this suit, Plaintiff ignores that careful balance of power between the federal and state governments, seeking to invalidate two California laws, Senate Bills (SB) 627 and 805. Each law exercises the State's historic and long-established police power, and neither unconstitutionally interferes with the federal government's sphere of responsibility.

In summer 2025, federal officers engaged in large-scale immigration-enforcement actions that were unlike any in recent history. Armed, masked individuals in plainclothes conducted swift "raids," grabbing, arresting, and abducting individuals whom they believed may not be in the country lawfully. These unidentified, masked individuals caused terror throughout California, with the public unsure whether they were interacting with legitimate law enforcement or imposters.

Recognizing the federal government's responsibility over immigration, as well as the State government's concomitant obligation to ensure Californians' safety in the face of militarized immigration enforcement, the State enacted SBs 627 and 805. SB 627 addresses the dangers posed to Californians by law-enforcement officers (LEOs) wearing masks while on duty, and SB 805 addresses the harms caused by LEOs conducting large-scale operations without uniforms, badges, or identification. SB 627 generally applies to local and federal law-enforcement agencies (LEAs), and SB 805 generally applies to all levels of law enforcement. These laws follow well-established precedent that allow federal agents broad latitude to perform their duties, but subject them to state liability if they exceed what is "necessary and proper" for those duties.

1

Plaintiff's pre-enforcement challenge to both laws fails, as it cannot show a concrete, imminent threat of injury.  Even with standing, because SBs 627 and 805 are generally applicable laws that, at most, incidentally affect federal activity, Plaintiff is unlikely to succeed on the merits of its Supremacy Clause claims or show that it is likely to face irreparable injury from either law.  Arguing essentially that it cannot constitutionally be subjected to any state law, Plaintiff's suit runs roughshod over California's sovereignty and long-recognized interest in ensuring the safety and security of its residents.  Taken to its logical conclusion, Plaintiff's position would mean federal agents could commit crimes and violate Californians'—or anyone's—constitutional rights with impunity, accountable to no one.  Furthermore, a preliminary injunction would undermine—not serve—the public's interest in safe and secure communities, which masked and unidentified law enforcement agents threaten.  Plaintiff's motion to preliminarily enjoin SBs 627 and 805 should therefore be denied.

# BACKGROUND

## I.   MASKED AND PLAINCLOTHES FEDERAL AGENTS CONDUCT MILITARIZED IMMIGRATION-ENFORCEMENT RAIDS IN CALIFORNIA

In summer 2025, the federal government accelerated its immigration-enforcement operations in California, focusing first in Los Angeles, then expanding across the State.  Bell Declaration ("Bell"), Exs. A, B.  As part of these large-scale immigration operations, federal LEOs conducted chaotic "roving patrols" and immigration raids in places like bus stops, car washes, Home Depots, and school drop-off lines.  *Id.*, Exs. A, C.  Federal LEOs frequently chased and tackled undocumented immigrants and citizens alike, and often conducted military-style raids using armored personnel carriers and military tactics when controlling crowds.  *Id.*, Ex. D.

Adding to the chaos, the public often could not tell LEOs from civilians, making it easier for criminals to impersonate law enforcement while committing

crimes. *See, e.g.*, *id.*, Exs. E-G, *see also* Shuchart Declaration ("Shuchart") ¶ 18; Franklin Declaration ("Franklin") ¶ 17. Eyewitnesses reported many federal LEOs wore plainclothes, drove unmarked vans, and refused to identify themselves, making verifying their identities difficult. Bell Ex. B; Velez Declaration ("Velez") ¶ 4; Mundwiler Declaration ("Mundwiler") ¶ 7; Aguiluz Declaration ("Aguiluz") ¶ 7. Other federal LEOs "look[ed] like they were wearing costumes"—resembling vigilantes to onlookers. Miranda Declaration ("Miranda") ¶ 10; Mundwiler ¶ 7; Carrasco Declaration ("Carrasco") ¶ 7; Anderson Declaration ("Anderson") ¶ 10; Le Blanc Declaration ("Le Blanc") ¶ 10. Witnesses struggled to confirm which federal agency or agencies were involved, further highlighting the lack of transparency. *See, e.g.*, Bell Ex. B (because of LEOs' plainclothes and unmarked vehicles, "it's hard to decipher who they are and [why] they're there").

Unidentified, masked LEOs intensified community fears of kidnappings and crimes committed by law-enforcement impersonators. Velez ¶ 17; Shouhed Declaration ("Shouhed") ¶ 17; Carrasco ¶ 7; Miranda ¶ 11. These fears were quickly borne out through ICE impersonator actions across the country, including California. Bell, Exs. E-G. In October, the Federal Bureau of Investigation (FBI) warned that "criminal actors" were using the "recent increase in ICE enforcement actions across the country" to their advantage by impersonating ICE officers as a means to commit crimes. *Id.*, Ex. G. The FBI urged LEOs to "identify themselves during operations and cooperate with individuals who request further verification, such as calling their local precinct to verify the officer's identity." *Id.*

## II. FEDERAL LEOs' RECENT MASKING AND IDENTIFICATION PRACTICES STRAY FROM RECOGNIZED BEST POLICING PRACTICES FAVORING ACCOUNTABILITY, TRANSPARENCY, AND PUBLIC SAFETY

Before 2025, it was "extremely uncommon" for federal LEOs to conduct enforcement operations while wearing masks and plainclothes, without identification. Shuchart ¶ 11; *see also* Schrader Declaration ("Schrader"), ¶¶ 52-56. All federal LEOs "are trained to identify themselves and carry badges," including

those who work in plainclothes, so they are easily recognizable as legitimate law enforcement. *See* Schrader ¶ 52; Bell, Ex. F. Not only does no law authorize federal LEOs to wear a mask, but federal law generally *requires* identification in some circumstances. *See, e.g.*, 10 U.S.C. § 723(a), (b) (excepting undercover or plainclothes officers). Additionally, immigration officers effectuating an arrest must identify themselves as such "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii).

Plaintiff cites no law authorizing federal officers to wear a mask or refuse to identify themselves. This is unsurprising, as any attempt to anonymize LEOs contradicts the historical tradition of law enforcement in democracies embracing transparency and accountability through uniforms, badges, and identification. *See generally* Schrader; *see also* Shuchart ¶¶ 15-17 (lack of identification undermines oversight); Franklin ¶¶ 9-14. Compared to dictatorships where unidentified police forces wear masks to evade accountability and carry out violence against their citizens, American law enforcement has traditionally maintained a visible public character so that they do not "operate in secret or in the shadows" and do not have a license to violate constitutional rights. Schrader ¶¶ 19, 40; *see also* Franklin ¶¶ 9-14. Standardized police uniforms and badges are also critical to law-enforcement oversight, so that the public has specific information to file a complaint about any misconduct. Schrader ¶ 18; Shuchart ¶ 15; Franklin ¶¶ 20-22.

This tradition of LEOs identifying themselves benefits public safety. For instance, if officers wear masks during raids, or do not wear uniforms or identification, the public may view the LEOs as aggressors who themselves "warrant[] a law enforcement response." Shuchart ¶ 18. Bystanders may also call local police to intervene in what they mistakenly view as an assault, and responding police may not recognize unidentified LEOs as legitimate law enforcement, creating a potentially dangerous situation. *Id.*

4

### III. Legislature Responds to Summer 2025's Chaos with SBs 627 and 805

California has long regulated identification requirements for LEOs operating within their boundaries.[1]  Such laws require LEAs to issue badges to their officers, Cal. Gov't Code § 26690, and require uniformed peace officers to wear a badge, nameplate, or other device that provides the identification number or name of the officer, Cal. Penal Code § 830.10.  California also criminalizes fraudulently impersonating peace officers.  *Id.* § 538d(a).

Pursuant to the State's long-established police powers, and in response to the sudden rise in quasi-militarized enforcement actions by unidentified LEOs, California enacted SB 627, the "No Secret Police Act," and SB 805, the "No Vigilantes Act."  The challenged provisions of both laws were set to take effect on January 1, 2026, but Defendants agreed to stay enforcement of those laws to facilitate orderly resolution of the instant motion.  Dkt. 20, ¶ 2.

### A.    The No Secret Police Act (SB 627)

SB 627 has two provisions relevant here, which apply to local law enforcement, out-of-state LEAs, and federal LEAs operating in California.  Cal. Gov't Code § 7289(d)(2).  Its "Policy Provision" requires affected LEAs to "maintain and publicly post a written policy regarding the use of facial coverings."  *Id.* § 7289(a).  The policy allows law enforcement to use facial coverings in numerous circumstances, including for "active undercover operations or assignments authorized by supervising personnel or court order; tactical operations where protective gear is required for physical safety; applicable law governing occupational health and safety, and reasonable accommodations; and protection of identity during prosecution."  *Id.* § 7289(b)(3).

---

[1] *See, e.g.*, *Comm'n on Peace Officer Standards & Training v. Superior Court*, 42 Cal.4th 278, 301 (2007) ("We find no well-established social norm that recognizes a need to protect the identity of all peace officers. Peace officers operate in the public realm on a daily basis, and identify themselves to the members of the public with whom they deal.").

5

SB 627's "Conduct Provision" imposes criminal penalties on LEOs who willfully and knowingly wear "a facial covering that conceals or obscures their facial identity in the performance of their duties[.]"  Cal. Penal Code § 185.5(a), (d).  The law does not, however, restrict all face coverings.  First, the law does not restrict the use of: (A) translucent face masks covered by agency policy; (B) medical masks and other masks that protect against transmission of disease, infection, or hazardous or harmful environmental conditions such as gas, smoke, and inclement weather; (C) masks necessary for underwater use; (D) motorcycle helmets; or (E) eyewear necessary to protect from the use of retinal weapons like lasers.  *Id.* § 185.5(b)(2).  Second, it does not apply to LEOs acting consistently with a posted agency policy or to officers actively performing SWAT team responsibilities.  *Id.* § 185.5(c).

Notably, the Policy Provision functions solely as a safe harbor; LEOs who violate the Conduct Provision in their law-enforcement capacity, but whose agency maintains a compliant policy, will not be subject to criminal penalties.  *Id.* § 185.5(f).

**B.    The No Vigilantes Act (SB 805)**

SB 805, which primarily criminalizes law-enforcement impersonation, likewise contains a Policy Provision and a Conduct Provision but generally applies to all LEAs operating in California.  Cal. Gov't Code § 7288(c)(2).  The Policy Provision requires LEAs to publicly post a policy that "all sworn personnel [must] visibly display identification that includes their agency and either a name or badge number, or both name and badge number, when performing enforcement duties," defined as "active and planned operations involving the arrest or detention of an individual, or deployment for crowd control purposes."  *Id.* § 7288(a)(2), (c)(1).  The law exempts undercover operations or investigative activities; officers employed by certain state and federal agencies; officers wearing personal protective

1    equipment that prevents display; exigent circumstances; and where identification
2    poses a "significant danger" to the peace officer.  *Id.* § 7288(a)(3).

3        SB 805 also contains a Conduct Provision, imposing criminal penalties for
4    non-uniformed LEOs who willfully and knowingly conceal identifying information
5    (agency name, and either a name or badge number, or both) when performing
6    "enforcement duties" as defined above.  Cal. Penal Code § 13654(a), (c).[2]  The
7    Conduct Provision does not apply to activities exempted by the Policy Provision,
8    nor to an officer performing SWAT, tactical-team, or protective-detail
9    responsibilities.  *Id.* § 13654(b).

10       Here, too, the Policy Provision functions solely as a safe harbor for LEOs
11   whose agencies maintain a compliant policy.  *Id.* § 13654(e).

12                          **LEGAL STANDARD**

13   **I.    PRELIMINARY-INJUNCTION STANDARD**

14       A preliminary injunction is an "extraordinary remedy that may only be
15   awarded upon a clear showing that the plaintiff is entitled to such relief."
16   *Winter v. Natural Res. Def. Council, Inc.* 555 U.S. 7, 22 (2008) (citation omitted).
17   The Court may not grant a preliminary injunction unless a plaintiff establishes that
18   (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer
19   irreparable harm in the absence of preliminary relief; (3) the balance of the equities
20   tips in its favor; and (4) an injunction is in the public interest.  *Id.* at 20.  A
21   plaintiff's burden is particularly heavy in cases seeking to enjoin state statutes
22   because "a state suffers irreparable injury whenever an enactment of its people or
23   their representatives is enjoined."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718,
24   719 (9th Cir. 1997).

25       ///

26       ///

27   _____

28   [2] Uniformed LEOs in California, subject to Cal. Penal Code § 830.10, are exempt
     because they are already required to clearly display identification.  *Id.*

## II. FACIAL-CHALLENGE STANDARD

Plaintiff's lawsuit effectively operates as a facial challenge seeking to invalidate entirely the portions of SBs 627 and 805 that relate to federal officers. Dkt. 1. To succeed on a facial challenge, Plaintiff must show that "no set of circumstances exists under which the law would be valid, or…that the law lacks a plainly legitimate sweep" as to federal law enforcement. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (citations omitted). Such challenges "often rest on speculation about the law's coverage and its future enforcement"—especially here, where Plaintiff has filed suit before the challenged laws have taken effect. *Id.* (citations omitted). Because "facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways…[they are] hard to win." *Id.* (citations omitted); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) ("[J]udicial restraint in a facial challenge frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.") (citations omitted).

## III. PRINCIPLES OF INTERGOVERMENTAL AND SUPREMACY-CLAUSE IMMUNITY

Under the intergovernmental immunity doctrine, "a state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). Recognizing the unique relationship between the federal government and the states, the doctrine "is based on the need to protect each sovereign's governmental operations from undue influence by the other." *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 814 (1989). Although states may not "interfer[e] with or control[] the operations of the Federal Government," *United States v. Washington*, 596 U.S. 832, 838 (2022), the intergovernmental

immunity doctrine "accommodat[es]…the full range of each sovereign's legislative authority," *North Dakota*, 495 U.S. at 435.  On the state's side, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 617 (2000).

Not every state law that touches federal activity is an unconstitutional direct regulation, and not every instance of differential treatment offends the Constitution. State law that "incidentally affects" federal operations does not violate intergovernmental immunity.  *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 205 (5th Cir. 2024).  But state law that intrudes so far as to control or override the federal government will violate the doctrine.  *Compare Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (invalidating state law that required federal agency to "entirely transform its approach…or else abandon" its immigration-detention activities in the state), *with Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025) (upholding state law that did not "prevent" federal government from running immigration-detention facilities).

When state law involves direct regulation, "[t]he key question is whether state law seeks to improperly control the employee's federal duties, or whether the law only might affect incidentally the mode of carrying out the employment." *Texas*, 123 F.4th at 206 (internal quotation marks omitted); *see also id.* n.24 (collecting cases).  And when a state law "treats someone else better than it treats [the federal government]," *Washington v. United States*, 460 U.S. 536, 544-45 (1983), intergovernmental immunity will only invalidate the state law "if it treats a state entity more favorably than it treats a *comparable* federal entity," *Inslee*, 151 F.4th at 1118 (emphasis added) (citing *Dawson v. Steager*, 586 U.S. 171, 175-76 (2019)).

While most intergovernmental immunity cases address agency action, SBs 627 and 805 impose potential state criminal liability for individual LEOs, based on conduct purportedly occurring in the course of their duties.  In such cases, courts

consider whether the Supremacy Clause grants LEOs full immunity—not from regulation or control, but from prosecution.  But "an employee of the United States does not secure a general immunity from state law while acting in the course of his employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920); *see also Clifton v. Cox*, 549 F.2d 722, 728-30 (9th Cir. 1977); *Texas v. Kleinert*, 855 F.3d 305, 309 (5th Cir. 2017) (referring to doctrine of "Supremacy Clause Immunity").  Although a federal employee may be "on duty," he may nevertheless be subject to state-law restrictions if his actions exceed his federal authority or are not "justified by [the] federal duty," *State v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990); *see also United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8 (1906) (in homicide charge, if decedent had surrendered, "it could not reasonably be claimed that the fatal shot was fired in the performance of a duty imposed by the Federal law").  Federal officers, thus, do not have "carte blanche…to proceed as they please" in carrying out their duties. *Ivory,* 906 F.2d at 1003.

Accordingly, Plaintiff's claim that "States cannot subject federal officers to state criminal liability for actions undertaken in accordance with federal law," Mot. at 14, is fundamentally incorrect and contradicted by Plaintiff's own authority.  As Plaintiff concedes, quoting the seminal Supremacy-Clause immunity case, a federal officer is immune from state liability only if "he did *no more than what was necessary and proper for him to do*," *id.* (citing *In re Neagle*, 135 U.S. 1, 75 (1890)) (emphasis added)—and if he has "an honest and reasonable belief" that his actions are necessary to carry out his duties. *Clifton*, 549 F.2d at 729-30 (citations omitted).  Thus, the ultimate question in such cases is two-fold: whether the federal officer honestly believed that his actions were "necessary and proper" in furtherance of his duties, and whether that belief was objectively reasonable.

///

///

///

10

# ARGUMENT

## I.   PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff cannot establish a likelihood of success on the merits for three reasons.  First, Plaintiff lacks standing, because it cannot show that federal LEOs face a credible threat of prosecution under SB 627 or SB 805.  Second, Plaintiff cannot establish that either law violates intergovernmental immunity.  Neither law directly regulates the federal government because each imposes an incidental effect, far short of controlling federal operations or altogether preventing federal immigration-enforcement efforts.  Nor does SB 627 discriminate against Plaintiff because federal LEOs and state LEOs are not similarly situated and the differential treatment is justified.  Third, Plaintiff cannot clear the high bar of a facial challenge by showing that there is no set of circumstances in which the laws' Conduct Provisions would be valid.

### A.   Plaintiff Lacks Pre-Enforcement Standing

To establish standing, a plaintiff must show injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  An injury-in-fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).  When the alleged injury is based on threatened enforcement of a law, Plaintiff must show it "[intends] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted).

For multiple reasons, Plaintiff does not satisfy the standard for pre-enforcement standing.  First, Plaintiff has not established an "actual or imminent" injury in fact.  Plaintiff's claims that the laws will "likely" deter LEOs from taking

11

safety measures or "chill federal law enforcement operations and reduce the number of officers willing to engage in certain operations," Mot. at 10, is, at best, a conjectural—not an actual or imminent—injury. *Lujan*, 504 U.S. at 560.

Second, while Plaintiff suggests it has articulated a "concrete plan" to violate the law, Mot. at 10, Plaintiff's declarants acknowledge they will violate the state laws *if* "appropriate to do so," Glasheen Decl. ¶ 15, or that the state laws "interfere with *discretion* to authorize" uniform and facial-covering modifications. Vargas Decl. ¶ 19 (emphasis added). Those equivocal statements do not constitute a concrete plan to violate the state law. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). In any event, Plaintiff's own refusal to comply with the Policy Provisions do not establish a credible threat of prosecution; the challenged laws provide no penalty for noncompliance with the Policy Provisions. *See* Cal. Gov't Code § 7289; *id.* § 7288. Rather, each law's Policy Provision is a safe harbor, exempting LEOs from prosecution *if* their agency complies. Cal. Penal Code § 185.5(f); *id.* § 13654(e).

Finally, Plaintiff also has not shown that "prosecuting authorities have communicated a specific warning or threat to initiate proceedings." *Thomas*, 220 F.3d 1139. A "generalized threat of prosecution" is insufficient; there must be a "genuine threat of imminent prosecution." *Id.* (internal quotation marks omitted). Not only have Defendants[3] temporarily disavowed enforcement of the laws, Dkt. 20, ¶ 2, Plaintiff also fails to point to any "specific warning or threat to initiate proceedings." *Thomas*, 220 F.3d at 1139. Instead, Plaintiff relies on the mere existence of SBs 627 and 805, and general statements by politicians with no authority to enforce the challenged laws. Compl. ¶ 68; Mot. at 10. One district attorney's statement that she was "open to charging federal officers for violations of

_____

[3] Plaintiff cannot show any connection between its alleged injury and any conduct by the Governor and thus lacks standing as to the Governor. Defendants respectfully reserve their right to raise this argument in further proceedings, including a motion to dismiss.

California law," Mot. at 11, is too vague to be a specific or realistic threat of imminent prosecution under the challenged laws. *Cf. Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) ("Plaintiffs are…deemed to have established that there is a realistic threat to initiate proceedings against them if the government has declared its intention to enforce the new law") (citations omitted). An "openness" to charging federal officers with violations of state law does not evince a specific intention to charge officers with violations of these particular laws.

Because Plaintiff can show neither a concrete plan to violate the law nor anything more than vague, nonspecific comments about the laws' enforcement, Plaintiff lacks standing to bring suit before either law is enforced.

## B.    SB 627 Does Not Violate Intergovernmental Immunity

### 1.    SB 627 Does Not Impermissibly Regulate the Federal Government

On the merits, SB 627 does not violate the intergovernmental immunity doctrine because it is a legitimate exercise of California's police power that, "at most, only incidentally affects" federal immigration and law enforcement. *Texas*, 123 F.4th at 205. Plaintiff's claim that SB 627 "threaten[s] to destroy the federal function of law enforcement in the State of California" falls flat. Mot. at 15. Until 2025, Plaintiff has enforced immigration and criminal law in a manner effectively consistent with the requirements of SB 627—that is, without the masks and facial coverings it now insists are necessary. *See* Shuchart ¶ 12. By regulating face coverings that are merely "incidental" to LEOs' duties, SB 627 does not control, impede, or grant "virtual power of review," *Inslee*, 151 F.4th at 1118, over federal law-enforcement activities. Therefore, SB 627 does not amount to an unconstitutional direct regulation.

Plaintiff's cited cases support this conclusion. Mot. at 12. In *United States v. City of Arcata*, the challenged ordinance completely prohibited the federal government from targeting minors with military recruitment, *entirely*

*thwarting* the federal government's activity in a realm squarely within its powers. 629 F.3d 986, 991 (9th Cir. 2010). In *Boeing Co. v. Movassaghi*, California's law imposing more stringent environmental standards violated intergovernmental immunity because it "replace[d] the federal cleanup standards…with the standards chosen by the state…overrid[ing] federal decisions as to necessary decontamination measures." 768 F.3d 832, 840 (9th Cir. 2014). And in *Newsom*, compliance with state law would have "requir[ed] ICE to entirely transform its approach to detention in [California] or else abandon its California facilities." 50 F.4th at 750; *see also United States v. King Cnty.*, 122 F.4th 740, 756 (9th Cir. 2024) (County Order violated intergovernmental immunity because it "effectively grant[ed] King County the power to *control* ICE's…operations," which "impermissibly [overrode] the federal government's decision") (emphasis added) (citations omitted). Conversely, here, "nobody is prohibiting the federal government from enforcing immigration law" or other federal laws. *Texas*, 123 F.4th at 206. Plaintiff makes generalized claims that the state laws will "substantially hamper[] federal operations," Mot. at 13, but neither explains nor demonstrates how the state laws would "transform" or "destroy" federal law enforcement.

   Not only does Plaintiff fail to show SB 627's effects are more than incidental, Plaintiff also cannot demonstrate that its officers are per se immune from liability under state law. Specifically, Plaintiff cannot meet its burden to show that a federal LEO's masking is "necessary and proper" in carrying out his duties, or that it is objectively reasonable. *See Clifton*, 549 F.2d at 729-30. Any claim of necessity is belied by the fact that neither law nor agency policy requires LEOs to mask, Shuchart ¶¶ 8-9, and individuals may choose whether to do so. Mot. at 8 (federal LEAs "allow their officers to choose whether to wear masks"); *see also* Vargas Decl. ¶ 8 (CBP "permits" but does not require LEOs "to wear facial masks or eyewear"); Glasheen Decl. ¶ 14 ("FBI Special Agents have discretion to wear masks…where they deem it appropriate"). Moreover, SB 627 exempts undercover

operations or masking to address health hazards to address situations when face coverings may actually be necessary.  Cal. Penal Code § 185.5(c)(1), Cal. Gov't Code § 7289(b)(3); *see also, e.g.*, Albarran Decl. ¶ 31 (describing health hazards).  Because masking is not "necessary and proper" for LEOs engaged in activity covered by SB 627, the State may properly enact generally applicable criminal laws in this space.

### 2.    SB 627 Does Not Unlawfully Discriminate Because Federal and State LEOs Are Not Similarly Situated

Although SB 627 excludes state law enforcement, it is a generally applicable law because, contrary to Plaintiff's contention, Mot. at 16-17, federal and state LEOs do not engage in the same activities and are thus not similarly situated.  As Plaintiff describes, "both [federal and state LEOs] engage in public law enforcement including investigations, stops, searches, and arrests." *Id.* at 17.  But there are "significant differences between the two classes [that] justify the differential treatment." *Dawson*, 586 U.S. at 175 (cleaned up).  Notably, SB 627 defines a "law enforcement officer" to mean a "peace officer, as defined in Section 830."  Cal. Penal Code § 185.5(e).  The vast majority of the state agencies that employ peace officers have limited jurisdiction, and those officers do not have significant interactions with the general public.  *See, e.g., id.* § 830.3(a) (designated investigators of the Dental Board of California are peace officers); *id.* § 830.3(b) (designated voluntary fire wardens who enforce laws and regulations related to forests, fire, and explosives are peace officers); *id.* § 830.3(c) (designated Department of Motor Vehicles employees are peace officers for limited purpose of enforcing laws committed to department's administration or on department's premises).

For those state agencies whose officers regularly engage in "investigations, stops, searches, and arrests," the officers typically wear uniforms and badges clearly identifying them as law enforcement during those activities.  *See, e.g.*, Bell

15

Ex. H (describing specific identifiable attire for "planned" enforcement actions, including "service of arrest or search warrants; residence...searches; undercover operations with a separate, pre-designated arrest team; or other high-risk enforcement operations"); Hurst Declaration, Att. 1.  And those officers wear masks only in limited and carefully circumscribed instances.  *See* Bell, Ex. H (detailing agency policy more restrictive than state law).  By contrast, federal LEOs increasingly engage in large-scale enforcement operations while wearing facial coverings, and *without* wearing conspicuous attire or other equipment that clearly identify them as LEOs.  Bell, Exs. B-C.  That conduct results in fear and intimidation among members of the public—one of the very harms that the No Secret Police Act intended to address.  Velez ¶ 7; Shouhed ¶ 11; Miranda ¶ 13; Speranza Declaration ("Speranza") ¶ 8; Mundwiler ¶ 9.  Because of this significant difference, federal and state LEOs are not similarly situated, and thus Plaintiff's discrimination argument must fail.

### C.   SB 805 Does Not Violate Intergovernmental Immunity

SB 805, which requires LEOs to "visibly display identification" when engaged in "enforcement duties," does not run afoul of intergovernmental immunity, either. Plaintiff does not allege SB 805 unlawfully discriminates against it, Dkt. 1, and thus concedes that it is a generally applicable statute.  As for direct regulation, federal employees enjoy no "general immunity" from state criminal laws enacted pursuant to the state's police power. *Johnson*, 254 U.S. at 56.  SB 805 is exactly that, as it is intended to ensure that the public knows whether they are being chased, detained, or arrested by someone with legitimate law-enforcement authority or someone aiming to do them harm.  The law does not threaten to "transform," *Newsom*, 50 F.4th at 750, "prevent," *Inslee*, 151 F.4th at 1118, or "destroy," Mot. at 15, federal law-enforcement functions.  Rather, it provides that non-uniformed LEOs display some identification—consistent with how federal LEOs have operated for decades—so that the public and law enforcement can tell the difference between

1    those with valid authority and imposters.  *See, e.g.*, Bell Exs. F-G; Schrader ¶ 8.

2    Like SB 627, SB 805's modest identification requirement, "at most, only

3    incidentally affects" federal operations.  *Texas*, 123 F.4th at 205.

4         Moreover, the statute's broad exceptions weaken Plaintiff's arguments

5    further, as they accommodate a wide range of law-enforcement activities, such as

6    undercover operations, investigative activities, exigent circumstances, and officers

7    engaged in SWAT or tactical-team responsibilities.  *See* Cal. Penal Code

8    § 13654(b).  Consequently, and contrary to Plaintiff's alarmist claims, nothing in

9    SB 805 prevents officers from "routinely conduct[ing] investigations and

10    surveillance in plainclothes," Albarran Decl. ¶ 33, *see also* Vargas Decl. ¶ 21, Allen

11    Decl. ¶ 14, as SB 805 exempts plainclothes operations *for investigation* or

12    surveillance operations, which are not "enforcement dut[ies]."  Cal. Penal Code

13    § 13654(d)(1).  To the extent revealing an agent's name or badge number may

14    result in doxxing, Mot. at 18, such harms can be mitigated through the use of

15    anonymized badge numbers where the agent's corresponding information is not

16    revealed to the public but maintained by the agency only.  Shuchart ¶ 15.  Because

17    Plaintiff cannot meet its burden to show that the conduct *actually covered* by SB

18    805 is "necessary and proper" for LEOs, its challenge to SB 805 must fail.

19    **D.    Plaintiff Has Not Satisfied the Standard for Bringing a Facial
         Challenge to Either Law's Conduct Provision**

20

21         Even if there may be some hypothetical circumstances where individual

22    federal officers who violate either law's Conduct Provision would be immune from

23    state prosecution under Supremacy-Clause immunity, Plaintiff cannot show that, *in*

24    *all circumstances*, masking or concealing identification by federal officers is both

25    subjectively necessary and objectively reasonable.  *See Moody*, 603 U.S. at 723.

26    Whether a federal officer subjectively believes he must shield his identity—whether

27    through masking or failing to display identification—and whether that belief is

28    objectively reasonable, depends on specific facts in an individual case and should

be litigated as an as-applied challenge. *See, e.g.*, *Kleinert*, 855 F.3d at 317-20; *see also Wash. State Grange*, 552 U.S. at 450. Federal LEAs currently give LEOs the *option* to mask—meaning two officers working together may make different choices. This is fatal to a facial challenge; regardless of why an individual officer may honestly believe it is necessary to violate either law's Conduct Provision, this Court cannot evaluate whether that belief is objectively reasonable absent a factual record specific to the circumstances and that LEO. Plaintiff, thus, is not likely to succeed on its facial challenge as to these laws.

## II.    PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

Fundamentally, Plaintiff's argument that it suffers irreparable injury based solely on the existence of a Supremacy Clause violation, Mot. at 17-18, fails because Plaintiff cannot demonstrate a likelihood of success on the merits. Even if Plaintiff was successful in showing a likelihood of success on its Supremacy Clause claim, Plaintiff ignores that the Ninth Circuit rejected this same argument in *United States v. California*, 921 F.3d 865, 894 (9th Cir. 2019), during the first Trump Administration. Although there, the Ninth Circuit determined that one provision of AB 103 likely violated the intergovernmental immunity doctrine, the court remanded to the district court to apply the other *Winter* factors where the United States's sole evidence of harm was tied to "conclusory assertions made by a DHS official in a declaration" and "general pronouncements that that a Supremacy Clause violation alone constitutes sufficient harm to warrant an injunction." *Id.*

The same is true here, as Plaintiff offers "conclusory assertions" and "general pronouncements." Plaintiff first provides no explanation to support its claim that if individual officers cannot wear a mask or conceal identifiers, law-enforcement operations will be "compromised." Mot. at 2. This sweeping statement cannot be squared with the fact that officers currently have the *choice* to wear a mask or conceal their identifiers, indicating that an officer's decision against doing so cannot be critical to operational security and success. Plaintiff additionally claims

18

SBs 627 and 805 will endanger LEOs and their families by publicly exposing their identities, *id*. at 18, and cites its own self-serving agency press releases, which themselves offer no citation to authority, *id.* at 7; *see also* Shuchart ¶ 13. But this claim is undermined by federal LEOs' routine public appearances, without masks and with identification displayed, while working in public buildings, testifying in open court, appearing on television, or attending recruiting events.

Plaintiff's related claims that the threat of enforcement will chill the enforcement of federal law and deter prospective federal LEOs from applying for jobs, Mot. at 19, is likewise speculative and conclusory. SBs 627 and 805 expressly exempt undercover operations, which continue unimpacted, while the conclusory testimony of Plaintiff's declarants fails to provide any evidence of how either law's covered conduct actually chills covered agents. Vargas Decl. ¶ 24; Albarran Decl. ¶ 37; Allen Decl. ¶ 19. Plus, DHS recently announced that it received over 200,000 job applications, demonstrating that prospective LEOs are undeterred from applying. Bell, Ex. I.

Further, because the challenged provisions are consistent with federal laws and longstanding agency policies regarding LEOs' identification, they cannot not irreparably harm Plaintiff. *See* Schrader ¶¶ 53, 56. Before January 2025, when the practice of conducting civil immigration enforcement in masks and without identifiers began, officers generally wore an "ICE" or "ICE POLICE" insignia with visible badge and number. Shuchart ¶ 11. Recognizing the longstanding identification practice, the United States Marshals Service also recently directed citizens that "[r]eal officers," including federal officers, will identify themselves by badge number and agency name. Bell, Ex. F. Additionally, the settlement agreement in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal. 2025), Dkt. 525-1, prohibits ICE officers in the Central District of California from identifying themselves just as "police," including by wearing jackets that say "POLICE," unless they also say "ICE" with equal prominence. For all these reasons, Plaintiff

has not demonstrated irreparable harm, so its motion can be denied on this basis alone.  *See Winter*, 555 U.S. at 22 (Plaintiff must show "likelihood" not just "possibility" of irreparable harm for injunctive relief).

### III.  THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH HEAVILY AGAINST A PRELIMINARY INJUNCTION

For government parties, the balance of hardships and the public interest *Winter* factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  After weighing "the effect on each party of the granting or withholding of the requested relief,"if the balance tips in the State's favor, the preliminary injunction should be denied.  *See Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

Here, the alleged harm on Plaintiff's side is slight.  Plaintiff argues without support that the challenged provisions "'[f]rustrat[e]…federal statutes and prerogatives.'"  Mot. at 19.  But Plaintiff identifies no federal law or policy that requires agents to mask or withhold their identities.  Both statutes are carefully tailored to allow legitimate uses of masks and identity concealment.  Cal. Penal Code § 185.5(b)(2), (c); *id.* § 13654(b).  Although Plaintiff contends that an injunction is needed to prevent conflict between state and federal LEAs, Mot. at 20, this ignores how state and federal law enforcement have long operated under dual federal and state regulation.  And while all law enforcement agents should be entitled to protection from harassment and doxxing, *see id.* at 19, Plaintiff offers no evidence that masking or refusing to wear a badge or identification number—practices virtually unheard of before 2025—does anything to ameliorate this risk.  *See supra* II; Shuchart ¶ 12.  Research also suggests the reports of increased assaults on federal agents cited by Plaintiff are inaccurate and do not appropriately distinguish by cause or severity.  Shuchart ¶ 13.

Instead, the equities heavily favor California.  "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers

20

a form of irreparable injury." *See Maryland v. King*, 567 U.S. 1301, 1303 (2012)
(quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351
(1977) (Rehnquist, J., in chambers); *accord Wilson*, 122 F.3d at 719. Courts
"should pay particular regard for the public consequences in employing the
extraordinary remedy of injunction." *Winter*, 555 U.S. at 20 (quoting *Weinberger
v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

A preliminary injunction will frustrate the State's attempt to ameliorate the
severe and irreparable harm that California faces. Both laws reflect a legislative
choice to ensure both that California's own LEOs are not at risk, *see, e.g.*, Shuchart
¶ 18, and that California's residents know whether they are interacting with
criminals or legitimate LEOs, and whether they are being directed to comply with
an order by individuals with legal authority or not, *see, e.g.*, Anderson ¶ 12;
Speranza ¶ 17; Shouhed ¶ 17. The laws also aim to address the fear and
intimidation that unidentifiable federal LEOs have caused throughout California
communities. Aguiluz ¶ 15; Miranda ¶ 11; Anderson ¶ 7; Shouhed ¶ 6.

Unidentifiable federal agents—especially when masked—pose significant
public safety risks. Federal LEOs' efforts to conceal their identities and
affiliations—using masks, wearing plainclothes, and refusing to identify
themselves—have made it difficult to distinguish them from criminals. *See, e.g.*,
Shuchart ¶ 18; Franklin ¶¶ 15-16; Wong Declaration ("Wong") ¶¶ 43-44; Anderson
¶ 12; Le Blanc ¶ 6; Mundwiler ¶ 7. Such practices also make it easier for criminals
to impersonate law enforcement while committing crimes. Shuchart ¶ 18; Bell,
Exs. F-G. Indeed, imposters dressed as immigration-enforcement agents have
reportedly engaged in sexual assaults, robberies, and kidnappings. Bell, Ex. G.
Without SBs 627 and 805, these dangers will persist.

Masked or unidentifiable federal agents also undermine state and local law
enforcement in a number of respects. Californians are more likely to fear or distrust
law enforcement generally if they witness LEOs wearing masks or conducting

enforcement actions in plainclothes without identification, Wong ¶¶ 19, 43, which damages the public trust that is necessary for state and local law enforcement to be effective, *see* Speranza ¶ 15; Anderson ¶ 12.  Californians also report being less likely to contact law enforcement if they need help, which likewise harms public safety.  Wong ¶¶ 22, 43; Anderson ¶ 11.  And enforcement actions taken by unidentified federal agents in plainclothes cause Californians to believe they are witnessing or victims of a criminal offense in the making, Le Blanc ¶ 11, Wong ¶¶ 42, 46, which increases the risk of a violent confrontation, posing additional public safety risks, Franklin ¶¶ 17-19.

Finally, the needless concealment of federal officers' identities limits the ability of individuals to challenge any unlawful acts LEOs may commit.  Le Blanc ¶ 18; Miranda ¶ 13; Aguiluz ¶ 17; Solarzano ¶ 12.  Time and again, Californians reported that masked federal agents often did not answer when asked to identify themselves or provide their name and badge number.  Velez ¶ 6; De La Riva ¶ 7; Le Blanc ¶ 9; Solarzano ¶ 12; Speranza ¶ 7; Carrasco ¶ 8.  Eyewitnesses fear that federal agents will be able to arrest and detain individuals with impunity and without cause.  Le Blanc ¶ 18; Miranda ¶ 13; Speranza ¶ 11.  And if individuals are injured by masked federal agents, they will struggle to exercise their legal rights if the agent involved cannot be identified.  *See, e.g.*, Franklin ¶ 20.  Given the federal government's current practices, a preliminary injunction of these laws will make it easier for federal officers, and the federal government writ large, to evade the accountability that is vital to the public interest and our democracy.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion.

1

Dated:  December 22, 2025

2

Respectfully submitted,

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANNA FERRARI
LEE I. SHERMAN
Supervising Deputy Attorneys General
KRISTI A. HUGHES
ZELDA VASSAR
ASHA ALBUQUERQUE
ALYSSA ZHANG
Deputy Attorneys General

3

4

5

6

7

8

9

10

*/s/ Cameron A. Bell*
CAMERON A. BELL
Deputy Attorney General
*Attorneys for Defendants*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

1

**CERTIFICATE OF COMPLIANCE**

2       The undersigned, counsel of record for Defendants State of California,

3   California Governor Gavin Newsom, and Calfiornia Attorney General Rob Bonta,

4   certifies that this brief contains 6,902 words, which complies with the word limit of

5   L.R. 11-6.1.

6

7   Dated:  December 22, 2025                    Respectfully submitted,

8                                               ROB BONTA
                                                Attorney General of California
9

10

11                                              */s/ Cameron A. Bell*

12                                              CAMERON A. BELL
                                                Deputy Attorney General
13                                              *Attorneys for Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28