1  ROB BONTA
   Attorney General of California
2  MICHAEL L. NEWMAN
   THOMAS S. PATTERSON
3  Senior Assistant Attorneys General
   ANNA FERRARI, SBN 261579
4  LEE I. SHERMAN, SBN 272271
   Supervising Deputy Attorneys General
5  KRISTI A. HUGHES, SBN 235943
   ZELDA VASSAR, SBN 313789
6  ASHA ALBUQUERQUE, State Bar No. 332901
   ALYSSA ZHANG, SBN 360105
7  CAMERON A. BELL, SBN 305872
   Deputy Attorneys General
8    300 S. Spring Street
   Los Angeles, CA 90013
9  Telephone: (213) 269-6000
   E-mail: Cameron.Bell@doj.ca.gov
10 *Attorneys for Defendants*

11                    IN THE UNITED STATES DISTRICT COURT

12                   FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14

15

16 | **THE UNITED STATES OF AMERICA,** | 2:25-cv-10999-CAS-AJR |
17 | | **DECLARATION OF CAMERON A. BELL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
   | Plaintiff, | |
18 | | |
19 | v. | |
20 | | |
   | **STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,** | |
21 | | |
22 | | |
23 | Defendants. | |
24

25

26

27

28

1

I, Cameron A. Bell, declare under penalty of perjury that the following is true and correct:

1.    I am an attorney licensed to practice law in the State of California, admitted to the bar of this Court, and a Deputy Attorney General in the Office of the Attorney General, California Department of Justice.

2.    The Attorney General is counsel to Defendants Attorney General Rob Bonta, Governor Gavin Newsom, and the State of California. I make this declaration in support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.

3.    I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

4.    Attached hereto as **Exhibit A** is a true and correct copy of a June 13, 2025 article authored by Pedro Rios and published by Cal Matters, entitled *ICE raids in San Diego foreshadowed the roundups, protests now spreading across California,* available on the Cal Matters' official website at: https://calmatters.org/commentary/2025/06/ice-san-diego-foreshadowed-protests/.

5.    Attached hereto as **Exhibit B** is a true and correct copy of a June 19, 2025 article authored by Martin Kaste and published by NPR, entitled *As courts review military in LA, immigration enforcement accelerates*, available on NPR's official website at https://www.npr.org/2025/06/19/g-s1-73569/as-courts-review-military-in-l-a-immigration-enforcement-accelerates.

6.    Attached hereto as **Exhibit C** is a true and correct copy of an August 8, 2025 article authored by Rachael Uranga and Brittny Mejia and published by the Los Angeles Times, entitled '*They run, we chase': Immigration raids test limits of probable cause*, and available on the Los Angeles Times' official website at

https://www.latimes.com/california/story/2025-08-08/they-run-we-chase-agents-employ-aggressive-and-some-say-illegal-tactics-on-l-a-streets.

7.    Attached hereto as **Exhibit D** is a true and correct copy of a June 11, 2025 article authored by Orlando Mayorquín and Jesus Jiménez and published by the New York Times, entitled *Agents Use Military-Style Force Against Protesters at L.A. Immigration Raid*, available on the New York Times' official website at https://www.nytimes.com/2025/06/06/us/los-angeles-immigration-raid.html.

8.    Attached hereto as **Exhibit E** is a true and correct copy of a June 27, 2025 article authored by Carlos Granda and published by ABC7, entitled *Huntington Park Police Arrest Man Possibly Posing as Border Patrol Agent,* available on ABC7's official website at https://abc7.com/amp/post/huntington-park-police-arrest-man-possibly-posing-border-patrol-agent/16868054/.

9.    Attached hereto as **Exhibit F** is a true and correct copy of a November 20, 2025 U.S. Marshals Service press release authored by Ryan Guay, Supervisory Deputy U.S. Marshal, entitled *Real Officers Have Nothing to Hide: If In Doubt, Ask to Verify*, available on U.S. Marshals Service' official website at https://www.usmarshals.gov/news/press-release/real-officers-have-nothing-hide-if-doubt-ask-verify.

10.    Attached hereto as **Exhibit G** is a true and correct copy of a 2025 Public Safety Awareness Report OPE-26-SA-02 by the Federal Bureau of Investigation, Office of Partner Engagement, entitled *Criminal Actors Impersonate ICE Agents to Commit Violent Crime*, available on Property of the People's official website at: https://propertyofthepeople.org/document-detail/?doc-id=26364028.

11.    Attached hereto as **Exhibit H** is a true and correct copy of an excerpt from the California Department of Justice, Division of Law and Enforcement, Policies and Procedures Manual 2024, Sections 1046-1046.3.11.  A redacted but publicly available copy of the policy is online at

1   https://oag.ca.gov/system/files/media/2024-law-enforcement-policy-and-
2   procedures-manual.pdf.

3           12.    Attached hereto as **Exhibit I** is a true and correct copy of a September
4   16, 2025 article authored by the U.S. Department of Homeland Security (DHS),
5   entitled *ICE Receives More than 150,000 Applications to Join ICE Law*
6   *Enforcement to Help Remove Worst of the Worst Criminal Illegal Aliens from U.S.*
7   and available on DHS's official website at
8   https://www.dhs.gov/news/2025/09/16/ice-receives-more-150000-applications-join-
9   ice-law-enforcement-help-remove-worst.
10
11          I declare under penalty of perjury under the laws of the United States that the
12   foregoing is true and correct.
13
14  Executed on December 22, 2025, in Los Angeles, California.
15
16                                              */s/ Cameron A. Bell*
                                                CAMERON A. BELL
17                                              DEPUTY ATTORNEY GENERAL
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

 10 YEARS

**Donate**

"CalMatters helps me render meaning out of an increasingly chaotic world." —CalMatters member Sean of Los Angeles

Politics   Immigration   Housing   Education   Economy   Environment   California Voices   Digital Democracy

**COMMENTARY**

# ICE raids in San Diego foreshadowed the roundups, protests now spreading across California

 **BY PEDRO RIOS**
**JUNE 13, 2025**

Republish



We don't yield to power.
No agenda but the truth.
Back independent, nonpartisan journalism for all Californians.

**Triple your donation**

Neighbors confront Immigration and Customs Enforcement's Special Response Team officers following an immigration raid at the Italian restaurant Buono Forchetta in San Diego on May 30, 2025. Photo courtesy of Pedro Rios

Days before President **Donald Trump** unleashed federal immigration agents to raid sites spanning from California's biggest cities to its **agricultural heartland**, **sparking protests in L.A.** and elsewhere, San Diego's quaint South Park neighborhood was targeted. Two popular Italian restaurants were **swarmed by Immigration and Customs Enforcement agents** on May 30, prompting a remarkable response from neighbors who rallied to the scene and **forced a retreat under shouts of "shame."**

Late that afternoon, dozens of ICE agents from the Homeland Security Investigations division entered the side-by-side Buona Forchetta and Enoteca Buona Forchetta restaurants, surrounding them with over a dozen vehicles. Police tape wrapped around government vehicles delineating an off-limits zone where dozens of federal agents congregated.

The disruption overwhelmed these already-crowded streets. Diners at nearby restaurants had been enjoying their meals and neighbors were walking their dogs. Children at **Albert Einstein Charter Academy prepared to leave** the schoolyard before they were directed to a back gate to avoid the commotion.

Aubree Miller, who has lived in South Park for the greater part of her adult life, described the experience to me in this way: "I was on my way to meet up with another neighbor and friend for happy-hour drinks when we were suddenly faced with a swarm of militarized people and a handful of unmarked cars cuffing and taking away people who have been a part of the fabric of the neighborhood for years."

At Buona Forchetta, known for its award-winning Neapolitan pizza, ICE agents placed all the workers in plastic zip ties. I could see the officers walking around them when I arrived roughly 25 minutes after ICE agents forced their way inside.

One detained worker was being muscled into a van, shackled by handcuffs with ankle restraints. A total of four people were arrested that day — all service workers.

A crowd had already formed outside of Buona Forchetta by that point. Patrons of nearby establishments, parents with their children in their arms and even dog-walkers were taking turns challenging the masked ICE agents, telling them in colorful language that they weren't welcome in this neighborhood.

An ICE tactical unit, geared up with helmets and rifles, tossed three loud flashbang grenades at the people who had surrounded their vehicles, intending to disperse them.

In an email, Patricia Mondragon, a South Park resident and regional policy manager at Alliance San Diego, told me that when she arrived at the site of the raid, "it was filled with people yelling and I could see smoke.

People with children or pets were rushing away from the intersection and I saw a lot of heavily armed and masked combatants."



ICE officers conduct an immigration raid at Buona Forchetta, an Italian restaurant, in the South Park neighborhood of San Diego on May 30, 2025. Photo courtesy of Pedro Rios

Of the four arrested workers, two remained at a for-profit detention center expecting to fight their removal from the United States. One signed a voluntary departure form and is now in Mexico. The fourth, a Colombian national with only a two-week work history at Buona Forchetta, his whereabouts were unknown.

ICE officials justified the raid by pointing to an unsealed warrant that claimed there were 19 instances where employees used fraudulent documents to gain employment. The warrant also alleged the owner of Buona Forchetta was "exploiting these employees by having them work over 12-hour shifts with no breaks," according to an unidentified November 2020 complaint.

San Diego County's Office of Labor Standards and Enforcement **wage theft judgement dashboard** does not contain any record of Buona Forchetta being involved in a labor code dispute.

Still, this was not the first operation in San Diego County under the second Trump administration. In March, ICE and other federal agencies, **including Border Patrol**, **conducted a worksite** raid at San Diego Powder and Protective Coatings, a family-run company in unincorporated El Cajon that contracts with the federal government.

In that operation, more than 60 federal agents reportedly held dozens of workers for over nine hours, restricting bathroom breaks and offering few snacks. Family members, fellow workers and community members protested outside the facility for hours.

**READ MORE: History suggests the GOP will pay a political price for its immigration tactics in California**

Since late last month, ICE agents have also been **arresting migrants appearing at immigration courts**. The arrests resemble kidnappings because people are abruptly separated from accompanying family members and attorneys and disappear into elevators.

In one case I witnessed in San Diego, **ICE agents mistakenly detained** "the wrong guy" who had a panic attack and fainted after being restrained, requiring a volunteer to call 911.

The confluence of these events in San Diego, alongside actions in other parts of the country where migrants were **unlawfully sent to El Salvador**, Guantanamo Bay or apprehended **without much information about their whereabouts**, has caused consternation about the degradation of rights and the heavy-handed approach ICE agents use to detain people.



People protest as ICE officers conduct an immigration raid at Buona Forchetta, an Italian restaurant, in the South Park neighborhood of San Diego on May 30, 2025. Photo courtesy of Pedro Rios

Trump has now deployed 700 active-duty Marines in addition to **federalizing several thousand National Guard troops** to ostensibly conduct law enforcement duties in Los Angeles, **triggering condemnation** by border-based organizations "for the excessive use of force and the militarization of our communities."

Despite the siege strategy displayed in ICE raids and the potentially disastrous presence of combat troops in major California cities, organizations like the National Day Labor Organizing Network **called on allies** to bring courage and anger, but "please leave your hatred at home. We are acting out of love."

It is that love that I heard from one of the long-time workers at Buona Forchetta when I asked him about the raid and what he witnessed. "I felt strengthened," he told me in Spanish, about seeing the neighbors that rallied against the ICE agents and in defense of those arrested.

READ MORE



**JUSTICE**

**72 hours in LA: Immigration sweeps, protests and a historic National Guard deployment**

JUNE 10, 2025



**JUSTICE**

**'Everybody stood up': Why a union leader's arrest galvanized California Democrats on immigration**

JUNE 9, 2025

---

© 2025 CalMatters

Exhibit A

# EXHIBIT B



HOURLY NEWS

Play Live Radio

LISTEN LIVE

MY PLAYLIST





DONATE

IMMIGRATION

# As courts review military in LA, immigration enforcement accelerates

JUNE 19, 2025 · 12:10 PM ET

 Martin Kaste

**3-Minute Listen**                                    PLAYLIST    TRANSCRIPT



Anti-ICE protesters face off with Homeland Security officers and Marines outside the federal building in downtown Los Angeles on Monday evening

013
Exhibit B

Case 2:25-cv-10999-CAS-AJR     Document 29-2     Filed 12/22/25     Page 14 of 70     Page
ID #:256

Martin Kaste

A federal appeals court Thursday has allowed President Trump to keep control of
California National Guard troops in LA. Gov. Gavin Newsom challenged the
president in a lawsuit that alleged Trump acted illegally when he federalized the
troops.

The president sent more than 4,000 Guard members to the city to protect federal
property and employees during tumultuous protests against immigration
enforcement; Newsom says the deployment of the Guard and an additional 700
Marines was an overreaction and counter-productive.

But while the status of the military units in Los Angeles remains undecided, the
immigration raids that touched off the protests in early June have intensified.

**Sponsor Message**

"Operations are getting a little bit more faster, and they're in and out," says Vlad
Carrasco, with the immigrant advocacy group CHIRLA, where he's part of a "rapid
response" effort that rushes to the sites of reported raids by Immigration and
Customs Enforcement, or ICE. Carrasco says he used to be able to get there in
time to document ICE actions, but that changed in early June. Now when he gets
to the scene, ICE is leaving or already gone.

"They know it'll likely cause a mobilization by the local community if they do stay

014
Exhibit B

there a long time," Carrasco says.

Advocacy groups have been sharing videos of ICE and other immigration
enforcement officers being confronted by angry civilians. In some cases, National
Guard soldiers will emerge from a van to establish a protective line between
agents and members of the public, but observers say the more common defensive
tactic is speed.

Combine that with the fact that agents are sometimes in plainclothes, masked, or
wear insignia from other federal agencies, and the result is widespread fear, says
Guillermo Torres of Clergy and Laity United for Economic Justice

"It makes you think of a totalitarian regime," Torres says. "It makes you think of a
country where people are kidnapped. Not only kidnapped, they disappear."

The Trump administration lays the blame for the stepped-up raids in LA on the
city itself, and its policies limiting cooperation between local law enforcement and
federal immigration enforcement. Administration officials such as "border czar"
Tom Homan have repeatedly said "sanctuary" jurisdictions force federal agents to
perform risky arrests in neighborhoods, because they're not able to take custody
of their targets from local jails, when local law enforcement arrests them on non-
immigration charges.

"These operations have been much more difficult because of Los Angeles' and

California's sanctuary policies," Homeland Security Secretary Kristi Noem said
last week.

As to agents wearing masks, the acting director of ICE, Todd Lyons, says it's a
necessary response to what he describes as efforts to post the photos and names
of agents online, which he says has led to threats to them and their families.

"Is anyone upset with the fact that ICE officers' families were labeled 'terrorists'?"
Lyons said, earlier this month.

But Oscar Zarate, also with CHIRLA, says the federal government's deployment of
personnel from multiple federal agencies to immigration enforcement in the city
has created what he calls a "peak level of anxiety." Immigration enforcement in LA
has involved personnel from Homeland Security Investigations, Customs and
Border Protection and the Drug Enforcement Administration.

"I think because we've seen some of the agents in plain clothing with unmarked
vehicles, it's hard to decipher who they are and what they're there for," he says,
adding that CHIRLA's rapid response team is also receiving more mistaken reports
from people who see local law enforcement activity and think it's ICE.

"But I think that's because [ICE is] kind of in disguise now, and people now can
never really decipher who it is," Zarate says.

ICE agents may soon be forced to identify themselves more clearly, because of a
class action lawsuit filed by the ACLU of Southern California in 2020. It challenges
immigration enforcement officers who allegedly pretend they're regular police to
lure people out of their homes.

016
Exhibit B

A federal court has granted preliminary approval to a settlement which would, in part, require certain ICE personnel in the Los Angeles region to wear more prominent insignia.

"Requiring that the identifiers at least be equally visibly prominent [as the word "POLICE"] will help with some of the confusion that there is when ICE officers are out and about," says Stephanie Padilla, a staff attorney with the ACLU of Southern California.

But even if the court settlement is implemented later this year, its effect will be limited: It applies only to ICE, not the employees of the other federal law enforcement agencies that have been drafted into President Trump's plan for mass deportation.

017

Exhibit B

# EXHIBIT C

*Los Angeles Times*

Trump
administration ›        Immigration    Environment    Economy

**CALIFORNIA**

# 'They run, we chase': Immigration raids test limits of 'probable cause'



Myra Villarreal wipes tears as her son Adrian Martinez, 20, describes how he was thrown on the ground by Border Patrol as he was returning from a break as a Walmart employee and trying to protect a co-worker.  (Gina Ferazzi / Los Angeles Times)

 

**By Rachel Uranga and Brittny Mejia**

Aug. 8, 2025 3 AM PT

019
Exhibit C

Matilde suffered a heart attack after she was held by immigration agents at a Lowes parking lot and can no longer go to the store without breaking down. Narciso Barranco, a gardener accused of threatening heavily armed agents with a weed whacker, still wakes up with headaches after he was beaten during his arrest. Jaime Alanís Garcia died after falling 30 feet from a rafter as agents stormed his workplace.

The aggressive tactics led by Border Patrol agents hundreds of miles from their posts have left communities jarred, people injured and businesses gutted.

"I can't erase the masked faces from my mind," said Matilde, a 54-year-old mother who is still gripped with fear about the raid in Pacoima. In a bystander video posted on social media, she appears to faint after agents grabbed her from behind. A doctor told Matilde, who asked that her full name not be used, that she had a heart attack.

Civil rights activists, city leaders, immigrants and their advocates were hopeful that the indiscriminate sweeps targeting Latinos were over in July after a federal judge issued a temporary restraining order, ruling that Border Patrol agents' profiling tactics violated the 4th Amendment. They were even more heartened when the 9th Circuit Court of Appeals rejected the government's argument that their tactics were lawful and upheld the restraining order.

But this week, Customs and Border Protection struck in Los Angeles again, raiding a car wash and a Home Depot, grabbing anyone who ran from them.

"We are not leaving," said Border Patrol Sector Chief Greg Bovino, who has been leading the operations in California.

The temporary restraining orders prohibits agents from stopping someone solely based on their race, language, job or location.

Mayor Karen Bass said it appears as if the Wednesday raid at a Home Depot in

020
Exhibit C

Westlake — dubbed "Operation Trojan Horse" — violated the order, but city attorneys
are still trying to determine the facts.

The legal wrangling will continue over the ways agents decide who to target and the
level of use of force they use for non-criminal enforcement. The government on
Thursday asked the U.S. Supreme Court to lift the judge's order.

Now other parts of the country are watching the events in California, expecting
federal agents to target their immigrant communities, particularly in states with no
judicial orders blocking them.

"We saw the videos, the images coming out of Los Angeles. We definitely thought we
would be next," said Rey Wences, with Illinois Coalition for Immigrant and Refugee
Rights, which runs a hotline that monitors raids. "We're just waiting for the shoe to
drop."

The Times reviewed dozens of witness and surveillance videos, pored through
criminal complaints and interviewed lawyers, advocates, bystanders and experts to
understand how on-the-ground operations have unfolded this summer and where the
points of contention are.

## Are 'roving patrols' simply racial profiling?

Border Patrol agents were driving down West Olympic Boulevard in Montebello — a
largely Latino community — when surveillance footage captured their white SUV
make a U-turn and pull into the driveway of a tow yard at 4:32 p.m on June 12.

021
Exhibit C

As Homeland Security Investigations special agent Nicholas DeSimone later wrote in a federal criminal complaint, the operation was not preplanned but rather part of a "roving patrol"— a controversial tactic that lawsuits link to racial profiling and was widely used in the Los Angeles area after the raids started in June.

"Roving patrols," according to U.S. Customs and Border Protection, involves agents on foot or in a vehicle simply looking for people who might be undocumented, a practice traditionally focused on the border region.

Within minutes, agents had arrested two people at the tow yard. They also cornered a U.S. citizen, Brian Gavidia, who is now part of a lawsuit challenging the constitutionality of these stops.

Video of the stop taken by his friend went viral and raised red flags early in the crackdown that agents were indiscriminately targeting people because of the way they looked.

022
Exhibit C

"I'm an American, bro," Gavidia can be heard saying to the agent, as his friend narrates. "These guys, literally based off of skin color!"

---



**CALIFORNIA**

**Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. citizens**

June 15, 2025

---

The purpose of a roving patrol is for border agents to deter or respond to illegal activity, according to the agency. These tactics are a departure from agents targeting specific immigrants based on information they have on the person, such as serious criminal histories or removal orders. And while agents have been carrying out roving patrols for more than a decade, they are controversial and untested at such a large scale in the interior of the country.



Mohammad Tajsar, senior attorney, speaks during a press conference at Bubble Bath Car Wash following weeks of immigration raids across Southern California.  (William Liang / For The Times)

In July, the ACLU of Southern California, Public Counsel, other groups and private attorneys filed a lawsuit in L.A. challenging the constitutionality of the roving patrols and requesting the temporary restraining order. During a hearing, Mohammad Tajsar, an ACLU attorney, told U.S. District Judge Maame Ewusi-Mensah Frimpong that plaintiffs had documented an "overwhelming record" showing the government "has a policy and practice of conducting so called roving patrols throughout this district to stop individuals without ever making a particularized, individualized assessment of reasonable suspicion that the person is in the United States in violation of U.S. immigration law."

"This practice is officially sanctioned," Tajsar said during the hearing.

ACLU lawyers had already sued over indiscriminate sweeps in February, after Bovino oversaw roving patrols in Kern County the month before. They argued the agency had a history of detaining people during these patrols without establishing reasonable suspicion of their immigration violation, and of threatening physical harm against those who refuse to comply.

"Border Patrol's interior sweeps demonstrate a pattern of noncompliance with the statutory and constitutional limits on its authority," attorneys argued in that case. Specifically, they alleged the agency was relying on race or ethnicity to justify stops, using physical abuse if a person refused to voluntary questioning and detaining people who declined to talk.

Past lawsuits show that Border Patrol agents determined on the fly who to stop, based on the slightest behaviors, from people slowing abruptly, speeding up, avoiding eye contact or not sitting upright.

But the agency's own data show that roving patrols don't often yield many people that

024
Exhibit C

are breaking the law.

In Border Patrol's El Centro sector, where Bovino is stationed, from Oct. 1, 2023 to March 31, 2024, agents conducted 1,114 roving patrol stops, according to a 2024 DHS report. Of roving patrol stops, only 160 were categorized as "Apprehensions Deportable."

## Is running away reasonable suspicion to detain someone?

On June 17, Vivaldo Montes Herrera was pushing a trash can across the parking lot of the plaza he's cleaned for years when he spotted a marked Border Patrol truck, out on a roving patrol, coming straight toward him.



025
Exhibit C



Handout photo of Montes Herrera with his daughter.   (Claudia Mejia)

Surveillance footage captured Montes Herrera pushing the trash can away and starting to run. Even before the Border Patrol truck stopped, an agent opened the door and dashed after the custodial worker.

To the agents, the fact that Montes Herrera ran helped create reasonable suspicion that he was in the country illegally. As Border Patrol captioned an Instagram video last month: "When they run, we chase."

Across the country, people now wrestle with the question of what do when confronted by immigration agents: Do I run?

026
Exhibit C

Even people who are in the country legally have tried to make a break for it. In one case, despite having legal status, Domingo Rueda Hernandez ran behind bags of soil during a raid that unfolded outside of a Home Depot in Hollywood.

In another instance captured on video, a U.S. citizen is splayed out on a sidewalk in El Monte as two men with vests that read "Border Patrol" kneel over him.

"What the hell, man," the man told the agents in perfect English. "I'm not doing nothing wrong."

"Then why were you running?" an agent asks.

Government and civil rights lawyers both agree that somebody running from an agent, in some cases, can be grounds for reasonable suspicion. But it doesn't determine whether an arrest can actually be made.

027
Exhibit C

In her ruling, Judge Frimpong did not order the agents to stop the practice but
expressed misgivings about it, noting that the government hadn't explained "why
fleeing upon seeing unidentified masked men with guns exiting from tinted cars
without license plates raises suspicion."



028
Exhibit C





Adrian Martinez, 20, with his mom Myra Villarreal, left, describes how his neck was bruised and his leg was injured after he was thrown on the ground by Border Patrol as he was returning from a break as a Walmart employee and trying to protect a co-worker.  (Gina Ferazzi / Los Angeles Times)

In El Monte, when Montes Herrera was being detained, Adrian Martinez, a worker at a Walmart in the plaza, tried to intervene and was arrested alongside him. Martinez said he heard agents laughing at Montes Herrera and calling him "dumb for running."

"We wouldn't have chased him if he wouldn't have ran," Martinez recalled the agents saying.

"They make it seem like, 'Oh, we're not going toward them unless they run,' but they do the most to get them to run," Martinez said.

"If I was that man," he added, "I would have ran too."

## Can questions from masked, armed agents be "consensual"?

"*Eres ciudadano Americano*," the Border Patrol agent, identified only as J.C., asked a man in the Montebello tow yard. "Are you an American citizen?"

The response is not captured on the footage, but the man is placed in handcuffs soon after.

"Can I ask you a question?" an immigration agent asked a man at the Santa Fe Springs swap meet. "Where were you born?"

029
Exhibit C

"Tustin, Santa Ana. Why are you asking?" the guy taking the video responds.

Immigration agents said arrests in June and July often stemmed from "consensual encounters."

"The individuals were free to walk away and terminate the encounter, decline to answer questions and refuse to provide requested identification documents," Kyle Harvick, who heads patrol for the El Centro Sector, said in a court declaration defending the practice used across the Southern California raids.

"While some of the individuals encountered freely answered questions about their names and place of birth and provided identification documents, others refused to answer questions and/or walked away from the encounters without any further interaction."

030
Exhibit C

Civil rights and immigration lawyers say that armed, masked men forcefully barking questions to vendors or people in a Home Depot parking lot is anything but a consensual interaction.

"If they are showing up in places with that display of force and authority and surrounding the people they're trying to talk to, that's no longer a consensual encounter," said Eva Bitran, a lawyer with the ACLU of Southern California.

Masked and armed agents surrounded Pedro Vasquez Perdomo and his co-workers as they waited at a bus stop in Pasadena on June 18. Vasquez Perdomo, who is a plaintiff in the L.A. civil rights lawsuit against the Trump administration, attempted to leave but was quickly handcuffed and put into a vehicle.

031
Exhibit C

"At the time he was handcuffed, agents did not have reasonable suspicion of a violation of immigration law," the lawsuit states. It was only after Vasquez Perdomo was taken to a nearby CVS parking lot that agents checked his identification.

In another case, a man who had fled immigration agents at a Downey car wash seemingly avoided arrest by not talking. Video captured the man, in jeans and a blue work shirt, on the ground near his overturned bike as masked men in plain clothes or vests that read "police" surrounded him.

"You don't have to tell them anything," Melyssa Rivas, a Downey resident, told the man repeatedly as an agent walked up and put a hand on his back. Urged by the crowd not to speak, the man kept quiet.

032
Exhibit C

"Have a good day," the agent told the man, before walking away.

Rivas and several others were recording the interaction, which she believes put pressure on the agents who were seeking to make an arrest.

Without reasonable suspicion, agents cannot legally detain someone according to federal regulations that dictate immigration enforcement. The suspicion must be based on "articulable facts." If an agent can establish enough of those facts to determine there is reasonable suspicion to stop someone, they can.

Trump administration lawyers say they consider a "totality of the circumstances" to make that determination, including the occupation of those stopped and the location they were picked up.



Exterior of Bubble Bath Hand Car Wash following weeks of immigration raids across Southern California.   (William Liang/For The Times)

033
Exhibit C

# Are car washes or Home Depots fair targets?

The masked, armed men pulled up to Beverly Car Wash in Montebello in white trucks with Texas plates. At least six agents, most wearing Border Patrol vests, made beelines to the brown-skinned men toweling down cars.

"What's your migration status?" an agent in camouflage asked a worker named Hector.

Another agent cornered Edgar "Gordito," asking him the same, scoffing at his claim he was there as a Mexican tourist.

One scared worker jumped over a nearby fence. An unmarked car followed her down the alley. Having fallen hard, she quickly gave herself up. During the raid, which lasted only two minutes, agents arrested three people.

In his declaration, Harvick said certain businesses, including car washes, "have been selected for encounters because past experiences have demonstrated that illegal aliens utilize and seek work at these locations."

At least 58 car washes have been hit, some of them more than once, according to the Clean Carwash Worker Center, which has been tracking the raids. After the Beverly Car Wash reopened weeks after the first raid, immigration agents hit it a second time. They arrested another two people who had just started working there.

034
Exhibit C

Case 2:25-cv-10999-CAS-AJR    Document 29-2    Filed 12/22/25    Page 35 of 70   Page
ID #:277

Although Harvick does not specifically reference Home Depot, so many have been hit that they have become a symbol of the raids.

035
Exhibit C

During a hearing last month, Frimpong called some of the locations that agents had
hit "general" and "not necessarily associated with not having status."

"As they said, bus stop, car wash, tow yard — maybe they're correlated with people
who are low-income or have low income-occupations, maybe they're correlated with
race or ethnicity, but they don't seem to be correlated with status," Frimpong said.

## More to Read

**'An American nightmare': L.A. hosts first congressional hearing
on effect of immigration raids**

**Nov. 24, 2025**



036
Exhibit C

## Border Patrol is monitoring U.S. drivers and detaining those with 'suspicious' travel patterns

**Nov. 20, 2025**



## ACLU argues Border Patrol broke court order with high-profile Sacramento raid

**Sept. 6, 2025**



---



## Sign up for Essential California

The most important California stories and recommendations in your inbox every morning.

**Sign Me Up**

    **Rachel Uranga**

Rachel Uranga covers immigration for the Los Angeles Times. She can be reached at rachel.uranga@latimes.com or via Signal at Uranga.64. She can also be found on Bluesky at racheluranga.bsky.social or X at racheluranga.

---

    **Brittny Mejia**

Brittny Mejia is a Metro reporter covering federal courts for the Los Angeles Times. She was a Pulitzer Prize finalist in 2021 for her investigation with colleague Jack Dolan that exposed failures in Los Angeles County's safety-net healthcare system. She joined The Times in 2014.

# EXHIBIT D

# *Agents Use Military-Style Force Against Protesters at L.A. Immigration Raid*

Armed agents in tactical gear threw flash-bang grenades to disperse a crowd in Los Angeles's Fashion District. Later, agents fired less-than-lethal ammunition at protesters outside a detention center.

 Listen to this article · 8:25 min    Learn more



**By Orlando Mayorquín and Jesus Jiménez**
Reporting from Los Angeles

Published June 6, 2025    Updated June 11, 2025

Federal agents in tactical gear armed with military-style rifles threw flash-bang grenades to disperse an angry crowd near downtown Los Angeles on Friday as they conducted an immigration raid on a clothing wholesaler, the latest sign of tensions between protesters and law enforcement over raids carried out at stores, restaurants and court buildings.

The operation was one of at least three immigration sweeps conducted in Los Angeles on Friday. In another one, federal agents converged at a Home Depot where day laborers regularly gather in search of work.

The raid at the clothing wholesaler began about 9:15 a.m. in the Fashion District, less than two miles from Los Angeles City Hall.

It was an extraordinary show of force. Dozens of federal agents wearing helmets and green camouflage arrived in two hulking armored trucks and other unmarked vehicles, and were soon approached by a crowd of immigrant activists and supporters. Some agents carried riot shields and others held rifles, as well as shotguns that appeared to be loaded with less-than-lethal ammunition.

Agents cleared a path for two white passenger vans that exited the area. A short time later, as officers boarded their vehicles to leave, a few agents lobbed flash-bang grenades at groups of people who chased alongside the slow-moving convoy. Some protesters had thrown eggs and other objects at the vehicles. At one point, the vehicles snagged and crushed at least two electric scooters that protesters had used.

David McDaniel said he was injured by a flash-bang grenade thrown by agents. He was assisted by bystanders and legal observers.  Alex Welsh for The New York Times

More than 100 people were arrested at three locations in Los Angeles after Immigration and Customs Enforcement officers executed four federal search warrants, according to federal officials. The operation drew immediate criticism from officials in Los Angeles, a Democratic-led city in a county where more than 30 percent of residents are immigrants.

"As mayor of a proud city of immigrants, who contribute to our city in so many ways, I am deeply angered by what has taken place," Mayor Karen Bass of Los Angeles said in a statement, adding: "My office is in close coordination with immigrant rights community organizations. We will not stand for this."

Hours after the raid, a second clash between protesters and federal agents broke out outside a federal detention center in downtown Los Angeles, where those who were detained were taken. At one of the entrances, protesters chanted and approached the building as officers fired less-than-lethal projectiles and squirted what appeared to be pepper spray. Some protesters threw a chair and other objects, and appeared to spray-paint anti-ICE graffiti on the building.

By 7 p.m., the Los Angeles Police Department declared an unlawful assembly, ordered demonstrators to disperse and a line of police in riot gear started to clear the area.

The morning raid took place at a business called Ambiance Apparel.

040
Exhibit D

Omar Diaz, 26, was working inside when several agents entered the building and corralled the roughly 20 to 30 workers inside and lined them up against a wall.

"They interviewed us one by one," Mr. Diaz said. "They would take us separately, ask us where we were born, and then they wanted our ID and our information."

After being detained for about an hour, Mr. Diaz, who said he is a U.S. citizen, and a few others were let go. But some of his co-workers, who are mostly immigrants from Mexico and South Korea, remained with the authorities, Mr. Diaz said.

"My friend is still in there, too, so I'm worried about him," Mr. Diaz said outside the front entrance of the building.

Omar Diaz, a worker at a clothing wholesaler, spoke to a crowd after a federal raid at his workplace in Los Angeles on Friday.  Alex Welsh for The New York Times

A group of activists aboard a truck repeated a list of rights over a loudspeaker, hoping those detained inside could hear them.

Gloria Miguel, an organizer with a local workers group, said she saw two women crying as the raid unfolded.

"The woman was crying: 'My husband is in there. I need help,'" Ms. Miguel said in Spanish, adding that there was another woman who was crying because her father was inside.

041
Exhibit D
12/19/2025, 10:23 AM

Agents at the scene were wearing patches on their uniforms identifying themselves as being with the F.B.I., Homeland Security Investigations and the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Yasmeen Pitts O'Keefe, a spokeswoman for Homeland Security Investigations, said on Friday that 44 people were "administratively arrested" and one person was arrested for obstruction.

An administrative arrest is a civil arrest that ICE utilizes to detain and, ultimately, try to deport people. Often, immigrants who are administratively arrested are placed into immigration court proceedings where the government pushes to remove people in front of judges. A growing backlog of cases, however, has meant that deportation cases can take years to resolve.

The U.S. attorney for the Central District of California, Bill Essayli, said agents arrested David Huerta, the California president of the Service Employees International Union, for impeding federal agents carrying out the raid by blocking their vehicle.

Gov. Gavin Newsom and other California leaders condemned the detention of Mr. Huerta, who is a well-known figure in the state's labor movement.

"David Huerta is a respected leader, a patriot, and an advocate for working people," the governor said in a social media post. "No one should ever be harmed for witnessing government action."

In recent weeks, ICE has ramped up enforcement across the country — boosting daily arrest numbers. Stephen Miller, President Trump's deputy chief of staff, has said that ICE was looking to make a minimum of 3,000 arrests a day. The Trump administration has long targeted so-called sanctuary jurisdictions like Los Angeles, arguing that they would have to boost arrests in communities because they don't have the same access to county jails, where they prefer to pick up immigrants.

Laura Eimiller, a spokeswoman for the F.B.I. field office in Los Angeles, said the F.B.I. was supporting its partners with the Department of Homeland Security, under the direction of Attorney General Pam Bondi.

"As we have been asked to do, we are sending agents to participate in these immigration enforcement efforts," Ms. Eimiller said. "That includes assisting in cities where major operations are already underway and where we have special agents embedded on operational teams with D.H.S."

Officials did not detail any injuries. One man on the street said he was injured by a flash-

042
Exhibit D

bang grenade.

"They started throwing flash-bangs and blew everybody up with it," the man, David McDaniel, said as he held his bloody foot. "I got shrapnel all over my body," he added.

Mr. McDaniel said he was not part of the protest and was just trying to get by. Bystanders and legal observers assisted him as they waited for an ambulance.

Protesters walked on the street near where the immigration raid took place.   Alex Welsh for The New York Times

Chief Jim McDonnell of the Los Angeles Police Department said in a statement that his agency was not involved in civil immigration enforcement efforts.

"While the LAPD will continue to have a visible presence in all our communities to ensure public safety, we will not assist or participate in any sort of mass deportations," Chief McDonnell said, adding that the department would not attempt to determine anyone's immigration status.

The Los Angeles police have had a policy in place since 1979 that bars officers from initiating police action for the sole purpose of determining someone's immigration status. California law also prohibits state and local resources from being used to help with federal immigration enforcement.

043
Exhibit D

The immigration sweeps in Los Angeles came one week after a similar operation in San Diego. Video of that raid showed federal agents using what appeared to be flash-bang grenades in an effort to disperse a group of people protesting the action.

That raid prompted members of Congress to write to the homeland security secretary, Kristi Noem, with questions about the tactics used by federal agents.

Hamed Aleaziz contributed reporting.

**Orlando Mayorquín** is a Times reporter covering California. He is based in Los Angeles.

**Jesus Jiménez** is a Times reporter covering Southern California.

# EXHIBIT E



# HUNTINGTON PARK POLICE ARREST MAN POSSIBLY POSING AS BORDER PATROL AGENT

*By Carlos Granda*

Friday, June 27, 2025

Amid stepped up immigration arrests in the Los Angeles area, Huntington Park police say they arrested a man who may have been posing as a federal agent.

HUNTINGTON PARK, Calif. (KABC) -- Amid stepped up immigration arrests in the Los Angeles area, Huntington Park police said Friday they arrested a man who may have been posing as a federal agent.

Fernando Diaz, 23, was arrested Tuesday in the 7000 block of Alameda Street after officers came across an SUV parked in a handicapped zone, police said during an afternoon news conference.

When officers began the process of impounding the car, Diaz approached them.

"Having learned that the vehicle was being impounded, the individual requested to retrieve items

046
Exhibit E

from the vehicle that he claimed belonged to a friend," Huntington Park Police Chief Cosme Lozano said. "When questioned by the officers about the police-like items inside the vehicle, the individual claimed he formally worked as a security guard."

Lozano said officers searched the vehicle and found "a loaded 9mm semiautomatic firearm, two holsters and additional ammunition for the firearm, three cellphones, official-looking documents bearing the heading of Homeland Security Investigations and U.S. Customs and Border Protection, a sheet containing U.S. Customs and Border Protection radio codes, multiple copies of passports not registered under the individual's name and other miscellaneous items indicative of possible criminal activities."

Ad removed.

Show details

When further questioned, Lozano said Diaz claimed he previously worked for Customs and Border Protection but couldn't produce valid credentials. Lozano said the department later learned Diaz had a prior arrest record related to human smuggling.

Diaz, who had an outstanding DUI warrant, allegedly claimed he was a CPB employee in 2022.

047
Exhibit E

He was arrested for possession of the allegedly unregistered firearm, but later released on $5,000
bail.

"What this individual was doing with those items remains under investigation, but the presence of
law-enforcement style equipment without any verified authority raises serious concerns," Mayor
Arturo Flores said. "When people cannot trust who is enforcing the law, public safety is
undermined."

*City News Service contributed to this report.*

**Report a correction or typo**

Copyright © 2025 KABC Television, LLC. All rights reserved.

048
Exhibit E

Go to ABC7.COM

| | |
|---|---|
| Full Site | Interest-Based Ads |
| Privacy Policy | Public Inspection File |
| Children's Privacy Policy | Your US State Privacy Rights |
| Terms of Use | |

Copyright © 2025 ABC, Inc., KABC Television, LLC. All Rights Reserved.

Exhibit E

# EXHIBIT F

Skip to main content

🇺🇸 An official website of the United States government                    Here's how you know

Search

## U.S. Marshals Service



≡ MENU



## U.S. Marshals Service

Justice. Integrity. Service.

U.S. Department of Justice

# Real Officers Have Nothing to Hide: If In Doubt, Ask to Verify

## For immediate release

—— NOVEMBER 20, 2025

## Ryan Guay, Supervisory Deputy U.S. Marshal

U.S. Marshals Service
Memphis Safe Task Force


↑ Back to top

051
Exhibit F

MSTF.PublicAffairs@usdoj.gov

Below is public guidance on how citizens can verify whether an individual is a legitimate law enforcement officer. This guidance reflects the ongoing commitment of the Memphis Safe Task Force and the Tennessee Bureau of Investigation (TBI) to ensure accountability and build safer communities through transparency and collaboration, particularly as plainclothes officers and unmarked vehicles are currently operating in Memphis.

## Key Safety Tips for the Public:

- **Proper Identification:** Real officers will identify themselves, state their agency, and explain the reason for the stop. They carry both a badge and agency-issued ID — always ask to see both. Officers should provide their badge number and agency name (Sheriff's Office, Police Department, USMS, FBI, TBI, etc.). Be cautious if they refuse.

- **Uniforms & Equipment:** Radios, marked vehicles, and standard gear are common indicators. Even in plain clothes, officers must identify themselves once enforcement begins. If the officer is in an unmarked vehicle and you feel unsafe, request a marked unit to respond.

- **Verification Options:** If in doubt, call 911 or the agency's non-emergency line to verify the officer's identity and purpose. Legitimate officers will wait until credentials are confirmed.

- **Behavioral Cues:** Legitimate officers explain the reason for the stop and will never demand money, request wire transfers, or ask for personal financial information, passwords, or social media access.

- **Trust Your Instincts:** If something feels off, drive to a well-lit, public location such as a busy store parking lot before stopping.

- **Compliance in High-Risk Situations:** If you are unlawfully armed or sought for a violent offense, the safest and most responsible course of action is to comply with law enforcement commands and then seek these verification steps. Compliance protects lives and ensures the situation is resolved safely.

Additional information about the U.S. Marshals Service can be found at https://www.usmarshals.gov.

####

↑ Back to top

052
Exhibit F

# EXHIBIT G

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

FEDERAL BUREAU OF INVESTIGATION        OFFICE OF PARTNER ENGAGEMENT        PUBLIC SAFETY AWARENESS REPORT



**PUBLIC SAFETY AWARENESS REPORT**
FEDERAL BUREAU OF INVESTIGATION
OFFICE OF PARTNER ENGAGEMENT

(U) PREPARED BY THE FBI OFFICE OF PARTNER ENGAGEMENT AND FBI NEW YORK

17 OCTOBER 2026
[OPE-26-SA-02]



(U) Warning: This document is classified: UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE. The information marked (U//LES) in this document is the property of the Federal Bureau of Investigation and may be distributed within the Federal Government (and its contractors), US intelligence, law enforcement, public safety or protection officials and individuals with a need to know. Distribution beyond these entities without FBI authorization is prohibited. Precautions should be taken to ensure this information is stored and/or destroyed in a manner that precludes unauthorized access. Information bearing the LES caveat may not be used in legal proceedings without first receiving authorization from the originating agency. Rec

(U) Public Safety Awareness Report template approved for fiscal year 2026, as of 1 OCTOBER 2025.
(U) Please direct comments and queries regarding this product to the FBI Office of Partner Engagement's Enhanced Engagement Unit at PSAR_Production@fbi.gov. Press or media inquiries should be directed to NPO@fbi.gov.

## (U//FOUO) Criminal Actors Impersonate ICE Agents to Commit Violent Crime

### (U) SITUATIONAL AWARENESS

(U//LES) This Situational Awareness report informs state, local, and federal law enforcement (LE) partners about criminal actors impersonating ICE agents to commit violent crime. Due to the recent increase in ICE enforcement actions across the country, criminal actors are using ICE's enhanced public profile and media coverage to their advantage to target vulnerable communities and commit criminal activity. This not only effects the victims and communities but also has broader negative consequences on law enforcement agencies. These criminal impersonations make it difficult for the community to distinguish between legitimate officers conducting lawful law enforcement action and imposters engaging in criminal activity, which damages trust between the local community and law enforcement officers.

- (U//FOUO) As of 7 August 2025, three unknown subjects wearing all black, including black vests claimed to be immigration officers and robbed an ATM located in a restaurant in New York. The subjects tied one victim's hands together and

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Shapiro

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

placed a garbage bag over their head. A second victim was upstairs when the break-in happened but upon hearing the subjects' claim they were immigration officers came downstairs and surrendered to the subjects. The victim was kicked to the ground, had their hands tied, and realized the subjects were not actually immigration officers and robbing the restaurant. [1]

- (U//LES) As of 14 April 2025, an individual impersonated an ICE agent and threatened immigrants. The individual from New York posted a photo of themselves on social media wearing an ICE jacket standing outside of an identified home improvement retailer corporation with the caption "It's my 14th shift and all the illegal aliens are gone! It worked!" A separate post on a different social media platform revealed the same subject posted a picture of himself wearing an ICE jacket with the caption "No. I'm not ice." [2]

- (U) As of 21 April 2025, an individual in Florida pretended to be an ICE agent and kidnapped a female victim who was in the process of becoming a legal US resident. The subject approached the victim and claimed she was there to pick up the victim. The subject unzipped their jacket and revealed a shirt that said ICE. The victim believed the subject was a real ICE agent and got in the car with the subject. The victim was taken to an apartment complex by the subject but was able to escape. [3]

- (U) As of 13 February 2025, an individual claiming to be an ICE agent approached a Hispanic woman in Brooklyn, New York. The individual directed the woman to a nearby stairwell where the individual punched her, tried to rape her, and stole her purse and cellphone. The individual was arrested by the NYPD and charged with rape, robbery, assault, burglary and criminal possession of stolen property. [4]

- (U) As of 29 January 2025, a subject was arrested in North Carolina for impersonating an ICE agent and sexually assaulting a woman. The subject allegedly entered the victim's motel room and threated to deport the woman if she did not have sex with him. The subject told the victim he was a sworn law enforcement officer and showed her his business card with badge on it. [5]

## (U) CONSIDERATIONS

(U) The following indicators include, but are not limited to any individual, or group; these indicators should be observed in context. An indicator alone does not accurately determine this threat activity; organizations should evaluate the totality of the suspicious behavior:

- (U) Individuals with suspicious/false identification or credentials (i.e. the photo does not match, the material appears fake).

- (U) Individuals with outdated, incorrect protective gear or equipment.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

- (U) Use of cloned emergency vehicles where the identifiers (decals, markings, logos, lights, license plates) differ from the official government vehicles.

- (U) Social Media posts from illegitimate or fraudulent sources claiming to be a government or law enforcement authority, advertising efforts to imitate or act as ICE to intimidate vulnerable communities.

## (U) OPPORTUNITIES

(U//FOUO) In addressing the ICE Impersonation schemes, law enforcement has the opportunity to:

- (U//FOUO) Coordinate with local, state, and federal law enforcement agencies regarding immigration operations in the area to help verify legitimate vs. non legitimate operations.

- (U//FOUO) Conduct community outreach programs to raise awareness of impersonation schemes and what to do in case they are targeted. Community outreach efforts boost the law enforcement's image and helps the community recognize officials in their area to counteract potential damage or mistrust caused by impersonators.

- (U) Conduct public awareness campaigns to educate and train the community on common impersonation tactics.

- (U//FOUO) Ensure law enforcement personnel adequality identify themselves during operations and cooperate with individuals who request further verification, such as calling their local precinct to verify the officer's identity.

## (U) RESOURCES

- (U) To report any leads, threats, and suspected criminal activity, you may also visit https://tips.fbi.gov/ or contact your local FBI Office: https://www.fbi.gov/contact-us. **Note:** *This website cannot be used to report emergencies or immediate threat to life. For emergencies or immediate threat to life, please call 911*

- (U) We also encourage the law enforcement use of the unclassified information sharing system **eGuardian** for reporting suspicious activity reports (SARs) to the FBI. Access eGuardian via the Law Enforcement Enterprise Portal (LEEP): https://www.cjis.gov/. If the information is urgent in nature, then please contact your local FBI field office directly and follow up with an eGuardian report.

(U) THE INFORMATION IN THIS PUBLIC SAFETY AWARENESS REPORT (PSAR) PREPARED BY THE FBI OFFICE OF PARTNER ENGAGEMENT AND THE NEW YORK FIELD OFFICE, IS PROVIDED TO ENHANCE PUBLIC SAFETY AND FOR SITUATIONAL AWARENESS PURPOSES ONLY. NO INFORMATION CONTAINED IN THIS PSAR, NOR ANY INFORMATION DERIVED THEREFROM, MAY BE USED IN ANY PROCEEDING (WHETHER CRIMINAL OR CIVIL), TO INCLUDE ANY TRIAL, HEARING, OR OTHER PROCEEDING BEFORE ANY COURT, DEPARTMENT,

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Shapiro

000004

Exhibit G

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

AGENCY, REGULATORY BODY, OR OTHER AUTHORITY OF THE UNITED STATES WITHOUT PRIOR APPROVAL FROM THE FBI. THESE RESTRICTIONS APPLY TO ANY INFORMATION EXTRACTED FROM THIS DOCUMENT AND USED IN DERIVATIVE PUBLICATIONS OR BRIEFINGS.

## (U) END NOTES

[1] (U//FOUO) FBI | Case Information | 8 September 2025 | 7 August 2025 | "[TITLE REDACTED]" | UNCLASSIFIED//FOR OFFICIAL USE ONLY | UNCLASSIFIED//FOR OFFICIAL USE ONLY.
[2] (U//LES) FBI | Case Information | 18 April 2025 | 18 April 2025 | "[TITLE REDACTED]" | UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE | UNCLASSIFIED//LAW ENFORCEMENT SENSTIVE.
[3] (U) News Article | Miami Herald | "Woman Poses as ICE Agent to Kidnap Ex-boyfriend's Wide at Work, Florida Cops Say" | 21 April 2025 | https://www.miamiherald.com/news/state/florida/article304699521.html | accessed on 26 August 2025.
[4] (U) News Article | ABC7NY | "Man arrested in attempted rape after allegedly posing as ICE agent in Brooklyn" | 13 February 2025 | https://abc7ny.com/post/brooklyn-heights-attack-man-arrested-attempted-rape-allegedly-posing-ice-agent/15902769/ | accessed on 26 August 2025.
[5] (U) News Article | WBTV | "Man Accused of Impersonating ICE Officer, Sexually Assaulting Woman at Raleigh Motel" | 29 January 2025 | www.wbtv.com/2025/01/29/man-accused-impersonating-ice-officer-sexually-assaulting-woman-raleigh-motel/ | accessed on 26 August 2025.

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

Shapiro

# PSAR Product Feedback Form

*Fill in the below fields with as much detail as possible.*

*Public Safety Awareness Reports (PSARs) share information and intelligence to enhance awareness of FSLTT law enforcement, intelligence, and homeland security customers.*

**Your input will help OPE continue to improve future PSARs.**



| | |
|---|---|
| **YOUR AGENCY:** (enter your employer name) | |
| **PUBLIC SAFETY CATEGORY:** (choose from the listing) | Select from listing... |
| **PSAR PRODUCT ID:** | |
| **PSAR USE:** How do you plan to use the information in this PSAR to support your agency's public safety mission? | ☐ Observe, identify, and/or disrupt threats<br>☐ Share with law enforcement, intelligence, and/or homeland security partners<br>☐ Allocate more resources (e.g., personnel, equipment)<br>☐ Initiate your own analysis in developing an analytical product<br>☐ To better understand or reprioritize law enforcement investigations<br>☐ Author or adjust policies, guidelines, preparedness efforts, training, and other response plans<br>☐ Do not plan to use<br>☐ Other: |
| **What are your recommendations to improve PSAR products?** | |
| **Do you have new PSAR topic suggestions? Please share your ideas:** | |
| **Please share any other comments, thoughts, or questions with us:** | |

**SUBMIT**

FEDERAL BUREAU OF INVESTIGATION

# EXHIBIT H



C A L I F O R N I A

## DEPARTMENT OF JUSTICE

# LAW ENFORCEMENT POLICY & PROCEDURES MANUAL

## JUNE 2024

## ROB BONTA
*ATTORNEY GENERAL*

This version of the of the *California Department of Justice Law Enforcement Policy and Procedures Manual* has been redacted as it relates to intelligence information or security procedures of the Department of Justice, as well as policies that have been superseded by General Orders or that are in the process of being updated.

## 1046 Uniform Regulations

## 1046.1 PURPOSE AND SCOPE

The uniform policy of the California Department of Justice is established to ensure that uniformed agents will be readily identifiable to the public through the proper use and wearing of department uniforms when participating in field enforcement operations. Employees should also refer to the following associated Policy Manual sections:

- Section 700 Department-Owned and Personal Property

- Section 1044 Personal Appearance Standards

## 1046.2 WEARING AND CONDITION OF UNIFORM AND EQUIPMENT

Agents are required to wear appropriate DOJ-issued Battle Dress Uniforms (BDU) and safety equipment as specified by this policy. Notwithstanding the type or level of uniform selected for any activity, consistency in appearance is required. The SAS/TFC or designee shall ensure that all personnel participating in field enforcement operations wear the same level of approved uniform to ensure a consistent appearance.

## 1046.3 RAID UNIFORMS

## 1046.3.1 PLANNED EVENTS

Planned events are defined as enforcement actions such as the service of arrest or search warrants, residence parole and probation searches, undercover operations with a separate, pre-designated arrest team, or other high-risk enforcement operations. The full raid uniform for planned events consists of the following:

a. Black-colored BDU consisting of long- or short-sleeved shirt, trousers, and boots. The wearing of the long-sleeved shirt versus the short-sleeved shirt shall be at the discretion of the SAS. The black DOJ windbreaker or foul weather jacket may be worn in conjunction with the BDU but not as a substitute for the black BDU shirt.

b. Ballistic vest.

c. Helmet.

   1. Wearing of the helmet is required during search warrant services, with the exception of business location searches. In all other activities, its use is at the SAS's discretion.

d. DOJ-issued safety equipment consisting of handgun, web belt, holster, dual magazine pouch, handcuffs, ASP baton, OC Aerosol canister, and portable radio.

061

Exhibit H

e.  DOJ-issued tactical vest cover or load bearing vest, if desired.

f.  The raid uniform described above may be waived in full or in part under the following circumstances:

1.  **Business Locations** - The SAS may waive the raid uniform when agent personnel are serving a search warrant for documentary evidence at a recognized business location not owned or controlled by the suspect(s) or associate(s) (i.e., a medical office or financial institution), and an arrest is not anticipated.

2.  **"Knock and Talks"** - When agent personnel are making contact at a private residence for the purpose of gathering information or initiating a consensual encounter, the SAS may waive elements of the raid uniform at his/her discretion. At a minimum, agents shall be required to wear their DOJ-issued safety equipment, boots, and either a BDU shirt worn over their ballistic vest or a DOJ-issued load bearing vest equipped with ballistic panels. The SAS shall ensure that all agents participating in the enforcement action present a consistent appearance and are clearly identifiable as DOJ Special Agents at all times.

3.  **Highly Sensitive Investigations** - When an investigation is deemed "highly sensitive" by the Bureau Director, the requirement to wear the raid uniform may be waived; if so, the SAC shall write "highly sensitive," the date, and sign his/her name across the top of the first page of the Operation Plan.

## 1046.3.2 UNPLANNED EVENTS

Unplanned events are defined as those instances in which it was not previously anticipated that an arrest or entry would occur. This includes "in-progress" type crimes and entries made under exigent circumstances. Agent personnel performing these types of actions shall wear at a minimum:

a.  DOJ-issued black mesh jersey, windbreaker, tactical vest cover or load-bearing vest.

b.  Ballistic vest.

c.  Helmet, if appropriate.

d.  DOJ issued or previously authorized safety equipment as listed in § 1046.3.1(c).

e.  Appropriate additional tactical equipment as approved by the SAC.

## 1046.3.3 CLANDESTINE LAB ENTRY

Clandestine lab entries are defined as those entries into known or suspected operational clandestine labs by members of a clandestine lab team that have been issued DOJ lab safety

Exhibit H

equipment and are trained to conduct such investigations. Participants in such entries are required to wear the following:

a. DOJ-issued black colored Nomex BDU with full identification patches.

b. Ballistic vest and helmet.

c. DOJ-issued or previously authorized safety equipment consisting of handgun, web belt, holster, dual magazine pouch, handcuffs, ASP baton, OC spray, and portable radio.

d. DOJ-issued tactical vest cover or load bearing vest, if desired.

e. Appropriate additional, DOJ-approved, tactical equipment as required by the responsible SAC.

f. Other personal protective equipment items issued by DOJ or listed in the DLE Clandestine Laboratory Manual under the Personal Protective Equipment Section.

## 1046.3.4 SPECIAL ENFORCEMENT DETAILS

Special enforcement details are defined as low crawls, rural listening/observation post assignments, long gun/observer assignments, and marijuana eradication activities. DLE recognizes the need for alternatives to the standard BDU during special enforcement details. Agents may have a need to wear a DOJ-approved camouflage uniform that blends with the environment.

With the case-specific approval of the SAC, agents conducting covert special enforcement details may wear a camouflage uniform. The approved uniform is the Tactical Response Uniform (TRU) manufactured by TRU-SPEC in the Multi-Cam pattern. The Woodland and Desert patterns are no longer authorized for use by DLE agents. The snow camouflage design may be worn, when appropriate.

The tan and green Multi-Cam patches specified in Policy Manual § 1046.4 shall be sewn onto Multi-Cam TRUs. The patches shall be of the same design and placed in the same location as the standard patches. All agent personnel conducting special enforcement details, with the exception of overt eradication operations, shall wear the following attire/equipment:

a. Multi-Cam TRU with the approved Multi-Cam identification patches (including the police patch on the back).

b. DOJ-issued ballistic vest.

c. Helmet (if appropriate).

d. DOJ-issued load bearing vest (if desired).

063
Exhibit H

e.  Appropriate DOJ-approved, additional tactical equipment as authorized by the responsible SAC.

Agents are not to wear camouflage uniforms while participating in overt eradication operations, such as the Campaign Against Marijuana Planting (CAMP). The uniform approved for eradication and other overt rural operations is described in Policy Manual § 1046.3.5.

No agent may take part in a raid entry while wearing a camouflage uniform unless there is an emergency situation. Agents wearing camouflage uniforms may assist with prisoner security, site security, or search for evidence once the initial raid team has secured the scene. Nothing in this section prohibits the wearing of camouflage uniforms during training exercises.

## 1046.3.5 ERADICATION OPERATIONS

The Olive Drab (OD) Green Uniform is authorized and encouraged for use in eradication and other overt rural operations. Agent safety may be compromised by wearing camouflage in these situations, because others may be unable to distinguish the agent from a suspect. The OD Green Uniform is widely recognized by law enforcement officers statewide and is used by CAMP.

OD Green Uniforms may be purchased by individual agents or offices and shall be affixed with authorized green and black OD Green Uniform patches.

## 1046.3.6 LOAD BEARING VESTS

For the purpose of this policy, a load bearing vest is defined as a non-ballistic vest of fabric construction. The vest design includes various DOJ-approved equipment pouches affixed to the exterior of the vest which allow the wearer to carry specific law enforcement equipment during enforcement operations. The vest has the DOJ-approved law enforcement identification patches on the front and back to identify the wearer as a law enforcement officer. Load bearing vests shall not be altered without previous written approval of the DLE Firearms Officer and the Deputy or Assistant Chief.

a.  The following DOJ-issued load bearing vests are authorized for use during field enforcement operations:

1.  Modular pouch load bearing vest manufactured by Safariland, Ltd. This vest is issued with two (2) "fixed" pouches; a medical (PTK) pouch and a large back pouch. All other pouches are modular and can be placed on the vest by the wearer in accordance with this order. A maximum of four additional pouches can be placed on the vest.

2.  In the past, the DOJ issued a limited number of load bearing vests which were purchased for the Violence Suppression Program. These vests are of a "fixed" pouch design, and as such, are authorized for use as designed until they become

unserviceable. When deemed unserviceable, they will be replaced with the new modular load bearing vest.

3. With the case-specific approval of the appropriate SAC, previously DOJ-issued, military style load bearing equipment, intended to be used solely for rural operations such as CAMP and counter-sniper deployments, may be utilized.

b. The load bearing vest may be worn during all field enforcement activities, to include the service of arrest and search warrants, undercover "buy/bust" operations, probation/parole searches, and crime scenes.

1. The load bearing vest is not a substitute for the DOJ-issued BDU that must be worn during planned enforcement activities.

2. In all cases, a DOJ-issued ballistic vest shall be worn under the load-bearing vest.

c. Equipment pouch placement:

1. Only equipment issued by DOJ may be carried on the vest. The pouches shall carry the equipment for which they were designed. The following denotes the approved placement of the modular pouches on the Safariland load bearing vests for a right-handed shooter; a left-handed shooter would mirror the stated placement directions:

| Equipment Pouch Placement | | |
|---|---|---|
| Pouch # | Description | Placement |
| D-1 | Long Arm Magazines (MP5-M4, HK53) | Front of vest, parallel to the center zipper. |
| D-2 | Shotshell Ammunition | Front of vest, parallel to the center zipper. |
| D-3 | Side Arm Magazines | Opposite side of handgun along the belt line or horizontal on the chest on the opposite side as the handgun. |
| D-4 | Side Arm/Long Arm | Front of vest, parallel to the center magazine zipper. |
| D-5 | Side Arm Magazines Handcuff | Front or side of vest so as not to interfere w/handgun placement on the web belt. |
| D-7 | Dual Distraction Pouch | Front of vest, either side, not to interfere with the handgun. |

| D-8 | Less Lethal Pouch | Front or side of vest, opposite of handgun side. |
| D-9 A-G | Blank Pads | Any blank area of vest. |
| D-11 | 8" x 8" Utility Pouch | Front or side of vest, opposite of handgun side. |
| D-12 | 4" x 8" Utility Pouch | Mounted vertically or horizontally on front or side of vest, not to interfere with the handgun. |
| D-13 | 6" x 8" Utility Pouch | Mounted vertically or horizontally on front or side of vest, not to interfere with the handgun. |
| D-14 | Radio Pouch | Side of vest, opposite of handgun side, or rear shoulder of vest. |
| D-16 | 37/40 mm Ammunition | Front of vest, either side, not to interfere with the handgun. |
| D-27 | Hydration System | Back of vest, as long as it does not block or interfere with the visibility of the "California DOJ Police" patch. |

## 1046.3.7 TACTICAL VEST COVERS

Black tactical vest covers shall be issued to all agents. They are designed with stationary equipment pouches and are affixed with the patches specified in § 1046.4(a)(2-4). The tactical vest cover may be worn on its own in place of the load bearing vest; alternatively, the panels from a ballistic vest may be inserted into the tactical vest cover, eliminating the need to wear two separate vests.

## 1046.3.8 FOUL WEATHER JACKETS

The Department issues foul weather jackets to all sworn personnel. The jackets shall bear all identification patches as previously outlined in this section. The approved jacket is identified as the BLAUER model # 9300Z All-Weather Jacket, black in color. The jacket may be worn with the DOJ-issued uniform. The jacket is not a substitute for the required BDU shirt or mesh jersey.

## 1046.3.9 PURCHASING AND REPLACEMENT OF UNIFORM EQUIPMENT

In order to ensure Division-wide standards, all purchases and replacements of any of the items described in this policy shall be approved by the Firearms Officer.

Exhibit H

Unserviceable items are to be surveyed per established procedures. No item described in this policy may be transferred to a task force or allied agency, even if it has been deemed unserviceable.

## 1046.3.10 EQUIPMENT INSPECTIONS

Each SAC is responsible for conducting biannual inspections of the BDUs, foul weather jackets, wind breakers, mesh jerseys, and load bearing vests assigned to agents under his/her command. The inspections are to be conducted during field operations and firearms training/qualification sessions. The purpose of the inspection is to ensure that all such items are being maintained in a condition that enhances officer safety and professional appearance.

## 1046.3.11 FACIAL COVERINGS

The DLE recognizes the need for the use of facial coverings (Nomex Balaclavas or face paint) during specific tactical operations. Their use is restricted to the following conditions:

a. Balaclavas may be worn while entering into a clandestine laboratory for protection from a flash fire. As soon as the flash fire threat has passed, they shall be removed. When Nomex Balaclavas are used in conjunction with an entry, they shall be worn with the DOJ Nomex raid uniform (BDU).

b. Balaclavas may be worn by the air crew and insertion team during a tactical aerial insertion. The insertion team shall remove the Balaclavas prior to making entry to the raid site if the location is not a suspected clandestine lab.

c. Facial coverings may be worn in conjunction with a covert operation during which the agents do not want to be detected (i.e. observation posts, recon teams, intelligence gathering, etc.) and enforcement action is not anticipated.

d. No agent should make entry while wearing camouflage face paint unless it is an emergency.

## 1046.3.12 BALLISTIC SHIELDS

A ballistic shield may afford an added level of protection during tactical operations. If ballistic shields are available, their use should be considered when planning tactical/enforcement activities. Ballistic shields shall be used in accordance with DLE training standards and, except in an emergency, may be used only by agents trained in the use of ballistic shields.

## 1046.3.13 FIRST AID KITS

While conducting field enforcement, such as undercover buys, surveillances, arrests, service of search warrants, clandestine laboratory investigations, and while attending firearms qualification and training, each agent shall have an approved first aid kit available.

067
Exhibit H

# EXHIBIT I



U.S. Department of Homeland Security

# ICE Receives More than 150,000 Applications to Join ICE Law Enforcement to Help Remove Worst of the Worst Criminal Illegal Aliens from U.S.

**Release Date:** September 16, 2025

*ICE made more than 18,000 tentative job offers to patriotic Americans who want to help remove murderers, gang members, pedophiles, terrorists, and rapists from the U.S.*

WASHINGTON – The Department of Homeland Security (DHS) today announced Immigration and Customs Enforcement (ICE) received **more than 150,000** applications from Americans who want to join U.S. (ICE) to help arrest and remove the worst of the worst criminal illegal aliens from America's streets. ICE has extended **more than 18,000** tentative job offers.

*"ICE has received more than 150,000 applications from patriotic Americans who want to defend the homeland by removing the worst of the worst criminal illegal aliens from the U.S.,"* said **Secretary Noem.** *"We have already issued more than 18,000 tentative job offers. Americans are answering their country's call to serve and help remove murderers, pedophiles, rapists, terrorists, and gang members from our country."*

**ICE is offering a robust package of federal law enforcement incentives. You may be entitled to these benefits:**

- A maximum $50,000 signing bonus
- Student loan repayment and forgiveness options
- 25% Law Enforcement Availability Pay (LEAP) for HSI Special Agents
- Administratively Uncontrollable Overtime for Enforcement Removal Operations (ERO) Deportation Officers
- Enhanced retirement benefits





For more information or to apply, visit: **www.ice.gov/careers** (https://www.ice.gov/careers)

**Topics**

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)

IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

**Keywords**

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)    CAREER (/KEYWORDS/CAREER)

JOB OPPORTUNITY (/KEYWORDS/JOB-OPPORTUNITY)

Last Updated: 09/30/2025

070
Exhibit I