ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANNA FERRARI, SBN 261579
LEE I. SHERMAN, SBN 272271
Supervising Deputy Attorneys General
KRISTI A. HUGHES, SBN 235943
ZELDA VASSAR, SBN 313789
ASHA ALBUQUERQUE, SBN 332901
ALYSSA ZHANG, SBN 360105
CAMERON A. BELL, SBN 305872
Deputy Attorneys General
 300 S. Spring Street
 Los Angeles, CA 90013
 Telephone: (213) 269-6000
 E-mail: Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**DECLARATION OF SCOTT SHUCHART IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

1

**DECLARATION OF SCOTT SHUCHART**

I, Scott Shuchart, declare under penalty of perjury that the following is true and correct:

1.      My name is Scott Shuchart. I am over 18 years old and a resident of Maryland. I make this declaration based on my own knowledge and general expertise in the field of immigration enforcement and law enforcement policy. I have also reviewed the United States' motion for preliminary injunction and supporting declarations that the United States filed in this matter. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to the matters set forth below.

2.      I began my legal career as a law clerk on the U.S. Court of Appeals for the Ninth Circuit in San Francisco.

3.      From 2010 to 2018, I served as the Senior Advisor to the Officer for Civil Rights and Civil Liberties in the Office for Civil Rights and Civil Liberties (CRCL) within the Department of Homeland Security (DHS). In that role, I consulted on policy and provided civil rights oversight for all of DHS's component agencies, including U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP).

4.      Outside of government, I have litigated immigration cases and complex federal cases against federal agencies. For example, I served on the litigation team that prevailed in *Negusie v. Holder*, 555 U.S. 511 (2009). From 2019 to 2022, I was the Senior Director for Legal Strategy at Kids in Need of Defense (KIND), leading impact litigation and training for attorneys representing unaccompanied minors in the immigration system. I was also a Senior Fellow covering immigration issues for the Center for American Progress from 2018 to 2019.

5.      From 2022 to 2025, I served as a senior official at ICE. From May 2022 to November 2023, I was Counselor to the Director of ICE, as well as for

some of that time the Acting Assistant Director for External Affairs. From November 2023 to January 2025, I was the Assistant Director for Regulatory Affairs and Policy. In that role, I had senior responsibility for ICE's written policies and regulations.

6.     When I worked at ICE, it had approximately 21,000 personnel, largely divided between the two principal operational directorates, Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI), each with between around 9,000 and 10,000 officers and agents and support personnel, as well as a large legal department and other service units. Policy that applied to all of ICE was made in the policy office I headed, while policies applicable only to ERO or HSI might be made by the Executive Assistant Director of the specific directorate.

7.     Through this experience inside and outside of government, I have a thorough understanding of many of the policies and practices of ICE's Enforcement and Removal Operations (ERO) directorate, including those applicable to uniform appearance, use of force, and wearing of indicia.

8.     Federal law regulating law enforcement officer (LEO) uniforms and indicia is limited. The area is largely governed by policies created by individual federal departments and agencies. The principal applicable federal statute, to my knowledge, is 10 U.S.C. § 723, which was first enacted in 2021. Under that provision, "Whenever . . . Federal law enforcement personnel provide support to Federal authorities to respond to a civil disturbance, each individual employed in the capacity of providing such support shall visibly display" a name tag or individual identifier (e.g., badge number) and the name of the entity employing the individual. However, this requirement is not applicable to plain-clothes or undercover personnel. I understand that by policy and practice ICE assures compliance with § 723 by special response teams (SRT) fielded by HSI—teams

3

similar to SWAT units—but that § 723 has not been understood to apply to routine civil law enforcement by its personnel, who are generally not uniformed.

9.  Certain policies that have been made available for public inspection have bearing on ICE's use of masks and displays of indicia. These policies include:

    a.  The ICE Employee Code of Conduct,[1] effective 2012, which provides as paragraph 5.15, "Standard of Attire," "ICE Employees must present a professional and positive image to the public and our colleagues both within and outside of ICE. While on official duty, employees must adhere to any applicable dress code policy where they are stationed";

    b.  The ICE Body Armor Policy,[2] effective 2005, which provides in part that "All ICE armed officers are strongly encouraged to wear their issued body armor while performing law enforcement duties," and that ERO (formerly DRO) officers "*shall* wear their issued body armor while in performance of their law enforcement duties" (emphasis added); and

    c.  The dress code policy for ICE's Health Service Corps (IHSC) unit,[3] effective 2020, reiterates the principles in the Employee Code of Conduct.

10.  ICE has been subject to litigation over deceptive arrest tactics, including deceptive attire. In particular, litigation has challenged ICE officers identifying themselves, verbally and in appearance, as working for any other law enforcement agency, or simply as "police." In early 2025, ICE settled the class

---

[1] U.S. Immigration and Customs Enforcement, Employee Code of Conduct, Directive No. 1033.1 (Aug. 7, 2012), available at https://tinyurl.com/3wv2298v.

[2] U.S. Immigration and Customs Enforcement, ICE Body Armor Policy, Directive No. 5-1.0 (Feb. 4, 2005), redacted version available at https://tinyurl.com/4rza89mu.

[3] U.S. Immigration and Customs Enforcement, IHSC Dress Code, IHSC Directive No. 5-1.0, ERO Directive No. 11770.2 (Feb. 3, 2020), available at https://tinyurl.com/6tptvcfk.

action in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal.), agreeing that officers in the Central District of California will not engage in the ruse of identifying themselves as police, including by not wearing jackets that say "POLICE" unless they also say "ICE" with equal prominence.[4]

11.     I am aware that, since January 2025, ICE and other federal law enforcement officers have increasingly appeared in public conducting civil immigration enforcement (a) with their faces covered with masks, bandanas, or gaiters; and (b) without uniforms, agency name identifiers, or individual identifiers like badge numbers. These were extremely uncommon practices for ICE officers prior to this year. Rather, in a typical ICE ERO enforcement action, officers would wear body armor and a jacket or vest clearly marked as "ICE" or "ICE POLICE" and would generally have a credential, bearing their badge and number, visible on their person.

12.     I am aware that, since January 2025, ICE leadership has stated publicly that it supports officers wearing masks and failing to display agency or individual identifiers due to fears of "doxxing" and other concerns for individual officer safety. Prior to 2025, I am not aware of the agency making any effort to conceal officer appearances with masks or hide badges, although concerns for officer safety are long-standing and predated 2025.

13.     I am aware that in support of the motion for preliminary injunction in this matter, the United States has submitted declarations from DHS providing an escalating set of numbers purporting to show a massive increase in assaults on law enforcement personnel—as much as an 8,000% increase in assaults on ICE personnel over the rate some years ago. My understanding is that these numbers do not differentiate between serious assaults and routine forms of unwanted touching that are inherent risks of conducting hands-on law enforcement work. It is telling in this regard that, per the declaration of Michael R. Vargas, ECF 11-3 at ¶10, assaults

---

[4] The settlement agreement is available at https://tinyurl.com/5n6pnbr4.

on CBP officers are up by a factor of less than 4, not ICE's alleged 80 times. These increases need to be considered in the context that interior immigration enforcement, and in particular un-targeted, at-large interior immigration enforcement in public places, has increased by comparable percentages, so it is not clear that the level of risk to officers per operation has actually increased by a meaningful amount.

14.     Based on my years of experience in law enforcement policy and oversight, successful adherence to policy depends on rigorous oversight outside the officer's chain of command. Prior to this year, officer conduct at DHS was overseen by an interlocking set of oversight offices created by statute: the Office of the Inspector General (OIG), *see* 6 U.S.C. § 113(b); the Office for Civil Rights and Civil Liberties (CRCL), *id.* §§ 113(d)(3) & 345; the Office of the Immigration Detention Ombudsman (OIDO), *id.* § 205; and an office of professional responsibility (OPR) within each operational component, *see id.* § 211(j) (Customs and Border Protection OPR), § 253 (ICE OPR). The way these offices would function included internal management referrals for use-of-force incidents and investigations of public complaints (including news stories and congressional inquiries). Once received, a matter would be de-conflicted among the oversight bodies, investigated by one of them, and the findings of that investigation could result in policy reform recommendations, officer discipline, or referral for criminal prosecution. While the OPRs remain, and the DHS OIG continues to function, both CRCL and OIDO were effectively abolished when their entire staffs were terminated this spring. *See generally Robert F. Kennedy Human Rights v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-01270 (D.D.C.) (litigation challenging suspension of CRCL and OIDO functions).

15.     Law enforcement oversight depends on investigators after the fact being able to discover which officers or agents were involved in potential misconduct. A visible identifier—ideally a name tag, or when necessary, an

6

identification number—is critical to that inquiry. Only by recording the specifics of the personnel with whom they interact can members of the public file meaningful, actionable reports or complaints about improper conduct by officers. Investigating an excessive force or unlawful arrest complaint at DHS, for example, would be effectively impossible without a name or numerical identifier that would allow an oversight office to identify the personnel involved in the incident. I am unaware of any officer safety or privacy reason to fail to display a badge number or similar identifier, even in circumstances where an officer's own name could present some risk of exposure. It is true that officers generally bear one badge number throughout their tour at an agency. But even if—and I am unaware of this being a well-founded concern—outside observers were able to link badge numbers to officer names, the agency could always issue a short-term identification number, to be worn on uniforms and changed regularly, for visibility and accountability. There is no logical reason that an officer would be placed at risk by displaying an anonymized number that is meaningful only as an index to agency records.

16.     While there are circumstances in which an officer wearing a medical mask or larger face covering may be necessary or sensible in light of specific risks, concealing the face also creates significant risks to officers and to the individuals with whom they interact. Non-verbal communication through facial expressions and clarity of speech, particularly when dealing with hearing impaired or limited English proficient persons, can be beneficial in a high-tension encounter.

17.     The fact that ICE appears to have blessed its personnel wearing irregular face coverings, rather than a uniform mask with a reasonable accompanying policy, in my view undermines the suggestion that wearing those masks is necessary to officer safety. By contrast, the body armor policy cited above expressly prohibits officers from wearing any body armor sourced themselves as opposed to supplied by the agency.

18. The failure to display agency or individual identifiers, officers' wearing of masks, and the driving of unmarked vehicles also increase the risk of federal officers being mistaken, by the public or by other (state, local, or tribal) law enforcement agencies, as criminal elements warranting a law enforcement response. It seems self-evident that civilians engaging in conduct like making nonconsensual stops, bundling people into unmarked vehicles and driving off, brandishing long guns, and using tear gas or other less-lethal munitions would be committing serious crimes. And so it is critical for public safety that federal agents deploying those tactics be understood by their targets, the general public, and especially other law enforcement elements as legitimate law enforcement personnel.

19. I have reviewed the declaration of Sergio Albarran (ECF 11-2) filed by Plaintiff in this action. I take issue with numerous statements therein, including:

a. Mr. Albarran suggests at ¶ 23 that "immigration activists" photograph enforcement actions "for the sole purpose of intimidating and harassing government employees." From my experience in law enforcement, it is clear to me that constitutionally protected photographing of open-air law enforcement operations is generally used to secure individuals' legal rights, to establish legal claims, and to encourage accountability for officers acting out of compliance with policy and procedure. I have received communications from immigration and community groups offering trainings for legal and other observers to be prepared to document (including by photographing) improper law enforcement conduct, not to threaten officer security, but to facilitate lawful officer behavior.

b. I agree with Mr. Albarran's general view, as stated at ¶¶ 30-31, that masks can serve health or safety purposes, when there are known hazards or in "high-risk operations." I am unclear why, for months

at a stretch, ICE personnel have uniformly been wearing masks in certain cities under these sorts of rationales. It is hard to credit the suggestion that every patrol is a "high-risk enforcement operation[] involving individuals with violent criminal history, gang affiliations, transnational criminal organizations, and known or suspected terrorists"—particularly when, compared to the prior period, the fraction of ICE arrests involving serious criminality has gone down[5] during this period of masked and un-identified officer operations.

c. Mr. Albarran conflates critical issues at ¶¶ 32-38. While it is obviously true that surveillance and investigative activities may need to be conducted in plain clothes, in tactical operations, ICE policy is to wear body armor that clearly singles officers and agents out as non-civilians. The question in those operations is not whether they blend in with civilians, but whether they are distinguishable from terrorists or bank robbers who also wear body armor and masks.

d. I find that the contrast between Mr. Vargas's and Mr. Albarran's declarations undermines Mr. Albarran's declaration. Mr. Vargas carefully describes actual CBP policies regarding deviations from uniform standards that have been authorized in certain circumstances "when the risk of doxxing to officers and agents is likely" (Vargas ¶ 18). As far as I can tell, Mr. Albarran does not indicate that ICE has actually considered these issues at the policy level, or created an articulable standard—like "risk of doxxing is

---

[5] *See, e.g., ICE has arrested nearly 75,000 people with no criminal records, data shows*, NBC News (Dec. 7, 2025) https://www.nbcnews.com/politics/immigration/ice-arrested-nearly-75000-people-no-criminal-records-data-shows-rcna247377.

likely"—for when deviations from ordinary practice are appropriate. This is consistent with my understanding from public statements by current ICE leadership that line officers have been allowed to come up with masking and other practices on-the-fly, without meaningful consideration of tradeoffs. If this contrast in presentation points to a difference in fact—that CBP has a masking/removal of nametag policy, and ICE does not—it further demonstrates the danger of ICE's ad hoc approach. In my experience, it is not a law enforcement best practice to allow line officers to decide when to follow agency uniform and identification policy and when they can invent their own vigilante costumes.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 19th day of December 2025, in Chevy Chase, Maryland.

Scott Shuchart