ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANNA FERRARI, SBN 261579
LEE I. SHERMAN, SBN 272271
Supervising Deputy Attorneys General
KRISTI A. HUGHES, SBN 235943
ZELDA VASSAR, SBN 313789
ASHA ALBUQUERQUE, SBN 332901
ALYSSA ZHANG, SBN 360105
CAMERON A. BELL, SBN 305872
Deputy Attorneys General
  300 S. Spring Street
  Los Angeles, CA 90013
  Telephone: (213) 269-6000
  E-mail: Cameron.Bell@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA; GAVIN NEWSOM, Governor of California, in his official capacity; ROBERT BONTA, Attorney General of California, in his official capacity,**<br><br>Defendants. | 2:25-cv-10999-CAS-AJR<br><br>**EXPERT REPORT AND DECLARATION OF DR. STUART SCHRADER IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

1

**<u>EXPERT REPORT AND DECLARATION OF DR. STUART SCHRADER</u>**

I, Stuart Schrader, declare under penalty of perjury that the following is true and correct:

1.    I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinions on the No Secret Police Act (Senate Bill No. 627) and the No Vigilantes Act (Senate Bill No. 805).

2.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## OVERVIEW

3.    I have reviewed the No Secret Police Act (Senate Bill No. 627) and the No Vigilantes Act (Senate Bill No. 805). I understand these laws to have been introduced in response to operations by federal law-enforcement agencies, particularly Immigration and Customs Enforcement, in the State of California. I have also reviewed the Motion for a Preliminary Injunction filed by the U.S. Department of Justice on November 25, 2025, as well as the attached Declarations by agents of Immigration and Customs Enforcement, Border Patrol, Federal Bureau of Investigation, and Drug Enforcement Administration.

4.    The Office of the Attorney General of the California Department of Justice asked me to provide expert opinions on the historical context for these laws and the operations of federal law enforcement that the laws would affect.

5.    In what follows, I discuss the history of policing and the development of traditions that the No Secret Police Act and No Vigilantes Act make explicit as legal requirements. I focus on the importance of the uniform, badge and badge number, and nameplate as material representations of the traditions and character of policing in the United States. Police uniforms and badges are central to the professional and operational identity of police because the development of police forces required the differentiation of professionals from other parties, including

vigilantes and the military. The history of policing in the United States offers a stark distinction: police are public and professional actors, different from private and vigilante actors.

6.      After an overview of sources of evidence and methods of investigation, in the first section, I explain my understanding of the justifications provided by the U.S. Department of Justice for abrogating longstanding traditions of police visibility and discuss how the No Secret Police Act and No Vigilantes Act appear to be consistent with longstanding policies of the Department of Homeland Security that existed before 2025. Next, I provide a summary of three key traditions of policing in the United States: the distinction between police and other government officials or private citizens; the public and visible character of police in the United States; and the civilian, rather than military, character of police. In the next section, I provide a brief explanation of how these traditions developed and why there is strong consensus on these traditions. I then briefly discuss the reasoning behind the adoption and development of police uniforms and badges. I explain how the traditions of policing in the United States developed in contrast to those of other countries, even as the United States also influenced other countries. Further, I show that a consistent tendency has emerged within the policing profession toward greater distinctiveness and visibility regarding the appearance of uniforms and greater clarity regarding the standards and expectations of identification—until the recent appearance of masked and unidentified federal law-enforcement officers engaged in street operations. I conclude by discussing federal law-enforcement training and policies that contradict recent practices, followed by a summary of my findings and opinions.

7.      Based on my expertise, I have reached the following conclusions:

(a)      These two laws are consistent with the history and traditions of policing in the United States. They seek to codify and standardize longstanding and common practice of police agencies. They are unlikely to change or distort how

most police operations unfold, but they would require greater transparency and clarity for the public regarding federal law enforcement agencies and officers that are actively conducting enforcement operations. They could also reduce the likelihood of individuals impersonating sworn officers.

(b)    In contrast, recent enforcement operations by federal officers have been marked by a departure from standard practice and longstanding tradition. Specifically, the widespread wearing of face coverings, irregular and inconsistent uniforms or lack of uniforms, and absence of clearly visible official and specific identification, including nameplates and badge numbers, all contravene traditions of policing in the United States.

## BACKGROUND AND QUALIFICATIONS

8.    I am an Associate Professor in the Department of History at Johns Hopkins University. I earned my Ph.D. in American Studies from New York University in 2015. My teaching and scholarship focus on policing, prisons, war, and empire. A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

9.    I have produced scholarship on the history of policing in the United States, including in leading peer-reviewed journals and edited volumes of scholarly essays. My first book, *Badges Without Borders: How Global Counterinsurgency Transformed American Policing*, was published by the University of California Press in 2019. *Badges Without Borders* examines how U.S. experts spread ideas about police reform around the globe during the Cold War, and how these ideas reverberated domestically in a period of social upheaval. My second book, *Blue Power: How Police Organized to Protect and Serve Themselves*, will be published in April 2026 by Basic Books. My academic research has been supported by the John W. Kluge Center at the Library of Congress, the Lyndon Baines Johnson Foundation, the American Council of Learned Societies, the Social Science Research Council, and more.

10.    I have presented my scholarship at dozens of scholarly conferences and symposia, including the annual meetings of the American Historical Association, American Studies Association, Organization of American Historians, Social Science History Association, Society for Historians of American Foreign Relations, and Urban History Association. I have also presented findings of my research at many universities, including Harvard University, Macalester College, Middlebury College, Tufts University, University of South Carolina, University of Washington, Yale University, and more.

## RETENTION AND COMPENSATION

11.    I am being compensated for services performed in the above-entitled case at an hourly rate of $250. I am receiving no other compensation for these services.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## SOURCES OF EVIDENCE AND METHODS OF INVESTIGATION

12.    For decades, scholars have analyzed the civilian origins of police in the United States and the comparative distinctiveness of police in the United States from their counterparts in other countries, as well as from the military, paramilitaries, or vigilante groups. Some of the now-classic historical research on policing emerged in the aftermath of the political upheavals of the 1960s, when so-called "social history" gained popularity. The study of policing went hand-in-hand with the study of ordinary people, social orders, and social control. There has been another efflorescence of historical scholarship on policing that began to coalesce in response to political protests against policing circa 2014 but has only grown in the decade or so since then.

13.    This declaration draws from this existing scholarship, as well as my own original research on the distinctiveness of police. In addition, I have reviewed numerous original or "primary" sources within the professional literature on policing, as well as documents produced by police agencies and policing experts. I

have particularly examined historical research that details the introduction of police uniforms in the nineteenth century as representing the genesis of traditions of policing that persist to the present.[1] I have also survey peer-reviewed scholarship on police uniforms in psychology and related fields concerned with assessments of perceptions of uniforms.[2] I published one of the few recent peer-reviewed articles on the history of police uniforms, in the *Journal of Urban History*, whose findings I discuss below.[3]

## RECENT FEDERAL LAW ENFORCEMENT OPERATIONS

14.    The U.S. Department of Justice, in its Motion for a Preliminary Injunction, claims that federal law-enforcement officers are "are navigating an intensely hostile environment" (page 7). The reason is that officers have engaged in novel types of immigration enforcement actions, including wearing plainclothes and masks, and not identifying themselves to the public. These practices lack popular legitimacy. Officers have conducted such operations in and around Los Angeles, Washington, DC, Chicago, Charlotte, New Orleans, and Minneapolis/St. Paul, as well as some other locations, in 2025. The Motion describes forms of protest and critique, as well as criminal activity, that have resulted after these enforcement actions. The Motion then declares, "federal law enforcement agencies allow their officers to choose whether to wear masks to protect their identities"

---

[1] Eric H. Monkkonen, *Police in Urban America, 1860–1920* (New York: Cambridge University Press, 1981).

[2] For example, Daniel J. Bell, "Police Uniforms, Attitudes, and Citizens" *Journal of Criminal Justice* 10, no. 1 (1982): 42–55; Richard R. Johnson, Darryl Plecas, Shawne Anderson, and Harry Dolan, "No Hat or Tie Required: Examining Minor Changes to the Police Uniform" *Journal of Police and Criminal Psychology* 30 (2015): 158–165; Ming S. Singer and Alan E. Singer, "The Effect of Police Uniform on Interpersonal Perception" *The Journal of Psychology* 119, no. 2 (1985): 157–161.

[3] Stuart Schrader, "More than Cosmetic Changes: The Challenges of Experiments with Police Demilitarization in the 1960s and 1970s" *Journal of Urban History* 46 no. 5 (2017): 1002–1025.

(page 8). It also declares that "the success of federal law enforcement actions often depends on officers' anonymity" (page 8). This claim is inconsistent with longstanding traditions of policing, as explained in what follows.

15.    Aside from this Motion, leaders within the Department of Homeland Security have largely confirmed and occasionally denied that federal officers are hiding their identities, but copious media coverage, including photojournalism, shows that officers have been wearing balaclavas, gaiters, and other masks of various types, inconsistently displaying badges, and donning mismatched uniforms or casual clothing, as well as generic patches or insignia that read only "police" or "federal agent" rather than their specific unit.[4]

16.    Federal law-enforcement officers within the Department of Homeland Security are, however, expected to wear uniforms and visible credentials to allow their clear and immediate identification, according to internal guidelines. Although not all operational policies and requirements of Immigration and Customs

---

[4] Media coverage and analysis of these federal operations has been extensive. I cite a selection here, emphasizing the employment of masks and irregular identification: Hamed Aleaziz, Brent McDonald, and Amogh Vaz, "How Washington Became a Testing Ground for ICE" *New York Times*, October 1, 2025, available at https://tinyurl.com/2kztswmn; Lisa Desjardins and Andrew Corkery, "Rise of ICE Agents Wearing Masks Creates Opportunity for Imposters to Conduct Crimes" *PBS News Weekend*, July 27, 2025, available at https://tinyurl.com/ysyrm6j8; Bora Erden, "How to Make Sense of the Federal Forces on the Streets" *New York Times*, October 24, 2025, available at https://tinyurl.com/3e7tfyec; Leila Fadel, Adam Bearne, Barry Gordemer, H.J. Mai, "Masked Immigration Agents Are Spurring Fear and Confusion across the U.S." *NPR Morning Edition*, July 10, 2025, available at https://tinyurl.com/2t6wb37f; Jenny Jarvie, "ICE Agents Wearing Masks Add New Levels of Intimidation, Confusion during L.A. Raids" *Los Angeles Times*, July 7, 2025, available at https://tinyurl.com/3tc6sbxr; Patrik Jonsson, "Immigration Police Say They Mask to Stop Retribution. They May Be Risking Trust" *Christian Science Monitor*, July 28, 2025, available at https://tinyurl.com/5emv37yj; Nathan Solis and Richard Winton, "'Who are these people?' Masked Immigration Agents Challenge Local Police, Sow Fear in L.A." *Los Angeles Times*, June 24, 2025, available at https://tinyurl.com/27kck3v8.

Enforcement and Customs and Border Protection are readily available to the public, I have encountered in my research explicit policies that are consistent with the No Secret Police Act and No Vigilantes Act, discussed below in Paragraph 53.

## OVERVIEW OF THREE KEY TRADITIONS AMONG POLICE

17.    Police in the United States maintain traditions that are widely accepted and often venerated. I focus on three here: differentiation of police from civilians or other officials; the public and visible character of police; and the distinction of police from military.

18.    The first tradition is the differentiation of police from civilians or other government officials through symbolism: badge, uniform, and weapon. The badge is both a real thing and a metaphor. The badge is a tangible symbol that an officer has undergone training and sworn an oath of service, but "the badge" is also a term that both police and outsiders use to refer to the profession. Phrases like "behind the badge," "before the badge," or "the badge means you care" are widely understood to refer to police officers and key aspects of their professional identities. If an officer loses his or her physical badge, a penalty often results. If an officer is stripped of his or her position as a member of the force, the badge will be confiscated. Today, the physical badges that most officers wear also include a unique identifying number, enabling the possibility that anyone who interacts with an officer could know who the officer is.

19.    Another tradition that police in the United States maintain is their public, visible character. Usually, this tradition is explained through comparative reference to police elsewhere or in different types of societies, particularly non-democratic or authoritarian societies, where so-called secret police are common.[5] Police in the United States do represent state power and dispense "non-negotiably coercive force" according to "situational exigencies," but tradition holds that they

---

[5] Sabrina Tavernise, "ICE Agents Are Wearing Masks. Is That Un-American?" *New York Times*, September 5, 2025, available at https://tinyurl.com/477da82f.

do so publicly, with accountability to their commanding officers, government officials, and the public.[6] Critics contend that accountability is often inadequate, but it would be possible only because police in the United States do not operate in secret or in the shadows. Tradition holds that if police were hidden, non-uniformed, and unidentifiable, they would be licensed to abrogate rights and constitutional protections. The contrast scholars often draw, therefore, is between public and democratic policing or secret and clandestine forms of policing. This tradition of democratic policing is what the No Secret Police Act and No Vigilantes Act are intended to uphold.

20.    A third tradition that police in the United States maintain is their civilian character. Police are not the military. It is nevertheless true that police departments have drawn strong influences from the military, particularly the Army.[7] Distinguishing police from military has still been important within the profession. In fact, in the nineteenth century, when the militia could not adequately contain social unrest, public officials were sometimes inspired to create a formal police force, which was separate.[8] Many important and influential police leaders have been veterans, and a significant percentage of police officers at any given time have a military background.[9] Further, many tactics that police have adopted, including even basic ones like patrol, originate with the Army. The same is true for many police technologies and matériel. Even police uniforms resemble military dress

---

[6] Egon Bittner, *The Functions of the Police in Modern Society* (Chevy Chase, MD: National Institute of Mental Health, 1970), 46.

[7] Julian Go, *Policing Empires: Militarization, Race, and the Imperial Boomerang in Britain and the US* (New York: Oxford University Press, 2024).

[8] Monkonnen, *Police in Urban America*, 36; Sidney L. Harring, *Policing a Class Society: The Experience of American Cities, 1865–1915* (Chicago: Haymarket Books, Second Edition, 2017). Militias later became consolidated as the National Guard.

[9] Stuart Schrader, "Cops at War: How World War II Transformed U.S. Policing" *Modern American History* 4, no. 2 (2021): 159-179.

uniforms. The need for clear distinctions, therefore, is strong.

21.    Scholars and journalists refer to erosions of the distinctiveness of police by military influence as "militarization."[10] Despite multiple forms of such influence, police in the United States remain distinctive from the country's military in mission, operations, and institutional identity, while the military is by custom and law typically not allowed to engage in domestic law enforcement. Comparison with other countries is instructive. France (along with several Francophone postcolonial states) maintains a gendarmerie, answerable to the Ministry of Defense and composed of officers who are technically soldiers. In colonial and postcolonial settings, the gendarmerie has typically been stationed in rural areas, and its officers lived in barracks, separate from the population, and trained in military formations and in wielding rifles. There is no direct equivalent to the military-linked gendarmerie in the United States, though state police forces have borne some resemblances, particularly in their early decades. Decentralized and civilian police forces have prevailed in this country.[11]

22.    These three traditions comprise the reigning orthodoxy that defines the institution of policing beyond the differences among individual police departments.[12]

---

[10] The literature on "militarization" is extensive. See, Scott W. Phillips, "Police Militarization" *FBI Law Enforcement Bulletin*, August 14, 2017, available at https://tinyurl.com/mppjjeap; Peter B. Kraska, ed., *Militarizing the American Criminal Justice System: The Changing Roles of the Armed Forces and the Police* (Boston: Northeastern University Press, 2001).

[11] Olly Owen, "Policing after Colonialism," in *The SAGE Handbook of Global Policing*, Ben Bradford, Beatrice Jauregui, Ian Loader, and Jonny Steinberg, ed. (Washington, DC: SAGE, 2016), 303–319. Other countries in Europe, including Italy, Spain, and the Netherlands, also developed a gendarmerie model.

[12] The scholar Micol Seigel refers to what I am calling traditions as "mythologies" that "legitimize police power" and rely on "borders" or "boundaries" to "delimit police work." In short, these are widely accepted stories that shape how police understand themselves and present themselves to the public. Micol Seigel, "Violence Work: Policing and Power" *Race & Class* 59, no. 4 (2018): 15–33.

## THE HISTORICAL DEVELOPMENT OF POLICE TRADITIONS

23.     These traditions that define policing in the United States developed over nearly two centuries and were not predestined. They matter because police developed and evolved as distinctive from private actors or groups. Defining themselves as different from vigilantes and avoiding the appearance of a standing army—which was political anathema in the young republic—were crucial for police to obtain public acceptance and legitimacy as protectors of the public. This acceptance and legitimacy were and remain fragile, but they are replenished through adherence to these traditions.

24.     As historians Simon Balto and Max Felker-Kantor write, "'[t]he police' as Americans have come to know them simply did not exist in colonial and early American life."[13] Watchmen, marshals, sheriffs, bailiffs, and constables all pre-dated the bureaucratic organizations commonly understood as modern police forces in the United States. So too did bounty hunters, vigilantes, posses, mobs, and slave patrols. The public-private distinction was not rigid in the eighteenth and nineteenth centuries, and volunteers and private groups also obtained the blessing of officials. In this vein, so-called "vigilance committees," which originally aimed to protect African American people fleeing slavery, bore resemblance to early police forces, particularly when they adopted formal charters and obligations, as well as fiscal ties, to local merchants and governments.[14] These committees also were direct precursors to police forces in some towns. But modern police differed from the informal, amateur organizations that preceded them.

25.     In most places across the United States, there is a clear before and after: at some point, a formal police force came into existence, controlled by local

---

[13] Simon Balto and Max Felker-Kantor, "Police and Crime in the American City, 1800–2020," in *Oxford Research Encyclopedia of American History*, https://tinyurl.com/bp8jj8en.

[14] Jesse Olsavsky, "The Black People Who Fled Slavery Had A Lot to Teach their Northern Allies" *Hammer & Hope* 8 (Fall 2025), https://tinyurl.com/54t6j6b7.

officials and funded by public budgets. Officers were paid for their work, and, it must be said, they were usually under direct sway of the ruling political party. This transition did not occur overnight, but it did occur.[15] The activity of policing conducted by various different actors and the longstanding police power became vested in an institution referred to as "the police," which would now comprise regularly employed professionals.[16] Marshals, sheriffs, bailiffs, and constables all became more professional, to be more like their police counterparts. In contrast, volunteer watchmen largely disappeared. Vigilantes, posses, and mobs became subject to sanction and penalty, to be enforced by police officers. Mob violence, in fact, was a widespread problem to be tamed in the early part of the nineteenth century, and police were the solution.[17] Policing by vigilantes and irregular volunteers became illegitimate, and social-control powers were arrogated to professionals. This shift can be considered the successful monopolization of the means of violence by the state, to draw on sociologist Max Weber's canonical definition.[18] The No Vigilantes Act, in particular, aims to ensure that the distinction

---

[15] David H. Bayley, *Patterns of Policing: A Comparative International Analysis* (New Brunswick, NJ: Rutgers University Press, 1985); Matthew Guariglia, *Police & the Empire City: Race & the Origins of Modern Policing in New York* (Durham, NC: Duke University Press, 2023); Alex S. Vitale, *The End of Policing* (New York: Verso, 2017).

[16] A founding father of the field of political science, John Burgess, once referred to the police power as: "the 'dark continent' of our jurisprudence. [. . .] the convenient repository of everything for which our juristic classifications can find no other place," quoted in: Santiago Legarre, "The Historical Background of the Police Power" *University of Pennsylvania Journal of Constitutional Law* 9 (2006): 745–796, 747n11; Mark Neocleous, *A Critical Theory of Police Power*: *The Fabrication of Social Order* (New York: Verso, 2021); Stuart Schrader, "Harm of the Law" *Artforum* (May/June 2020).

[17] Samuel Walker, *A Critical History of Police Reform: The Emergence of Professionalism* (Lexington, MA: Lexington Books, 1977).

[18] Weber writes, "a state is a human community that (successfully) claims the monopoly of the legitimate use of physical force within a given territory"; Max

(continued…)

between sworn police and vigilantes or other private actors remains sturdy and clear.

### I.    Historical Adoption of Police Uniforms

26.    Why police forces emerged and what made the creation of police forces necessary in specific cities may remain a subject of conversation among scholars. But scholars maintain a broad consensus about what they looked like when they did coalesce. Officers would be uniformed and bear a standard badge.

27.    New York City provided a template for many police forces, according to historian Eric Monkonnen, and its police force was the first to adopt an official uniform, in addition to a required badge.[19] The required, standard uniform emerged in New York City in 1853. It was adorned with a badge or "shield" that officers would wear while on duty.[20] Both New York City and Boston, which created a police force earlier, drew inspiration from London's metropolitan police department.

28.    The police badge and uniform distinguished the professional police officer from non-professional contenders, like vigilantes, or the military. Among the most notable features of the new London police department was its adoption of a recognizable blue uniform, which contrasted with the military's red uniform.

29.    Not all police officers in the nineteenth-century United States were initially keen to wear a uniform. Objections in New York City, for instance, included the cost to the public purse, the diminution of independence, and fears of

---

Weber, "Politics as a Vocation," in *From Max Weber: Essays in Sociology*, translated, edited, and with An Introduction by H. H. Gerth and C. Wright Mills (New York: Oxford University Press, 1946).

[19] Monkonnen, *Police in Urban America*.

[20] "Early New York City Police 'Badges' & Emblems of Office—1800-1845," *The History of Policing in the City of New York*, October 11, 2020, https://tinyurl.com/yea2a85f.

resembling a standing army.[21] But the badge and uniform composed a public symbol, recognizable to all, of the authority of the police.

30.    Notably, members of the most well-known and largest vigilante organization in the history of the United States, the Ku Klux Klan, wore their own recognizable uniforms but typically hid their faces behind hoods. These vigilantes engaged in extrajudicial violence and did not want to be easily identified.[22]

31.    The police uniform solved a problem for the public. In the era before telecommunications, how could an ordinary person find an officer when in need? The uniform was one way to make officers stand out. Against rank-and-file reluctance in New York City and elsewhere, departments prevailed in compelling officers to start wearing a uniform. This change highlights how despite internal cultures among officers, the bureaucracies of police departments were shaped both by adherence to formal rules and rituals and by strict lines of command authority to enforce them. These uniforms, in turn, shaped how police would interact with members of the public. As historian Robert Fogelson writes, "By the 1890s most policemen were uniformed, armed, and readily available virtually everywhere in urban America."[23]

32.    Uniforms became ubiquitous, but their appearance was not stable. Departments debated what color uniforms should be. Officers wanted to stand out but also appear authoritative. If departments afforded them high-quality uniforms, it would contribute to a sense they were appreciated.[24] Pushes for greater legitimacy and competence among officers by supervisory officers have intersected with

---

[21] Robert M. Fogelson, *Big-City Police* (Cambridge, MA: Harvard University Press, 1977); Monkonnen, *Police in Urban America*.

[22] Linda Gordon, *The Second Coming of the KKK: The Ku Klux Klan of the 1920s and the American Political Tradition* (New York: Liveright, 2017).

[23] Fogelson, *Big-City Police*, 15.

[24] President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Police* (Washington, DC: Government Printing Office, 1967), 136.

demands by rank-and-file officers for more respect by members of the public and better compensation; uniforms have crystallized both pressures.

## II.    Historical Adoption of Police Badges

33.    The badge is as essential as the uniform to the history of police developing accountability to the public. In many places, badges predated uniforms. Different police departments maintain different badge designs. Badges may reference local history or draw iconography from a deep well, going back in some cases to ancient or medieval periods. The shape of the badge or shield, according to some, even evokes the shield carried by a medieval knight. Although the police badge is a relatively modern invention, by drawing from much older traditions, this iconography asserts forms of authority that exceed contemporary forms of governance. The scholars David Correia and Tyler Wall suggest that the badge is best understood like a costume that transforms an ordinary person into someone with transcendent and sacred authority. "Through its theatrics," they write, "the badge does important political work by giving symbolic form to police authority." They continue, "The badge renders the violent work of policing legitimate and justified, but also noble and sacred. The anthropologist Michael Taussig calls the police badge a 'magical talisman,' the holy artifact that endows the police community with a mystical authority not just earthly and pragmatic, but nearly divine and transcendent."[25] Although most police officers may not describe the badge in such terms, all know that donning the badge and uniform is transformative because it changes how members of the public respond and how to expect members of the public to behave.

## III.    Professionalization of Policing and Democracy in the United States

34.    Over time, the social responsibilities associated with the police power narrowed, and police officers came to be tasked mainly with the control of disorder

---

[25] David Correia and Tyler Wall, *Police: A Field Guide* (New York: Verso, 2018), 115, 116.

and deterrence of crime, or what has been labeled "public safety." Other responsibilities, including hygiene, commercial inspections, or child welfare, were delegated to other government or private agencies, or else eliminated. Maintaining social peace, defined according to the country's class, racial, gender, political, and social order, became the function of police. This limited mission was to be represented by their public persona and symbolic features. As Correia and Wall put it, "The police uniform must be understood as part of a process of uniformity, the production of order. [. . .] The police body is uniformed to represent order."[26] Conversely, it could be argued that irregular, haphazard, mismatched, and informal—non-uniform—dress among police would represent a type of disorder. The No Secret Police Act and No Vigilantes Act embody efforts to enhance "public trust" (SB 627 Sec. 2 (b)(1)(A)) and "public safety" (SB 805 Sec. 13) in alignment with the scope of the police mission as it has developed in the past 150 or more years in the United States.

35.     The primary term for the process of shedding unrelated responsibilities and developing aptitude in crime control is "professionalization." Police professionalization is a never-finished process of reform, modernization, elevation of standards, introduction of new technologies, and so forth.[27] Its advocates demand that police recruits be qualified and undergo training both "before the badge" and during service across a career.[28] Professionalizers also recommend that police be compensated adequately for the work they do, in distinct contrast to vigilantes.

36.     Professionalization has occurred in waves. It is possible to identify the approximate onset of three major waves: one around the 1930s, one around the

---

[26] Correia and Wall, *Police: A Field Guide*, 153.

[27] Bayley, *Patterns of Policing*; Fogelson, *Big-City Police*; Stuart Schrader, *Badges Without Borders: How Global Counterinsurgency Transformed American Policing* (Oakland: University of California Press, 2019).

[28] Samantha Simon, *Before the Badge: How Academy Training Shapes Police Violence* (New York: New York University Press, 2024).

1960s, and one around the 2010s. In the first wave, the main objective was to delink police from partisan urban political machines and grant them political independence. In the second wave, the main objective was to upgrade standards and regain legitimacy after the crises of urban unrest and rising crime. The third wave's objectives were similar to those of the second, after another bout of civic unrest and public criticism of policing. Yet the three traditions I have mentioned have been constant across the periods, even if they have been continually contested and then re-asserted: the distinction of police from ordinary people or other officials; the public character of police; and the distinction of police from military. Uniforms and badges have been key markers of these traditions.

37.    The Los Angeles Police Department, under the leadership of William H. Parker in the middle of the twentieth century, exemplified some forms of professionalization. Parker instituted a "Daily Training Bulletin" that conveyed lessons about proper policing techniques, discipline, fitness, the courts, public relations, and many other topics. The collected Daily Training Bulletins provide a remarkable window into how police professionalizers like Parker understood their task. The Bulletins include a few important points about the relevance of appearance of officers to public trust and approval, such as, "Since the public readily identifies an officer by his uniform, his conduct is subject to either considerable criticism or commendation."[29] Among the recommendations are for even plainclothes officers to be prepared to display a badge or "pin the badge quickly on his lapel" in an emergency.[30] These types of recommendations, now decades old, represented an effort to rationalize policing practices and uphold the legitimacy of the institution. The No Secret Police Act and No Vigilantes Act

---

[29] I have reviewed the two-volume collection of the Bulletins, totaling around 500 pages. W.H. Parker, *Daily Training Bulletins of the Los Angeles Police Department, vol. 1* (Springfield, IL: Charles C. Thomas, 1954), 200.
[30] W.H. Parker, *Daily Training Bulletins of the Los Angeles Police Department, vol. 2* (Springfield, IL: Charles C. Thomas, 1958), 96.

1  extend these efforts in the present. They continue the professionalization of
2  policing.

3    IV.    **Professionalization of Policing and Comparisons with Other**
4           **Countries**

5    38.    Professionalization deepened and reinforced the traditions of policing
6  in the United States through training and policy, fashioning the institution into its
7  contemporary form. The first round of professionalization aimed to grant police
8  independence and political neutrality, rooting out corruption. This experience
9  shaped how police experts came to understand the difference between police of the
10 United States and those of authoritarian regimes, including Nazi Germany and
11 Imperial Japan, as well as the Soviet Union. In these types of regimes, as well as in
12 colonial settings, police were understood to be under centralized authority, and their
13 accountability was "upward-facing," designed to protect the regime. Operations
14 were frequently secret: regime opponents would disappear, rather than being
15 subject to public judicial processes, for instance. And, as with the U.S. political
16 machines, police gained appointments through ties to the party in power.[31]
17 Although the analogy to political machines was not always perfect,
18 professionalizers believed that democratization and professionalization was a way
19 to assure that police accountability became "downward-facing," toward the
20 public.[32] Police departments remained hierarchical bureaucracies, and officers
21 answered to their supervisors. But law enforcement and other types of discretionary
22 social control became central to their mission. Regime protection or politicized
23 operations would not be the sole focus. Downward-facing accountability would
24 require that police be identifiable to the public.

25

_____

26 [31] Andy Aitchison, "Policing after State Socialism," in *The SAGE Handbook of*
27 *Global Policing*, Ben Bradford, Beatrice Jauregui, Ian Loader, and Jonny Steinberg,
   ed. (Washington, DC: SAGE, 2016), 321–336.
28 [32] Owen, "Policing after Colonialism," 306.

39.    In 1955, Allen Dulles, director of the Central Intelligence Agency contrasted the United States and the Soviet Union through reference to police. He reported, "If I were asked to point out the most obvious difference between the free world and the Communist dominated areas it would be this. The free world provides for law enforcement that protects the rights and liberties of the individual." In contrast, "Law enforcement in the Communist world looks first and foremost to safeguarding the ruling regime without regard for individual rights."[33] Police in a democratic society were supposed to serve the public and be recognizable to members of the public as such.

40.    Yet not only Soviet-linked police forces became undemocratic and authoritarian. These same characteristics emerged among U.S.-backed police forces, such as in Brazil during the dictatorship period (1964–1985). The scholars Martha Huggins, Mika Haritos-Fatouros, and Philip Zimbardo write about how Brazilian police experienced "deindividuation": "sense of anonymity—'no one knows who I am' and 'no one cares what I do'." Behavioral constraints and "cognitive controls," they argue, were lifted because police operated in clandestine fashion. "This violent actor is submerged in groups, acting in the dark, wearing a uniform, mask, hood, or painted face. Under such circumstances, responsibility for action is minimized: we are not socially accountable if unidentifiable."[34] Similarly, in Guatemala at the height of the long civil war (1960–1996), "government death squads roamed the streets of the capital in unmarked cars, windows blackened, to hunt their victims. The unidentified agents of army intelligence and the police took thousands of people away to clandestine interrogation centers to torture information

---

[33] Allen Welsh Dulles, "Intelligence" *The Police Chief* (November 1955), 11.

[34] Martha Huggins, Mika Haritos-Fatouros, and Philip Zimbardo, *Violence Workers: Police Torturers and Murderers Reconstruct Brazilian Atrocities* (Berkeley: University of California Press, 2002), 257.

out of them."[35] The police or army uniform does deindividuate, but the visibility of a police officer's face, and a badge number and name plate, contrast with this uniformity. Without those balancing controls, constraints easily disintegrate: "The Brazilian police were almost always in a group, often acting in the dark, sometimes in a common uniform, and sometimes masked or hooded. These props in the theater of repression helped to produce the deindividuating anonymity for Brazilian violence workers that assisted their carrying out horrific duties."[36]

41.     In the United States, the foremost police professionalizer of the mid-twentieth century, Orlando W. Wilson, identified the solemn importance of uniforms and badges in his widely adopted textbook *Police Planning*. Regulations were important to Wilson's vision of policing, and he suggested that wearing uniforms and badges was imperative; wearing anything that did not conform to departmental regulations was not allowed. Further, officers were not to wear uniforms outside of duty, except under limited circumstances, such as while commuting to a shift. Uniforms could not be worn by any officer who was suspended, and badges could not be transferred or modified. No badges other than the official one could be worn. When officers were engaged in duties that necessitated plain clothes, they "shall be prompt to identify themselves when the necessity arises, and at the scene of an emergency where it is desirable to display the badge continuously, it shall be attached" to a plainclothes officer's outerwear.[37]

42.     Thus, the No Secret Police Act and No Vigilantes Act represent new steps in the ongoing professionalization process for police. They align with the history of police reform in the United States and contrast with horrifying episodes of abuse enabled by secrecy and deindividuation that are hallmarks of undemocratic

---

[35] Kate Doyle, "Preface to English Translation," in *From Silence to Memory: Revelations of the AHPN* (Eugene: University of Oregon Libraries, 2013), xvii.
[36] Huggins, Haritos-Fatouros, and Zimbardo, *Violence Workers*, 259.
[37] O.W. Wilson, *Police Planning* (Springfield, IL: C.C. Thomas, 1957, 2nd edition), 372–373.

1   regimes and mob violence.

2   **INCREASING CONSENSUS WITHIN THE POLICE PROFESSION OVER**

3   **PUBLIC VISIBILITY AND IDENTIFICATION**

4   43.    Despite the consistent status and importance of uniforms and badges

5   outlined above, in practice, there have been discussions within the profession over

6   time concerning how to achieve the best results, as well as modifications of the

7   details of how police identify themselves. Further, there have always been tactical

8   or weather-related exceptions to the expectation that officers prominently display a

9   badge and wear a visible uniform—and otherwise be identifiable, including by not

10  hiding their faces. The tactical exemptions the No Secret Police Act and No

11  Vigilantes Act contain conform to the history of exceptions to these traditions and

12  also reflect recognition that changes to police practice and standards do occur. I

13  understand these laws as another step in the process of codifying the results of

14  discussion within the profession, which have tended toward standardizing the

15  public image of police.

16  44.    When police legitimacy was imperiled amid social upheaval in the

17  1960s, one particularly innovative police chief named Victor Cizanckas engaged in

18  a campaign of reforms that centered on uniforms. The chief recognized that

19  uniforms were crucial tools in achieving public legitimacy. His goal was to change

20  interactions between his officers and the residents of the small city of Menlo Park,

21  in California, reducing mistrust and antagonism. Cizanckas believed the

22  "demilitarizing" police could improve communication with the public and

23  compliance of those who interacted with police. He began an experiment in

24  demilitarization in 1969.[38]

25  45.    This experiment ran in the opposite direction from contemporary

26  federal law-enforcement operations, by making police seem less intimidating,

27

28  [38] Schrader, "More Than Cosmetic Changes."

anonymous, and unapproachable. The most visible form of demilitarization of the police in Menlo Park was a change to officer uniforms. Instead of the traditional blue uniform modeled on military dress uniforms, with weapons visible at the waist, officers began to wear standardized green blazers, which concealed weapons, radios, handcuffs, and other implements. Officers did not display a metal badge, though the blazers were instead embroidered with a logo. A nameplate substituted for a badge to provide identification of the individual officer. This demilitarized uniform led to positive effects, including attracting more highly educated recruits. Among the public, crime did not increase, and there were fewer assaults on officers. Additionally, members of the public did not readily know officers' ranks, meaning that people were more likely to speak to a patrol officer without requesting a supervisor. Overall, public opinion of the police in Menlo Park improved, with officers found to be "friendlier."[39] After Cizanckas left his leadership role in Menlo Park, however, traditional uniforms returned; assaults on officers increased with the return to traditional uniforms.[40] In this case, uniforms and identifying placards did not disappear, but they changed, with the goal of changing the image of the police. The conclusion to draw is that how police present themselves has an impact on public perceptions and behavior, which the No Secret Police Act and No Vigilantes Act explicitly recognize.

46. The police nameplate or nametag is another tool for improving police

---

[39] Schrader, "More Than Cosmetic Changes"; Victor I. Cizanckas and Fritzi Feist, "A Community's Response to Police Change" *Journal of Police Science and Administration* 3, no. 3 (1975): 284–291; James H. Tenzel and Victor I. Cizanckas, "The Uniform Experiment" *Journal of Police Science and Administration* 1, no. 4 (1973): 421–424; D. F. Gundersen, "Credibility and the Police Uniform" *Journal of Police Science and Administration* 15, no. 3 (1987): 192–195.

[40] One study challenges the finding that assaults on officers decreased with the uniform change and then increased when traditional uniforms returned. Robert Mauro, "The Constable's New Clothes: Effects of Uniforms on Perceptions and Problems of Police Officers" *Journal of Applied Social Psychology* 14, no. 1 (1984): 42–56.

transparency, as well as trust and legitimacy among the public. The nameplate was introduced much later than badges and uniforms. But police officers sometimes resisted this change, such as in New York City in the mid-1970s. The contemporary reluctance of federal law-enforcement officers to make their credentials visible echoes this resistance. The New York City patrol officers' union, which did not exist during the initial scrum over requiring uniforms in the nineteenth century, opposed requiring nameplates or nametags. The union made a few different arguments. One was that the proposed plastic material for the nameplate was flammable. Another was that easy identification of officers posed a risk. According to the police union, "people would harass, abuse, and threaten police officers and their families." Nevertheless, the change was adopted, with officers subject to penalty for failing to wear the requisite insignia. The risks did not outweigh the benefit to the public, who would now be able to identify officers more easily. Despite resistance within the rank and file to this change, pressure for transparency and accountability succeeded. In this way, the No Vigilantes Act's requirement of "identification that includes [officers'] agency and either a name or badge number, or both name and badge number" (Sec. 2 (a)(2)) codifies what became an accepted practice after a period of disagreement in locales like New York City. Within the country's biggest municipal police force, acceptance of nametags is thus around 50 years old.

47.    Worries about easy identification of officers were not confined to the United States. Similar resistance to requirements for nametags emerged elsewhere at the same time, with patrol officers worried about punitive measures imposed by superior officers. As one scholar suggested, regarding a parallel situation of the adoption of nametags in Germany, "The men opposed to this were not those who reported that they had difficulties in their relations with the public, but those who

had difficulties with their supervisors."[41] The concern was less about how members of the public might treat officers or their families than about how supervisory officers would deal with complaints against officers they disfavored. In sum, officers were concerned about internal discipline measures more than what is today called "doxxing," as referenced by the U.S. Department of Justice's Motion.

48.     One study of police uniforms argues that "Dress is both a symbol and a defense. Clothing serves as a filter and a barrier, communicating to others nonverbally who we are or would like to be and the kind of world in which we would like to live."[42] Although there have been changes in how police appear, and there has been internal contestation over values and authority, as represented by uniforms, badges, and appearance, there is no question that there is strong linkage between the traditions of policing in the United States up to today and their visible appearance. The trend has been toward greater transparency and identifiability in normal operations, which the No Secret Police Act and No Vigilantes Act codify.

## I.     Historical Example of Police Response to Threats from the Public

49.     Threats to police officers and their families are not new. By the 1980s, law-enforcement experts and legal advocates pressed police to use tort claims to gain civil remedy for physical or verbal "assault." These remedies were separate from criminal prosecution. Although it was already common for members of the public to sue after suffering alleged or confirmed abuse, now advocates suggested that officers should sue the public if they experienced abuse. One emphasis was "infliction of mental distress," including through harassment. This harassment could also target an officer's family and include "obscene or threatening phone

---

[41] "New York City Police Get Nametags" *Police Labor Review* (February 1975), 3; Michael Banton, "The Sociology of the Police III" *The Police Journal* 48, no. 4 (1975): 299–315, 308.

[42] James H. Tenzel, Lowell Storms, and Hervey Sweetwood, "Symbols and Behavior: An Experiment in Altering the Police Role" *Journal of Police Science and Administration* 4, no. 1 (1976): 21–27.

calls," issuing a false message that an officer had been hurt or killed, injuring or killing an officer's family pet, damaging an officer's personal property, or directly harming an officer's family members. There were two proposed remedies, injunctive relief and common-law tort action. Nowhere in the suggested remedies was hiding an officer's face or identity, and the advocates noted that officers do not have a right of privacy while conducting their duties.[43]

## II.   Contemporary Examples of Police Visibility

50.    As the professionalization process continues, and police reform continually reappears on the national agenda after high-profile incidents of abuse, public accountability remains a central concern. The President's Task Force on 21st Century Policing, appointed by President Barack Obama, for instance, made a series of recommendations designed to improve policing and lessen the likelihood of civil protest and disorder. One was: "Law enforcement agencies should adopt policies requiring officers to identify themselves by their full name, rank, and command (as applicable) and provide that information in writing to individuals they have stopped."[44]  A concomitant suggestion was that officers should carry a printed card with this name, rank, command, and contact information to distribute in all encounters. This recommendation has been unevenly adopted in the years since the report was released.

51.    In recent years, police officers have brought several lawsuits against their departments for purported violations of the Fair Labor Standards Act related to uniforms. Generally, the legal question has revolved around whether officers should be paid for time spent "donning" and "doffing" their required uniforms. Because wearing a uniform is a banausic part of the job, time spent putting it on and taking it

---

[43] Charles E. Friend, *Police Rights: Civil Remedies for Law Enforcement Officers* (Wilmette, IL: Callaghan & Co., 1987), 40–41, 104, 108–109.
[44] President's Task Force on 21st Century Policing. *Final Report of the President's Task Force on 21st Century Policing* (Washington, DC: Office of Community Oriented Policing Services, 2015), 27.

off is also required and therefore should be compensated, some plaintiffs have argued. Federal courts have come to differing decisions, but the rule of thumb is that if officers are required to don and doff their uniforms on the premises of the police department, then compensation is warranted. These cases concern labor law, rather than police operations, but their premise is that police uniforms (and implicitly badges adorning them) are standard and required tools.[45]

### III.    Federal Law Enforcement Training Guidance and Policies on Uniforms, Badges, and Masks

52.    Among federal law-enforcement officers, there is a distinction between officers who typically wear plainclothes like FBI agents and those who wear uniforms, such as the green uniforms of Border Patrol. But all are trained to identify themselves and carry badges. Training and standard policies have not entailed hiding officer identities except under specific circumstances.

53.    Standard policies of the Department of Homeland Security require that officers wear visible badges and nameplates and standard uniforms. For instance, I have reviewed the Uniform and Grooming Standards of the U.S. Border Patrol (USBP), which dictate that agents "wear officially authorized uniform items when performing USBP duties"; that "[o]fficial credentials will be carried at all times while on duty"; and that "[b]adges and nameplates or unique identifiers must be worn on the outermost uniform garment and visible to the public when practicable."[46] Similarly, the collective bargaining agreement between Customs and Border Protection and the National Border Patrol Council confirms: "The employer

---

[45] "'Donning and Doffing' Police Uniforms and Protective Gear Under the Fair Labor Standards Act" *FBI Law Enforcement Bulletin*, June 11, 2011, available at https://tinyurl.com/3a562ury.

[46] U.S. Border Patrol, Internal Operating Procedure: Uniform and Grooming Standards 2025, July 2, 2025, available at https://tinyurl.com/2w3625ep, 4. See also, U.S. Customs and Border Protection, Inspector's Field Manual (IFM), 2006, released by FOIA, December 11, 2011, available at https://tinyurl.com/4xm5ydw5.

has determined that the maintenance of a uniformed force of employees will promote the law enforcement mission of the Agency" and "Uniformed personnel will be required to wear name plates with the wearer's initial and last name."[47] In this sense, the No Secret Police Act and No Vigilantes Act accord with standard practice of the Department of Homeland Security and would not contradict existing policy and labor agreements.

54.    Federal officers do engage in tactical operations that necessitate face coverings or other types of safety gear that obscure identities. And inclement weather is a common reason for officers to wear neck gaiters or other face coverings. During the peak of the Covid-19 pandemic (2020–2021), federal law-enforcement officers wore face masks to avoid infection. The No Secret Police Act and No Vigilantes Act both include exemptions for tactical and safety reasons that would therefore not prevent officers from wearing face coverings for limited and specific purposes.

55.    Within the available documentation from the Federal Law Enforcement Training Centers (FLETCs), operational since 1970, or materials from the International Police Academy that operated from 1963 to 1975, there is scant evidence of officers receiving training that entails masking, outside of specific situations requiring particular types of protection.[48] The No Secret Police Act and

---

[47] Collective Bargaining Agreement Between the National Border Patrol Council and U.S. Customs and Border Protection, 2019, available at https://tinyurl.com/4wx8h4mr, 54. ICE's field manual refers to an earlier version of this collective bargaining agreement in its chapter on uniforms: ICE Detention and Deportation Officer's Field Manual, 2003, released by FOIA, March 27, 2006, available at https://tinyurl.com/3tr7dexs.

[48] Proving a negative is difficult, but in my review, I have encountered no evidence of training recommendations to wear face coverings or irregular uniforms in normal operations for federal law-enforcement officers or others they are training. I have reviewed every published issue of the International Police Academy's newsletter *IPA Review*, published from 1967 to 1975 by the U.S. Agency for International

(continued…)

No Vigilantes Act, therefore, are consistent with the training materials produced by federal law enforcement that I have reviewed.

56.    The activities described in the Motion for a Preliminary Injunction and the accompanying Declaration by Immigration and Customs Enforcement officer Sergio Albarran, which include "masking or otherwise protecting the personal identities of immigration officers," are inconsistent with the traditions of policing in the United States. Albarran's Declaration argues that officers should "have the ability to prepare themselves for [. . .] hazards at any time during any law enforcement operation."[49] It is well within the traditions and training of police to prepare for hazards. The vast majority of police in the United States do so daily without hiding their faces, removing badges and nameplates, or otherwise obscuring their identities. This has been standard practice for well over a century. It has also been standard practice for federal officers until recently. The Declarations provided by officers from Immigration and Customs Enforcement, Border Patrol, Federal Bureau of Investigation, and Drug Enforcement Administration do not acknowledge this history or the existing policies of these respective agencies, which are consistent with the No Secret Police Act and No Vigilantes Act.

### SUMMARY OF OPINIONS

57.    Police in the United States have maintained a profile since the

---

Development. I have also reviewed Frederick S. Calhoun, *The Trainers: The History of the Federal Law Enforcement Training Center and the Professionalization of Federal Law Enforcement* (Glynco, GA: FLETC, 1996), as well as the FLETCs' YouTube channel, X account, and website, along with the FLETCs' strategic plans commencing in fiscal years 2009, 2016, and 2018, plus all published issues of *FLETC Journal* from 2007 to 2018. I have also reviewed available photos in the Customs and Border Protection media library: https://www.cbp.gov/medialibrary/photos. Over the past 13 years of my career, I have also reviewed countless other police publications, including many issues of the *FBI Law Enforcement Bulletin* and *The Police Chief* magazine from the 1940s through the 1990s.

[49] Paragraphs 30 and 31.

institution's inception that is guided by three main traditions. Police are distinctive from other civilians or government officials, as indicated by their badge, uniform, and weapon. Police are public and accountable to the public, and they do not operate primarily in secret or clandestine ways, except for tactical purposes. Police are civilian, not military.

58.    All of these traditions have been challenged. Police do not always adhere perfectly to them. Critics poke holes and call out hypocrisy. Scholars document inconsistency and transformations, not least of which is the so-called militarization of policing.

59.    Yet the traditions persist, widely accepted within the profession and among the public. When Americans recoil at the sight of law-enforcement officers dressed irregularly, carrying military-style weapons, and hiding their faces, names, and identifying insignia, the reason is that these all violate widely accepted traditions that define the orthodoxy of police practice in this country.

60.    Based on my expertise and familiarity with the historical literature on policing, as well as my review of recent and contemporary documentation of federal law-enforcement training and operations, I believe that there would be minimal impediments, obstacles, or harms to federal law-enforcement operations caused by enforcement of the No Secret Police Act and No Vigilantes Act.

61.    Further, based on my review of the No Secret Police Act and No Vigilantes Act, I find that these laws are consistent with policing practice and orthodoxy across a large period of U.S. history. Further, they extend longstanding efforts to professionalize policing by upgrading police transparency, accountability, and legitimacy. None of these attributes is guaranteed, which is why new policies and laws are often deemed necessary, as public expectations change in response to events and political change.

62.    These two laws contain exemptions that would not preclude federal officers from taking measures to avoid hazards or from engaging in specific types

1    of tactical operations that may require briefly hiding their identities. The

2    Declarations provided by officers representing Immigration and Customs

3    Enforcement, Border Patrol, Federal Bureau of Investigation, and Drug

4    Enforcement Administration identify circumstances in which it is necessary to

5    conceal officers' identities. The laws allow this practice, rather than banning it.

6        63.    To conclude, I find the descriptions of federal law-enforcement

7    operations on pages 7 and 8 of the Motion for a Preliminary Injunction from the

8    U.S. Department of Justice (and expanded in the attached Declarations) to be

9    inconsistent with the traditions and history of policing in the United States. In

10   contrast, I find the No Secret Police Act and No Vigilantes Act to be consistent with

11   the traditions and history of policing in the United States.

12

13       I declare under penalty of perjury that the foregoing is true and correct to the

14   best of my knowledge.

15

16       Executed this ___20th___ day of December 2025, in Brooklyn, New York.

17

18                                                    _____

19                                                    Dr. Stuart Schrader

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Stuart Schrader

### Curriculum Vitae

Johns Hopkins University
stuart.schrader@jhu.edu
973-727-7545

330B Gilman Hall
3400 N. Charles Street
Baltimore, MD 21218

## PROFESSIONAL APPOINTMENTS

2024–     Associate Professor (with Tenure), Department of History, Johns Hopkins University

Director, Chloe Center for the Critical Study of Racism, Immigration, and Colonialism, Johns Hopkins University

2021–24   Associate Research Professor, Center for Africana Studies, Johns Hopkins University

2019–23   Associate Director, Program in Racism, Immigration, and Citizenship, Johns Hopkins University

2018–21   Lecturer, Johns Hopkins University

2018      Agnese N. Haury Postdoctoral Fellow, Center for the United States & the Cold War, Tamiment Library

2017–18   Fellow, Crime and Punishment in American History, Charles Warren Center for Studies in American History, Harvard University

2015–17   Postdoctoral Fellow, Global American Studies, Charles Warren Center for Studies in American History, Harvard University

## EDUCATION

2015   Doctor of Philosophy, New York University, New York, NY
       Program in American Studies, Department of Social & Cultural Analysis
2005   Master of Arts, New School University, New York, NY
2000   Bachelor of Arts, Vassar College, Poughkeepsie, NY

## SCHOLARLY PUBLICATIONS

### Monographs

2026   *Blue Power: How Police Organized to Protect and Serve Themselves*, Basic Books, forthcoming.

2019   *Badges Without Borders: How Global Counterinsurgency Transformed American Policing* (University of California Press, American Crossroads Series).

- Scholarly reviews: *American Historical Review*, *American Quarterly* (review essay), *Choice Reviews*, *Contexto Internacional*, *Diplomatic History*, *Georgetown Security Studies Review*, *H-Diplo* (review symposium), *International Labor and Working-Class History* (review essay), *International Politics Reviews* (review symposium), *Journal of American History*, *Kalfou*, *La Vie Des Idées* (French), *Law & Social Inquiry*, *The Metropole* (Urban History Association), *Michigan Law Review*, *Punishment & Society*, *Race & Class*, *Small Wars Journal*, *Social Justice* (review essay)

November 19, 2025

032
Exhibit A

Stuart Schrader

Curriculum Vitae

- Popular reviews: *Al Bosla* (Arabic), *The Baffler*, *Bookforum*, *Boston Review*, *Jacobin*, *Johns Hopkins Magazine*, *Protean*

**Journal Special Issue**

2022 "Global Counterinsurgency and the Police-Military Continuum" *Small Wars & Insurgencies* 33.4–5 (Authored introduction and edited double issue of journal).

**Edited Volume**

2026 *The Imperial Entanglements of Policing*, Duke University Press, forthcoming. Co-edited with Julian Go.

**Articles (refereed)**

2021 "Cops at War: How World War II Transformed U.S. Policing" *Modern American History* 4.2: 159–179.

2020 "More Than Cosmetic Changes: The Challenges of Experiments with Police Demilitarization in the 1960s and 1970s" *The Journal of Urban History* 46.5: 1002–1025.

2019 "To Protect and Serve Themselves: Police in US Politics Since the 1960s" *Public Culture* 31.3: 601–623.

2016 "To Secure the Global Great Society: Participation in Pacification" *Humanity: An International Journal of Human Rights, Humanitarianism and Development* 7.2: 225–253.

2015 "'The Anti-Poverty Hoax': Development, Pacification, and the Making of Community in the Global 1960s" *Cities: The International Journal of Urban Policy and Planning* 44: 139–145. Co-authored with Ananya Roy & Emma Shaw Crane.

**Chapters (refereed)**

2023 "Avoiding the Security Trap: The Contributions of Terence Hopkins and World-Systems as Methodology for Critical Police Studies" in *World-Systems Analysis at a Critical Juncture*, Corey R. Payne, Roberto Patricio Korzeniewicz, and Beverly J. Silver, eds. (Routledge). Co-authored with Brendan McQuade.

2019 "A Carceral Empire: Placing US Prisons and Policing in the World" in *Shaped by the State: Toward a New Political History of the Twentieth Century*, Brent Cebul, Lily Geismer, Mason B. Williams, eds. (University of Chicago Press).

2015 "Gray Areas: The War on Poverty at Home and Abroad" in *Territories of Poverty* (University of Georgia Press). Co-authored with Ananya Roy and Emma Shaw Crane.

2012 "Policing Political Protest: Paradoxes of the Age of Austerity" in *Is This What Democracy Looks Like?* (Social Text: Periscope).

**Selected Articles**

2024 "Cop Cities Mock Cities" *Los Angeles Review of Books*, October 12.

2023 "Cages Without Borders" *Inquest*, November 30.

2021 "Freedom Education" *Public Books*, October 4, 2021. Co-authored with NDB Connolly.

Stuart Schrader

*Curriculum Vitae*

2020    "Defund the Global Policeman" *n+1*, Fall.
- Italian translation, *Collettivo le Gauche*, November 7, 2021.

2020    "Harm of the Law" *Artforum*, May-June.

2018    "Tear Gas and the U.S. Border" *Process: A Blog for American History* (Organization of American Historians), processhistory.org, December 6.

2018    "The Long Counterrevolution: United States–Latin America Security Cooperation" *SSRC Items*, items.ssrc.org, September 18.

2018    "Henri Lefebvre, Mao Zedong, and the Global Urban Concept" *Global Urban History*, globalurbanhistory.com, May 1.

2017    "Nicaragua: Central America's Security Exception" *NACLA Report on the Americas* 49.3: 360–365.

2017    "In Memoriam: Marilyn Young" *Critical Asian Studies* 49.2: 285–288. Co-authored with Christy Thornton.

2016    "When NACLA Helped Shutter the U.S. Office of Public Safety" *NACLA Report on the Americas* 48.2: 181–187.

2016    "Reading Jane Jacobs in the Era of #BlackLivesMatter" *Harvard Design Magazine* 42: 52–53.

2012    "Reflections on Occupy Wall Street, the State and Space" *City: Analysis of Urban Trends, Culture, Theory, Policy, Action* 16.1/2: 243–248. Co-authored with David Wachsmuth.

**Review Essays**

2020    "Rank-and-File Antiracism: Historicizing Punk and Rock Against Racism" *Radical History Review* 138: 131–143.

2011    "Embedded in the Street: Studying Up, Studying Down" *American Quarterly* 63.4: 1039–1049.

**Book Reviews**

2025    *The Policing Machine*, by Tony Cheng, *American Journal of Sociology* 131.1: 260–263.

2022    *The Punitive Turn in American Life*, by Michael S. Sherry, *Journal of Social History* 55.4: 1111–1113.

2021    *Beyond the Usual Beating*, by Andrew Baer, *American Historical Review* 126.3: 1296–1297.

2020    *The Counterrevolution*, by Bernard Harcourt, *Social Justice* 46.2/3: 167–172.

2020    *Policing Life and Death*, by Marisol LeBrón, *The AAG Review of Books* 8.3: 174–176.

2020    *Sorting Out the Mixed Economy*, by Amy Offner, *NACLA Report on the Americas* 52.2: 231–232.

2018    *The FBI in Latin America*, by Marc Becker, *Radical Americas* 3.1.

2017    *Vagrant Nation*, by Risa Goluboff, *The Journal of Southern History* 83.2: 472–473.

Stuart Schrader

Curriculum Vitae

2016  *A World of Homeowners*, by Nancy H. Kwak, *The Journal of American History* 103.3: 838–839.

## PUBLIC HUMANITIES
### Documentary Films

Consulting Producer: *Power*, dir. Yance Ford, 2024.

Research Consultant: *Riotsville, USA*, dir. Sierra Pettengill, 2022.

### Museum Exhibits

Co-curator: "Revolution In Our Lifetime": The Black Panther Party and Political Organizing in Baltimore, 1968–1974, Peale Center for Baltimore History and Architecture, Baltimore, MD, April–July 2024.

Consultant: Counter/Surveillance: Control, Privacy, Agency, Wende Museum, Culver City, CA, October 2024–October 2025.

## FELLOWSHIPS AND GRANTS
### External

2022  Kluge Fellowship, John W. Kluge Center, U.S. Library of Congress
2021  Inheritance Baltimore: Humanities and Arts Education for Black Liberation, Just Futures, Andrew W. Mellon Foundation, co-investigator
2021  Maxcy Visiting Fellow, Maxcy College, University of South Carolina
2020  Publication Grant, Textbook & Academic Authors Association
2019  Solidarity Fund Travel Grant, American Studies Association
2014  Mellon/American Council of Learned Societies Dissertation Completion Fellowship
2014  Annette K. Baxter Grant, American Studies Association
2013  Samuel Flagg Bemis Dissertation Research Grant, Society for Historians of American Foreign Relations
2013  Moody Research Grant, Lyndon Baines Johnson Foundation
2012  Dorothy Evans Fellowship, Vassar College
2012  Visiting Research Fellow, Blum Center for Developing Economies, University of California Berkeley
2012  Alumni Initiative Travel Award, Social Science Research Council
2011  Dissertation Proposal Development Fellowship, Social Science Research Council
2010  Travel Fellowship, Skellig Foundation, Dublin, Ireland

### Internal

2025  Faculty-Student Engagement and Enrichment Fund Award, JHU
2023  Nexus Award, JHU, co-investigator
2021  SNF Agora Institute Faculty Grant, JHU, co-investigator
2019  Provost's PhD Professional Development Innovation Initiative Grant, JHU, co-investigator

Stuart Schrader

Curriculum Vitae

2016    Postdoctoral Award for Professional Development, Harvard
2014    Mellon Dissertation Fellowship, NYU (declined)
2013    Provost's Global Research Initiative Fellowship, NYU
2013    Summer Research Grant, Department of Social & Cultural Analysis, NYU
2013    Dean's Student Travel Grant, Graduate School of Arts & Sciences, NYU
2012    Predoctoral Summer Fellowship, Graduate School of Arts & Sciences, NYU
2012    Travel Grant, Department of Social & Cultural Analysis, NYU
2010    Dean's Student Travel Grant, Graduate School of Arts & Sciences, NYU
2009    Henry M. MacCracken Fellowship, NYU

**AWARDS**

2023    Johns Hopkins Alumni Association Excellence in Teaching Award, Krieger School of Arts and Sciences, JHU
2017    Teaching Excellence, Derek Bok Center for Teaching and Learning and Dean of Undergraduate Education, Faculty of Arts and Sciences, Harvard University
2016    Teaching Excellence, Derek Bok Center for Teaching and Learning and Dean of Undergraduate Education, Faculty of Arts and Sciences, Harvard University
2015    Ralph Henry Gabriel Dissertation Prize, Finalist (second place), American Studies Association
2014    Gene Wise – Warren Susman Prize (best graduate student paper presented at annual meeting), American Studies Association

**INVITED TALKS**

"Police Power in Building Authoritarian and Social Control"

2025    Harvard Kennedy School, Criminal Law as a Tool of Authoritarian Control Speaker Series, October 29.

"National Security for Imperial Insecurity: Race and Counterinsurgency Across the Pacific"

2025    NYU, Marilyn B. Young Memorial Lecture, Discussant with Moon-Ho Jung (University of Washington), September 9.

"Imperial Entanglements: New Approaches to the Critique of Police Power"

2024    University of California, Santa Barbara, Department of Global Studies, January 10.

"'Not Unless This Country Plunges into Fascism': Black Radical Critiques of Preventive Counterrevolution and the Global Security State"

2022    Binghamton University, Towards a New World Order? The U.S., China, and the Rise of the Far Right, Keynote Address, October 21.

"Badges Without Borders: How Global Counterinsurgency Transformed American Policing"

2022    University of Iowa, Department of American Studies, January 21.

Stuart Schrader

Curriculum Vitae

2021    L'Université Paris 1 Panthéon-Sorbonne, Séminaire Sociologie Politique de l'International, October 20.
2021    Middlebury College, Rohatyn Center for Global Affairs, May 4.
2021    University of South Carolina, Maxcy College, March 3.
2020    University of Texas Rio Grande Valley, Department of Political Science, December 4.
2020    The New School, Program in Historical Studies, Critical History Today Lecture Series, September 14.
2020    Yale University, International Security Studies, Speaker Series in Grand Strategy and International Security Studies, March 3.
2019    Macalester College, Kofi Annan Center for Global Citizenship, International Roundtable, Keynote Address, October 11.
2019    University of Washington, Henry M. Jackson School of International Studies, May 9.
2018    Towson University, Department of History, February 12.
2017    Johns Hopkins University, Arrighi Center for Global Studies, December 8.
2017    Tufts University, Fletcher School of Law and Diplomacy, May 9.
2017    Hampshire College, School of Critical Social Inquiry, January 26.
2016    University of California, Santa Cruz, Politics Department, December 2.
2015    NYU, Gallatin School of Individualized Study, December 8.

"Militarization as Globalization: How World War II Transformed U.S. Police"
2021    Dartmouth College, Dickey Center for International Understanding, Speaker Series, January 14.
2020    University of New Mexico, Department of History, International Studies Institute, and Latin American & Iberian Institute, February 14.

"The Invention of the Urban Guerrilla: Social Science, Counterinsurgency, and Revolutionary Black Movements in the Global 1960s"
2019    Johns Hopkins University, Department of History, Seminar, December 2.
2018    NYU, Center for the United States & the Cold War, Cold War Seminar, March 1.

"Global Policemen: Imperialism and Law and Order in Baltimore"
2019    University of Baltimore, Division of Legal, Ethical and Historical Studies, March 26.

"The Forgotten History of the Car Barn: Police Repression and Resistance in the Cold War"
2019    Georgetown University, History Department Americas Initiative and Center for Latin American Studies, February 19.

**CONFERENCES**
**Paper Presentations and Panel Commentary at Association Conferences**
- American Historical Association Annual Meeting: 2020
- American Studies Association Annual Meeting: 2025, 2024, 2020*, 2019, 2018, 2017, 2015, 2014, 2013, 2012

6

Stuart Schrader

Curriculum Vitae

- Organization of American Historians Annual Meeting: 2022, 2021, 2020*
- Society for Historians of American Foreign Relations Annual Meeting: 2023, 2021, 2020*, 2019, 2018, 2017, 2016, 2015, 2014
- Social Science History Association Annual Meeting: 2023, 2022, 2021, 2019, 2017, 2015, 2012
- Urban History Association Biennial Meeting: 2025, 2023, 2020*, 2018

* Canceled due to Covid-19

**Other Recent Conference Presentations**

2025    University of Chicago, Labor and Working Class History Association Annual Meeting, June 13.

2024    University of Basel and Geneva Graduate Institute, Peace and Security Now, June 6.

2023    Pontifical Catholic University of Minas Gerais, Brazilian Association of International Relations Annual Meeting, July 26.

2021    Middlebury College, New Directions in the Study of Global Police Power, October 1.

2020    University of Chicago, Reimagining/Reinventing Police, July 30.

2020    John Jay College, Historical Memory Project, The Military-Industrial Complex in the Americas: Continuities and Discontinuities, February 28.

2019    University of Toronto, Centre for the Study of the United States, America's Carceral Landscapes Symposium, November 1.

2019    University of Tennessee, Knoxville, Department of Sociology and Antipode Foundation International Workshop, Policing Rage in the Urban Age of Crisis & Extremes, May 17.

2019    University of Wisconsin, Milwaukee, Center for 21st Century Studies, Insecurity Conference, May 4.

2019    Duke University Center for International and Global Studies, Workshop on Realism, Liberal Internationalism, History: Conceiving a New Research Agenda, February 9.


**PROFESSIONAL MEMBERSHIPS**

American Historical Association
American Studies Association
Social Science History Association
Society for Historians of American Foreign Relations

038
Exhibit A