TANYA BRODER (SBN # 136141)
broder@nilc.org
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., No. 108-62
Los Angeles, CA 90010
Tel:   (213) 639-3900
Fax:   (213) 639-3911

EFRÉN C. OLIVARES*
olivares@nilc.org
NATIONAL IMMIGRATION LAW CENTER
PO Box 34573
Washington, D.C. 20043
Tel:   (213) 639-3900
Fax:   (213) 639-3911

LEAH BROWNLEE TAYLOR*
brownleetaylor@nilc.org
NATIONAL IMMIGRATION LAW CENTER
PO Box 34573
Washington, D.C. 20043
Tel:   (213) 639-3900
Fax:   (213) 639-3911

Counsel for Amicus Curiae
*pro hac vice application forthcoming

**FILED**
CLERK, U.S. DISTRICT COURT

January 6, 2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CMJ_____ DEPUTY

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA,
WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF CALIFORNIA, *et al*.,

Defendants.

Case No. 25-CV-10999-CAS-AJRx

**BRIEF OF THE CENTER FOR POLICING EQUITY,
THE JUSTICE COLLABORATORY AT YALE LAW SCHOOL,
AND THE NATIONAL IMMIGRATION LAW CENTER
AS AMICI CURIAE**

HANNAH KARIN COMSTOCK (SBN # 311680)†ˑ
*hcomstock@socialjusticelaw.org*
SOCIAL JUSTICE LEGAL FOUNDATION
523 W 6th St, Suite 450
Los Angeles, CA 90014
Tel:   (213) 259-2503

† Designated Local Counsel

**TABLE OF CONTENTS**

Page

INTEREST OF *AMICI CURIAE* ...................................................................1

INTRODUCTION AND SUMMARY OF BRIEF ..................................................3

ARGUMENT ...........................................................................................4

   I.   RESEARCH ON PUBLIC SAFETY POLICY CONSISTENTLY FINDS
      THAT TRANSPARENCY AND PROCEDURAL JUSTICE ARE CRITICAL
      TO ENSURING EFFECTIVE, ACCOUNTABLE LAW ENFORCEMENT
      AND CONTINUED PUBLIC COOPERATION WITH LAW
      ENFORCEMENT ....................................................................... 4

   II.  S.B. 627 AND S.B 805 EACH ALIGN CLOSELY WITH EVIDENCE-
      INFORMED POLICY EFFORTS AIMED AT MAKING POLICING MORE
      EFFECTIVE, FAIR, AND ACCOUNTABLE THROUGH PROVEN
      FRAMEWORKS ROOTED IN PROCEDURAL JUSTICE ............................. 7

CONCLUSION ........................................................................................11

ii

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Atkinson v. City of Mountain View, Mo.*,
  <u>709 F.3d 1201</u> (8th Cir. 2013)................................................................ 8
*Bakutis v. Dean*,
  <u>129 F.4th 299</u> (5th Cir. 2025) ............................................................ 8
*Cooper v. Sheehan*,
  <u>735 F.3d 153</u> (4th Cir. 2013)............................................................... 8
*Doornbos v. City of Chi.*,
  <u>868 F.3d 572</u> (7th Cir. 2017)............................................................... 8
*McKenzie v. Lamb*,
  <u>738 F.2d 1005</u> (9th Cir. 1984)............................................................. 8
*Nance v. Sammis*,
  <u>586 F.3d 604</u> (8th Cir. 2009)............................................................... 8
*Pauly v. White*,
  <u>874 F.3d 1197</u> (10th Cir. 2017)........................................................... 8
*Rogoz v. City of Hartford*,
  <u>796 F.3d 236</u> (2d Cir. 2015)............................................................... 8
*Watkins v. Davis*,
  <u>156 F.4th 1084</u> (11th Cir. 2025) ......................................................... 8
*Yates v. City of Cleveland*,
  <u>941 F.2d 444</u> (6th Cir. 1991)............................................................... 8

<u>Statutes</u>

Section 185.5 (California Penal Code) ...................................................... 3
Section 13654 (California Penal Code) ..................................................... 3

<u>Regulations</u>

3 C.F.R. Exec. Order 14148 ..................................................................... 5
<u>8 C.F.R. § 287.8</u> ...................................................................................... 10
<u>87 Fed. Reg. 32,945</u> (Exec. Order No. 14074) ....................................... 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>Other Authorities</u>

Dell Cameron & Caroline Haskins, *FBI Warns of Criminals Posing as ICE,
Urges Agents to ID Themselves, Wired* (Nov. 4, 2025)................................ 9

David Weisburd, et al.,
*Reforming the police through proc. just. training: A multicity randomized
trial at crime hot spots*, 119 PNAS 1 (2022) ...................................... 6

*Exec. Summary – About the Nat'l Initiative*,
The Nat'l Initiative for Building Cmty. Tr. & Just. (2016) ........................ 11

Hossein Zare, et al., *State-by-State Rev.: The Spread of L. Enf't Accountability
Policies*, 14 Soc. Sci. 483 (2025)....................................... 7

Int'l Assoc. Chiefs of Police, *Promoting Transparency, Accountability,
Coordination, & Officer Safety in Immigr. Enf't Operations* (Aug. 2025)........ 11

Kyle McLean, et al., *Randomized controlled trial of social interaction police
training*, 19 Criminology & Pub. Pol 805 (2020)................................ 6

Kyle Peyton, Michael Sierra-Arévalo & David G. Rand,
*A field experiment on cmty. policing & police legitimacy*, 116 PNAS 19894,
(2019) ............................................................. 4

J. David McSwane & Hannah Allam, *Unfettered & Unaccountable:
How Trump Is Building a Violent, Shadowy Fed. Police Force*, ProPublica
(Oct. 18, 2025) ...................................................... 9

Jorja Leap, *Evaluation of the LAPD Cmty. Safety Partnership* (2020)................... 4

Letter to Congress on ICE Mask Legislation from Leticia James, et al.
(July 15, 2025) ..................................................... 10

Lorraine Mazerolle, et al., *Proc. just. & police legitimacy: a systematic review of
the rsch. evidence*, 9 J. Experimental Criminology 245 (2013)........................ 5

Nick Miroff, *Why They Mask*, The Atlantic (Nov. 10, 2025)............................ 8

President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (May 2015) ............................................. 11

Rebecca Beitsch*, FBI urges ICE to ID themselves as criminals impersonate officers* (Nov. 5, 2025)*, The Hill*............................................................. 9

Rodrigo Canales, et al., *Shaping Police Officer Mindsets & Behavs.: Experimental Evidence of Proc. Just. Training*, 71 Mgmt. Training 8995 (2025) .......................................................... 7

Senate Bill 627 ................................................................Passim

Senate Bill 805 ................................................................Passim

Senate Bill 806 ...................................................................... 3

Tom R. Tyler, *Legitimacy-based policing*, 24 Criminology & Pub. Pol. 165 (2025).................. 5

Tom R. Tyler, Jonathan Jackson &Ben Bradford, *Proc. Just. & Coop.*, Encyclopedia of Criminology & Crim. Just. (Gerben Bruisma & David Weisburd, eds.) ......................................... 4

### INTEREST OF *AMICI CURIAE*

The Justice Collaboratory at Yale Law School is a group of nationally recognized academics, researchers, and social scientists who have joined together to build a more just, effective, and democratic criminal legal system by advancing public policies that are scientifically proven to build strong and safe communities where all citizens can thrive. Much of its work advances a specific theory of change that focuses on procedural justice, a concept rooted in the idea that the central goal of the criminal justice system should be to increase cooperation and trust between individuals and the state, and to encourage the public's engagement with officers charged with preserving public safety. In service of this goal, the Justice Collaboratory utilizes the latest in criminal justice theory and empirical research to advance its public policy vision.

Founded in 2008 as a university research center, the Center for Policing Equity (CPE) became a non-profit research and action organization in 2017 and has since grown into the largest organization dedicated to eliminating racism in public safety. Powered by public safety data and science that diagnose inequality, CPE is a team of advocates, scientists, policy experts, community engagement specialists, and former law enforcement professionals aimed at making policing less burdensome and less unequal for everyone. Our work has helped dozens of jurisdictions shift policy and create new responses to public safety crises, changing the way that millions across the United States experience safety. As such, we have an interest in making sure that scientific evidence drives public safety policy.

Established in 1979, the National Immigration Law Center (NILC) is one of the leading advocacy organizations in the U.S. dedicated to advancing and defending the rights and opportunities of low-income immigrants and their loved ones. Working at the intersection of immigrant, economic, and racial justice, NILC deploys a multi-pronged strategy to secure lasting, transformational change. NILC

1

seeks to build an inclusive future for low-income immigrants through impact litigation, policy advocacy, movement-building, and narrative and culture change. In pursuit of its mission, NILC has an interest in ensuring respect for the rule of law and defending democratic institutions, and ensuring accountability and transparency for law enforcement officers is a core tenet of its work.

## INTRODUCTION AND SUMMARY OF BRIEF

As the District Court considers the issuance of a preliminary injunction in this case, it may be helpful for the Court to understand how the laws in question, Senate Bill 627 (2025-26) and Senate Bill 805 (2025-26), fit within the national effort to ensure that law enforcement remains both effective and accountable. To this end, this brief provides the Court with a summary explanation of the current state of research and policy on effective and fair policing and how S.B. 627 and S.B. 806, which were signed into law by California Governor Gavin Newsome on September 20, 2025, are consistent with policing best practices and policy, as adopted by nationally-recognized policing organizations.

Specifically, this amicus brief discusses how S.B. 627 (which limits the use of facial coverings by law enforcement officers)[1] and S.B. 805 (which requires non-uniformed law enforcement officers to visibly display identification)[2] align strongly with available research and best practices regarding fair, effective, transparent, and accountable law enforcement. Their consistency with evidence-informed practice, in turn, makes it likely that their implementation would reap substantial safety benefits for both police officers and the public as well as improvements to policing administration generally. The brief intends to aid the Court in its jurisprudential considerations, and its evaluation of the Parties' claims regarding the import and impact of both laws.

---

[1] *See* Senate Bill (S.B.) 627 § 3 (2025-2026) (adding Section 185.5 to the California Penal Code, including § 185.5(a), which states that "[a] law enforcement officer shall not wear a facial covering that conceals or obscures their facial identity in the performance of their duties, except as expressly authorized in this section.").

[2] *See* Senate Bill (S.B.) 805 § 10 (2025-2026) (adding Section 13654 to the California Penal Code, including § 13654(a), which states that "[a] law enforcement officer operating in California that is not uniformed, and therefore is not required to clearly display identification pursuant to Section 830.10, shall visibly display identification that includes their agency and either a name or badge number or both name and badge number when performing their enforcement duties, unless expressly exempt under subdivision (b).").

3

# ARGUMENT

I.  **RESEARCH ON PUBLIC SAFETY POLICY CONSISTENTLY
     FINDS THAT TRANSPARENCY AND PROCEDURAL
     JUSTICE ARE CRITICAL TO ENSURING EFFECTIVE,
     ACCOUNTABLE LAW ENFORCEMENT AND CONTINUED
     PUBLIC COOPERATION WITH LAW ENFORCEMENT**

Research is consistent in finding that when communities know their police officers and can build meaningful relationships with them, safety outcomes improve for all.[3] Even brief but positive interactions with the police can have a meaningful and sustained impact on community perceptions of the police, including among those who previously held negative views of law enforcement.[4] These improvements in perception can then lead to greater cooperation by communities with law enforcement authorities, which eases the burden on law enforcement by making the task of maintaining public safety a joint police-community enterprise.[5]

---

[3] *See, e.g.*, Jorja Leap, *Evaluation of the LAPD Cmty. Safety Partnership* (2020), *available at* https://luskin.ucla.edu/csp (finding that a joint police-community violence reduction and safety strategy rooted in relationship building and mutual trust lowered violent crime and improved perceptions of safety at rates greater than baseline); *see also* https://cops.usdoj.gov/aboutcops (the Department of Justice's Community Oriented Policing Services or "COPS" office, noting that "community policing begins with a commitment to building trust and mutual respect between police and communities. It is critical to public safety, ensuring that all stakeholders work together to address our nation's crime challenges.") (last visited Dec. 22, 2025).

[4] *See* Kyle Peyton, Michael Sierra-Arévalo & David G. Rand, *A field experiment on cmty. policing & police legitimacy*, 116 PNAS 19894, 19896 (2019), https://doi.org/10.1073/pnas.1910157116.

[5] *See* Tom R. Tyler, Jonathan Jackson &Ben Bradford, *Proc. Just. & Coop.*, Encyclopedia of Criminology & Crim. Just.4011 (Gerben Bruisma & David Weisburd, eds.) (2013) (describing how, when legal authorities act fairly, they "build legitimacy and increase both willing deference to rules and the decisions of the police and courts, as well as the motivation to help with the task of maintaining social order in the community.").

4

Key to these improvements in police-community relations are dedicated commitments by law enforcement officers to enhance their legitimacy among the communities they serve.[6] To achieve this goal, successful departments have dedicated themselves to the tenets of procedural justice,[7] without which their efforts to improve legitimacy and transparency through meaningful community engagement would have certainly suffered.[8]

Within policing, procedural justice refers to the notion that people's perception of fairness is shaped by their experience with how they interact with the police (e.g., during a traffic stop) and not solely the outcome of that interaction (e.g., whether the police issue them a ticket).[9] Procedural justice is typically defined according to four principles that people use to evaluate the fairness of their

---

[6] The importance of these commitments has also been reflected within national law enforcement policy as well, as seen in an executive order issued by President Joe Biden on May 25, 2022:

> Our criminal justice system must respect the dignity and rights of all persons and adhere to our fundamental obligation to ensure fair and impartial justice for all. This is imperative—not only to live up to our principles as a Nation, but also to build secure, safe, and healthy communities. Protecting public safety requires close partnerships between law enforcement and the communities it serves. Public safety therefore depends on public trust, and public trust in turn requires that our criminal justice system as a whole embodies fair and equal treatment, transparency, and accountability.

Exec. Order No. 14074, 87 Fed. Reg. 32,945 (May 31, 2022), *repealed by* Exec. Order 14148, 3 C.F.R. Exec. Order 14148 (Jan. 20, 2025).

[7] For a fuller discussion of the connection between legitimacy and procedural justice, *see generally* Tom R. Tyler, *Legitimacy-based policing*, 24 Criminology & Pub. Pol. 165 (2025) [hereinafter Tyler, *Legitimacy-based policing*].

[8] *See* Lorraine Mazerolle, et al., *Proc. just. & police legitimacy: a systematic review of the rsch. evidence*, 9 J. Experimental Criminology 245, 264 (2013) (discussing the findings of a meta-analysis of available research and concluding that "it is the procedurally just *features* of [a police] training, directive or organizational innovation that foster legitimacy-enhancing dialogue rather than any specific type of strategy that leads to citizen perceptions of legitimacy") (emphasis in original).

[9] *See* Tyler, *Legitimacy-based policing*, *supra* note 7 at 173.

5

interactions, in keeping with constitutional due process and equal protection principles:

- voice (do people have an opportunity to speak and self-advocate?);
- neutrality (are police procedures unbiased, consistently applied, and concerned with facts and rules?);
- respect (do people feel as if the police treated them with dignity?); and
- trustworthiness (do people believe that the police acted sincerely and in the interests of the community?)[10]

Research suggests that when the police internalize these principles and act accordingly, their own attitudes of the communities they serve can shift positively, particularly when operational commitments to procedural justice—in the form of officer training or enforced agency policy—are consistent and prolonged.[11] Beyond changing officer attitudes, available research also suggests that intensive training that emphasizes each of the four principles of procedural justice can simultaneously improve officer conduct (by, for example, reducing rates of arrest and officer discourtesy) while also reducing criminal incidence.[12]

---

[10] *See id*.

[11] *See* Kyle McLean, et al., *Randomized controlled trial of social interaction police training*, 19 Criminology & Pub. Pol 805, 824 (2020) (reporting the results of a randomized-controlled trial on social interaction training that indicates that extended procedural justice training results in a stronger treatment effect on officer attitudes).

[12] *See* David Weisburd, et al., *Reforming the police through proc. just. training: A multicity randomized trial at crime hot spots*, 119 PNAS 1 (2022), https://doi.org/10.1073/pnas.2118780119 (reporting the results of a randomized trial where officers who received intensive training in procedural justice were more likely to act in a procedurally just manner, were less likely to make arrests, and were seen by the communities they patrolled as less likely to engage in harassment or unnecessary use of force, while contributing to a 14% decline in criminal incidence in neighborhoods patrolled by trained officers).

That similar results have been observed in studies of police departments outside the United States[13] suggests that procedural justice strategies may have universal application for improving outcomes across varied law enforcement contexts. Supported by this growing body of evidence, policing policies rooted in procedural justice have become increasingly prevalent as policymakers seek to promote and preserve important gains in their efforts to make policing more effective, fair, and accountable.[14]

## II.    S.B. 627 AND S.B 805 ALIGN CLOSELY WITH EVIDENCE-INFORMED POLICY EFFORTS AIMED AT MAKING POLICING MORE EFFECTIVE, FAIR, AND ACCOUNTABLE THROUGH PROVEN FRAMEWORKS ROOTED IN PROCEDURAL JUSTICE

The alignment of S.B. 627 and S.B. 805 with the principles of procedural justice is made evident along three factors: the clear legislative intent of each bill; their prohibition of officer conduct that would contravene those principles; and their requirements that law enforcement adhere to conduct and policies that reinforce them.

The factual and policy assertions contained within each bill's declaration of legislative findings make clear that, in enacting a ban on facial coverings and

---

[13] *See, e.g.*, Rodrigo Canales, et al., *Shaping Police Officer Mindsets & Behavs.: Experimental Evidence of Proc. Just. Training*, 71 Mgmt. Training 8995 (2025) (finding "significant and positive effects of [procedural justice] training across all measures of the procedural justice model" in a randomized controlled trial of 1,854 police officers in Mexico City).

[14] *See* Hossein Zare, et al., *State-by-State Rev.: The Spread of L. Enf't Accountability Policies*, 14 Soc. Sci. 483 (2025) (tracking the passage of police accountability laws nationwide from 2020 to 2022, including laws in 16 states for improving police training and 13 states for improving state regulation of officer certification standards, and noting that the enactment of such laws was facilitated by significant community support and a shift in professional ethos from warrior-style policing to procedurally just guardian-style policing).

7

requiring the visible display of official identification, the California legislature intended to reinforce a vision of policing that adheres closely to the procedural justice model. S.B. 627, for example, notes how the "visibility of an officer's face is vital for promoting transparency, facilitating communication, and building trust between law enforcement agencies and the communities they serve."[15] It further notes how public trust and safety are put at risk and law enforcement operations are hindered whenever officers are not readily identifiable.[16] This is, as the bill notes,[17] in large part because obscured faces can severely inhibit communication and intimidate community members who may in turn respond defensively or avoidantly, leading to unnecessarily escalated interactions. The problem can become so pronounced that some communities may even seek law enforcement protection *against* these anonymized agents given their likeness to "armed masked men," as it has been reported.[18]

---

[15] S.B. 627 § 1(d).

[16] *See id*. at §§ 1(c), (e). Several circuit courts similarly recognize that an officer's failure to identify themselves during law enforcement operations is relevant to the objective reasonableness of their conduct. *See Bakutis v. Dean*, 129 F.4th 299, 306 (5th Cir. 2025); *Watkins v. Davis*, 156 F.4th 1084, 1112-13 (11th Cir. 2025); *Doornbos v. City of Chi.,* 868 F.3d 572, 583-84 (7th Cir. 2017)*; Pauly v. White*, 874 F.3d 1197, 1216-17 (10th Cir. 2017); *Rogoz v. City of Hartford,* 796 F.3d 236, 251 (2d Cir. 2015)*; Cooper v. Sheehan*, 735 F.3d 153, 159-60 (4th Cir. 2013); *Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1210 (8th Cir. 2013); *Nance v. Sammis*, 586 F.3d 604, 610 (8th Cir. 2009); *Yates v. City of Cleveland,* 941 F.2d 444, 447 (6th Cir. 1991); *McKenzie v. Lamb*, 738 F.2d 1005, 1010–11 (9th Cir. 1984).

[17] *See id*.

[18] *See* Nick Miroff, *Why They Mask*, The Atlantic (Nov. 10, 2025), *available at* https://www.theatlantic.com/politics/2025/11/ice-immigration-masks/684868/ (reporting how, according to Chuck Wexler, the executive director of the Police Executive Research Forum, "police departments in some cities are getting 911 calls from community residents reporting the presence of armed masked men in their neighborhoods, hoping local officers can protect them.").

S.B. 805 makes similar assertions, noting multiple instances where witnesses confused the actions of unidentifiable law enforcement agents with crimes like kidnapping and assault, and where bad actors were able to falsely pose as law enforcement despite their lack of official identification, enabling them to commit serious violent crimes.[19] These instances have reportedly resulted in warnings by the Federal Bureau of Investigation (FBI), with the FBI urging Immigration and Customs Enforcement (ICE) agents to adequately identify themselves amid a rise in violent crimes.[20] Both bills note the substantial societal harms that arise from these risks, including "significant implications for public perception [of law enforcement], officer-community interactions, and accountability"[21] as well as "[undermining] public trust in law enforcement, especially among vulnerable populations."[22] These concerns are significant and have prompted many from within law enforcement itself to urge federal legislative action to curb these risks by proscribing the use of masks by law enforcement officers and requiring the prominent display of identifying insignia and other markers of office.[23]

---

[19] *See* S.B. 805 §§ 1(c), (d), (f). In some instances, the appearances and actions of these anonymized agents are so comparable to those of armed criminals that people have called 911 to report possible kidnappings when witnessing certain enforcement operations. *See* J. David McSwane & Hannah Allam, *Unfettered & Unaccountable: How Trump Is Building a Violent, Shadowy Fed. Police Force*, ProPublica (Oct. 18, 2025), https://www.propublica.org/article/trump-dhs-ice-secret-police-civil-rights-unaccountable/ (reporting on witness accounts of ICE enforcement actions where agents used vehicles without license plates or other identifying markers to detain individuals).

[20] *See* Dell Cameron & Caroline Haskins, *FBI Warns of Criminals Posing as ICE, Urges Agents to ID Themselves, Wired* (Nov. 4, 2025), https://www.wired.com/story/fbi-warns-of-criminals-posing-as-ice-urges-agents-to-idthemselves/ ; *see also* Rebecca Beitsch, *FBI urges ICE to ID themselves as criminals impersonate officers* (Nov. 5, 2025)*,* The Hill, https://thehill.com/policy/national-security/5590694-fbi-ice-masks-dhs/.

[21] S.B. 627 § 1(a).

[22] S.B. 805 § 1(e).

[23] *See, e.g.,* Letter to Congress on ICE Mask Legislation from Leticia James, et al. (July 15,

The operative portions of each bill do just this, reflecting a recognition supported by both experience and available evidence that community trust, accountability, and law enforcement efficacy all demand greater, not lesser, transparency, and closer, not more distant, connections between law enforcement and community members. To foster both transparency and community engagement, S.B. 627 and S.B. 805 impose reasonable constraints on the ability of law enforcement to conceal their identities for purposes of avoiding accountability and visibility. Under S.B. 627, exemptions for safety exist, consistent with federal regulations that require Department of Homeland Security officers to identify themselves when safe to do so. *See* 8 C.F.R. § 287.8(c)(2)(iii)(A) (2025) (Standards for Enforcement Activity) ("At the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so: (A) Identify himself or herself as an immigration officer []"). The bills also require law enforcement agencies to redouble their commitments to basic tenets of procedurally just policing by requiring the adoption and publication of internal policies that affirm agency commitments to transparency, accountability, and public trust.[24]

The requirements of these bills align closely with the recommendations of many major thought leaders on policing, including those whose work forms the foundation upon which current best practices and policies are built. These practices and policies include those memorialized in the published findings of landmark convenings of public safety experts, like the National Initiative for Building

---

2025), *available at* https://ag.ny.gov/sites/default/files/letters/letter-to-congress-on-ice-mask-legislation-letter-2025.pdf (urging Congress, on behalf of 21 state attorneys general, to "consider and advance legislation that would generally prohibit federal immigration agents from wearing masks that conceal their identity and require them to show their identification and agency-identifying insignia.").

[24] *See* S.B. 627 § 2(b)(1)(A); S.B. 805 § 2(a)(1)(A).

Community Trust and Justice [25] and the President's Task Force on 21st Century Policing, as well as published resolutions by the International Association of Chiefs of Police (IACP), one of the largest police organizations.[26] Each of these sets of recommendations reflects the collective wisdom of law enforcement, community, and academic leaders, a wisdom that can only be said to be ignored and cast aside when law enforcement hides itself, literally and metaphorically, from the communities it swears to protect.

## **CONCLUSION**

For all the foregoing reasons, amici curiae respectfully urge the court to consider the profound policy impact of S.B. 627 and S.B. 805 within the constitutional framework of transparency in law enforcement.  Fair, effective, and accountable law enforcement in the nation's most populous state is critical to public safety, security, and democracy. California's enactment of both bills underscores

---

[25] *See Exec. Summary – About the Nat'l Initiative*, The Nat'l Initiative for Building Cmty. Tr. & Just. (2016), *available at* https://s3.trustandjustice.org/misc/National_Initiative-Executive_Summary.pdf (comprising experts from the National Network for Safe Communities from the John Jay College of Criminal Justice, the Justice Collaboratory at Yale Law School, the Center for Policing Equity, and the Urban Institute, and describing the Initiative's three central pillars as "enhancing procedural justice," "reducing the impact of implicit bias," and "fostering reconciliation.").

[26] *See* President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* (May 2015), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/final-report-presidents-task-force-21st-century-policing (comprising experts from the law enforcement, academia, and non-profit sectors and identifying building trust and legitimacy; oversight; and community policing as among the central pillars of modern American policing).  *See* Int'l Assoc. Chiefs of Police, *Promoting Transparency, Accountability, Coordination, & Officer Safety in Immigr. Enf't Operations* (Aug. 2025), *available at* https://www.theiacp.org/sites/default/files/2025-08/Face_Coverings.pdf (issuing a resolution asserting, in part, that "the use of face coverings and the absence of visible identification during enforcement operations can create confusion, fear, and mistrust among community members and responding agencies, potentially increasing operational risks and eroding public confidence" and that "clearly visible agency affiliation and unique identifiers—such as badge numbers or alphanumeric codes—enhance both accountability and officer safety, and align with long-standing policing practices").

11

1  the need for procedural justice in law enforcement, consistent with constitutional

2  due process and equal protection principles. The court's jurisprudential

3  consideration of these principles is central to its constitutional merits determination.

4

5  DATED:  December 23, 2025          Respectfully submitted,

6

7                                    By:/s/ Tanya Broder
                                     TANYA BRODER (SBN # 136141)
8                                    broder@nilc.org
                                     NATIONAL IMMIGRATION LAW
9                                    CENTER
10                                   3450 Wilshire Blvd., No. 108-62
                                     Los Angeles, CA 90010
11                                   Tel:  (213) 639-3900
                                     Fax:  (213) 639-3911
12

13                                   EFRÉN C. OLIVARES*
14                                   olivares@nilc.org
                                     NATIONAL IMMIGRATION LAW
15                                   CENTER
16                                   P.O. Box 34573
                                     Washington, D.C. 20043
17                                   Phone: (213) 639-3900
18                                   Facsimile: (213) 639-3911

19

20                                   LEAH BROWNLEE TAYLOR*
                                     brownleetaylor@nilc.org
21                                   NATIONAL IMMIGRATION LAW
22                                   CENTER
                                     P.O. Box 34573
23                                   Washington, D.C. 20043
24                                   Tel:  (202) 216-0261
                                     Fax:  (202) 216-0266
25

26                                   HANNAH KARIN COMSTOCK
                                     (SBN # 311680)†
27                                   hcomstock@socialjusticelaw.org

28

12

1   SOCIAL JUSTICE LEGAL
2   FOUNDATION
    523 W 6th St, Suite 450
3   Los Angeles, CA 90014
    Tel:  (213) 259-2503
4
5   † Designated Local Counsel
6
7   *  r          application forthcoming

13

### CERTIFICATE OF CONFERENCE

I hereby certify that counsel for *Amicus Curiae* have complied with the meet and confer requirements of Local Rule CV-7(h). The parties consent to the filing of this motion.

*/s/ Tanya Broder*
Tanya Broder

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on December 23, 2025, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Tanya Broder*
Tanya Broder

14

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for *Amicus Curiae* certifies that this brief contains 2780 words, which complies with the word limit of L.R. 11-6.1.


DATED:  December 23, 2025                    */s/ Tanya Broder*
                                                              Tanya Broder